No. 2023-1137

# United States Court of Appeals for the Federal Circuit

3G LICENSING, S.A.,

*Appellant*

v.

HONEYWELL INTERNATIONAL INC., SIERRA WIRELESS, INC., TCL COMMUNICATION TECHONOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) HOLDINGS, INC., THALES DIS AIS DEUTSCHLAND GMBH,

*Appellees.*

On appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2021-00584

**PRINCIPAL BRIEF OF APPELLANT 3G LICENSING, S.A.**

Timothy Devlin
tdevlin@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorney for Appellant*
*3G Licensing, S.A.*

Corrected on April 4, 2023

Relevant claims of U.S. Patent No. 7,551,625 ("'625 patent") include:

16. A method of scheduling an uplink packet transmission channel for user equipment (UE), the method comprising:

> receiving a scheduling assignment in Enhanced Absolute Grant Channel (E-AGCH), wherein the scheduling assignment comprises an identifier for a plurality of UE;
>
> acquiring the contents of the scheduling assignment; and
>
> transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment.

17. The method of claim 16, wherein one of two identifiers are allocated to each EU.

18. The method of claim 16, wherein the scheduling contents include a scheduled power command for assigning a specific amount of power for the uplink pack transmission.

19. The method of claim 16, wherein the scheduling contents include a duration command for determining a length of period the scheduling assignments remains effective.

21. The method of claim 16, where in the scheduling assignment includes a command granting or denying transmission in the E-DCH.

22. The method of claim 16, wherein each EU of a shared channel in the E-AGCH has at least one UE identifier.

39. A method of scheduling a plurality of uplink packet transmission channels for corresponding plurality of user equipment (UE), the method comprising:

> receiving a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH), wherein the content of the scheduling assignment includes an identifier associated with a plurality of UE; and

[*continued on next page*]

transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) in accordance with the content of the scheduling assignment.

40. The method of claim 39, wherein the content of the scheduling assignment includes information relating to the uplink transmission, and wherein two identifiers are allocated at least on EU.

42. The method of claim 40, wherein the content of the scheduling assignment further includes a command granting or denying transmission in the E-DCH.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1137

**Short Case Caption** 3G Licensing, S.A. v. Honeywell International, Inc.

**Filing Party/Entity** 3G Licensing, S.A.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/04/2023

Signature: /s/ Timothy Devlin

Name: Timothy Devlin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Sisvel S.p.A. | | Sisvel International S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Timothy Devlin (Devlin Law Firm) | Neil Benchell (Devlin Law Firm) | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ vi

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 1

INTRODUCTION ........ 2

STATEMENT OF THE ISSUES ........ 5

STATEMENT OF THE CASE ........ 6

I. The Parties ........ 6

II. background Technology ........ 6

A. The ’625 Patent And Relevant Claims ........ 8

III. Relevant ’625 Patent Claims ........ 12

IV. Asserted References ........ 13

A. The 3GPP References ........ 13

1. Meeting45 ........ 13

2. Meeting39 ........ 14

3. Meeting45bis ........ 15

B. Chen ........ 16

V. Procedural History ........ 16

SUMMARY OF THE ARGUMENT ........ 24

ARGUMENT ........ 27

I. Standard of Review ........ 27

II. The Board Erred when construing E-AGCH ........ 28

A. The Meaning Of E-AGCH Is Clear From The Intrinsic Record— "A Single Common Grant Channel Capable Of Assigning Multiple Identifiers To A Single UE That Transmits Scheduling Grants To A Single User Equipment, Groups Of User Equipment, Or All User Equipment On The Channel" ..............................29

B. The Board's Construction Of E-AGCH Was Legally Erroneous Because It First Settled On An Extrinsic Definition For That Term And Then Demanded Disclaimer Or Redefinition From The Intrinsic Record .....................................33

C. The Board's Construction Of E-AGCH Erroneously Ignored Evidence Of Redefinition By The Patentee.........................................................................36

III. Under a correct construction of E-AGCH, the challenged claims cannot be found invalid on the record here .........................................................................39

IV. Under The Board's Construction For E-AGCH, The Board Erred in determining That the '625 patent is not entitled to the priority date of the korean application ..........................................................................................................42

V. CONCLUSION ...........................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Andrx Pharms., Inc.*
473 F.3d 1196 (Fed. Cir. 2007) ... 30

*Airbus S.A.S. v. Firepass Corp.*,
941 F.3d 1374 (Fed. Cir. 2019) ... 42

*Ariosa Diagnostics v. Verinata Health, Inc*.,
805 F.3d 1359 (Fed. Cir. 2015) ... 27

*Chemours Co. FC, LLC v. Daikin Indus*.,
4 F.4th 1370 (Fed. Cir. 2021) ... 27

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ... 27

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ... 28

*Gemtron Corp. v. Saint-Gobain Corp.*,
572 F.3d 1371 (Fed. Cir. 2009) ... 45

*Highmark Inc. v. Allcare Health Mgt. Sys., Inc.*,
572 U.S. 559 (2014) ... 28

*Hill-Rom Servs. Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ... 23

*Icon Health & Fitness, Inc. v. Strava, Inc.*
849 F.3d 1034 (Fed. Cir. 2017) ... 45

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ... 42

*Microthin.com Inc. v. SiliconeZone USA, LLC*,
377 Fed. Appx. 8 (Fed. Cir. 2010) ... 20

*Norian Corp. v. Stryker Corp*.
432 F.3d 1356 (Fed. Cir. 2005) ... 30

*Philips v. AWH Corp.*,
415, F.3d 1303 (Fed. Cir. 2005) ... 22, 25, 35

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
780 F. App'x 880 (Fed. Cir. 2019) ......................................................42

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017) ......................................................28

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) ......................................................27

*Shinseki v. Sanders*,
556 U.S. 396, 406 (2009) ......................................................39

*Sinorgchem Co. v. ITC*,
511 F.3d 1132 (Fed. Cir. 2007) ......................................................30

*Tex. Digital Sys. v. Telegenix, Inc.*
308 F.3d 1193 (Fed. Cir. 2002) ......................................................35

*Tex. Digital Sys. v. Telegenix, Inc.*,
308 F.3d 1193 (Fed. Cir. 2002) ......................................................25

*TiVo, Inc. v. Echostar Communs. Corp.*,
516 F.3d 1290 (Fed. Cir. 2008) ......................................................30

*TriVascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016) ......................................................27

*Trs. Of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ......................................................35

*Vitronics Corp. v. Conceptronic*,
90 F.3d 1576 (Fed. Cir. 1996) ......................................................21

*Wasica Fin. GmbH v. Cont'l Auto Sys.*,
853 F.3d 1272 (Fed. Cir. 2017) ......................................................45

**Statutes**

37 C.F.R. 42.23 ......................................................25

5 U.S.C. § 706 ......................................................27

## STATEMENT OF RELATED CASES

This appeal concerns the Final Written Decision ("FWD") issued by the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("PTAB" or the "Board") in Case No. IPR2021-00584 finding claims 16-19, 21, 22, and 39 of U.S. Patent No. 7,551,625 ("the '625 patent") unpatentable as anticipated and claims 40 and 42 unpatentable as obvious.

No other appeal in or from that same proceeding was previously before this or any other appellate court. Except for the following matters that also concern the '625 patent, counsel is unaware of any other case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision:

*Sisvel Int'l S.A. v. Honeywell Int'l, Inc.,* No. 20-cv-00652 (D. Del.);

*Sisvel Int'l S.A. v. Xirgo Techs.,* No. 20-cv-00659 (D. Del.);

*Sisvel Int'l S.A. v. HMD Am., Inc..,* No. 20-cv-22061 (S.D. Fla.);

*Sisvel Int'l S.A. v. VeriFone, Inc.*, No. 20-cv-00656 (D. Del.);

*3G Licensing S.A. v. TCL Commc'n Tech. Holdings Ltd.,* No. 20-cv-00654 (D. Del.).

## JURISDICTIONAL STATEMENT

The Board issued its Final Written Decision on September 12, 2022, under its jurisdiction to conduct IPR proceedings pursuant to 35 U.S.C. § 314. Appellant 3G Licensing, S.A. ("3G") filed a timely notice of appeal under 35 U.S.C. §§ 141-

142 and 37 C.F.R. § 90.2 on November 4, 2022. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## INTRODUCTION

3G appeals the Board's invalidation of claims 16-19, 21, 22, 39, 40, and 42 (the "invalidated claims") of the '625 patent as obvious or anticipated based on various "3GPP References" that postdated the '625 patent's priority date based on its foreign parent application (the "Korean Application").

Key to the Board's invalidity decision was its construction of the term "Enhanced Absolute Grant Channel." Rather than start from the intrinsic evidence to determine the meaning of that term to a POSITA *within the context of the '625 patent*, the Board instead turned to extrinsic evidence and declared that *outside* the '625 patent that term had an established meaning to a POSITA that included certain functionality purportedly absent from the disclosure in the Korean Application (which meant the '625 patent could not claim priority to the Korean Application and the 3GPP References qualified as prior art). To the Board, that broad extrinsic definition controlled the claim construction inquiry unless the patentees otherwise clearly and unequivocally redefined the term more narrowly in their patent. But as this Court held *en banc* in *Philips*, that backwards approach to claim construction is legally erroneous. The understanding of a POSITA within the context of the patent—not extrinsic evidence—controls the meaning of a claim term. That is why

a proper claim construction inquiry *starts* with the intrinsic evidence and then turns to extrinsic evidence *only if the intrinsic record is unclear*. And here the intrinsic record is clear. For instance, the specification expressly teaches that "Enhanced Absolute Grant Channel" ("E-AGCH") in context of the '625 patent means a single common grant channel that transmits scheduling grants to one user equipment, groups of user equipment, or all user equipment ("UE") on the channel, wherein that channel supports a single UE being assigned multiple identifiers. Appx110 at 3:10-25, 3:42-50. Nothing in that clear intrinsic meaning of the term requires more than one common grant channel or support for assignments of just single identifiers—the broader functionality that the Board injected from its extrinsic definition of E-AGCH to break the '625 patent's priority chain. Indeed, the Board plucked such advanced functionality for absolute grant channels from 3GPP References that *postdated* the Korean Application itself, which raises the basic question of how could the patentees disclaim functionality that did not even exist at the time of the patent? The answer is simple—they couldn't, and didn't because their E-AGCH was simpler. Under the proper construction for E-AGCH, there is clear specification support in the Korean Application, which means the '625 patent rightfully claims priority to it, the core 3GPP References are not prior art, and reversal is warranted.

But even if the Court were to adopt the Board's extrinsic-first approach to claim construction here, the Board's decision should at least be vacated and

remanded because the Board erroneously excluded 3G's argument and evidence rebutting that extrinsic definition. The Board ruled that a portion of 3G's evidence and argument regarding that definition came too late because it appeared in 3G's Sur-Reply and "was not originally set forth in Patent Owner's Response[.]" Appx31. But 3G's arguments and evidence were in keeping with 37 C.F.R. 42.23(b)—they were directly responsive to an argument raised by Honeywell for the first time in its Reply and did not contain any new evidence. *See* Appx600-601. At minimum, this requires remand for the Board to reconsider the extrinsic evidence in light of the full evidentiary record.

If the Board's faulty construction ultimately prevails (which it should not), the Board wrongly applied it to find that the '625 patent was not entitled to its earliest priority date. 3G provided significant unrebutted testimony regarding the knowledge of a POSITA that was either unaddressed, ignored, or discounted in favor of mere attorney argument. 3G presented the Board with testimony from its expert, Mr. Lipoff, who provided comparisons between the key figures of the '625 patent and the Korean Application as well as portions of the specification, and explained that a POSITA would have been able to glean the innovations of the former from the latter. Appx1391. Yet the Board did not address this evidence in its Final Written Decision at all (which alone requires remand). Nor did the Board properly consider Mr. Lipoff's unrebutted testimony that a POSITA would understand the Korean

Application to disclose the concept of "absolute grants." Appx263-264; Appx487-488; Appx3317; Appx3187 at 33:6-10. The Board inexplicably dismissed that evidence because Mr. Lipoff relied upon his experience with a standard known as DOCSIS, which he opined a POSITA would be familiar with. As Mr. Lipoff explained—unrebutted by Honeywell's expert—that DOCSIS was foundational to the discussions in the field of the '625 patent and the Korean Application and would have been familiar to a POSITA, yet because DOCSIS was not developed by 3GPP, the Board dismissed Mr. Lipoff's testimony.

The Board's errors warrant reversal, or at least remand.

## STATEMENT OF THE ISSUES

1. Did the Board err in construing "Enhanced Absolute Grant Channel?"

2. Under a correct construction of "Enhanced Absolute Grant Channel," can the challenged claims of the '625 patent be found invalid on the record below?

3. If the Board's construction for "Enhanced Absolute Grant Channel" stands, did the Board err when concluding that the '625 patent was not entitled to the priority date of its foreign application for lack of sufficient written description support in the foreign application when 3G provided supporting evidence that the Board either did not consider at all or did not consider properly?

## STATEMENT OF THE CASE

### I. THE PARTIES

3G is a world leader in fostering the development and management of intellectual property, including in the wireless 3GPP cell phone arena. 3G is also a well-known contributor to policy discussions with government bodies on intellectual property matters.

Appellees Honeywell International Inc., Sierra Wireless, Inc., TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Holdings, Inc., Thales DIS AIS Deutschland GmbH, (collectively, "Honeywell") make and sell cellular products that use 3G's patented 3GPP technology.

### II. BACKGROUND TECHNOLOGY

The '625 patent relates to cell phone technology, specifically improvements in allocating network resources in cellular networks. Appx105; Appx109. For instance, the patent teaches a method by which a cell tower can provide a cell phone with a "scheduling assignment" (also known as a "scheduling grant" or "grant"). Appx109 at 1:34-44. A scheduling assignment is a bundle of data that generally pertains to the amount of available network resources, and often contains how much bandwidth on that network a cell phone is allowed to use. Appx110. Scheduling assignments are often described as "downlink," a term that generally describes things that go from a cell tower "down" to a cell phone, or that have the same

orientation. Appx3230 at ¶ 40. A data packet, for example, may be described as "downlink" because it is sent from cell tower to cell phone, and a channel dedicated to conveying such packets from a cell tower to a cell phone may also be described as a "downlink" channel. *See id.*

There are two kinds of scheduling assignments relevant here: "relative" grants and "absolute" grants. *Id.* A relative grant tells a cell phone to increase, decrease, or maintain its usage of network resources relative to a previous grant/assignment. *Id.* An absolute grant is comparatively self-sufficient—it tells a cell phone the maximum amount of network resources the cell phone can use (regardless of any previous grant/assignment). *Id.*

At the time of the '625 patent's invention (April 2, 2004), there were an increasing number of cell phones (also referred to as "user equipment" or "UE") in circulation, many with greater data-use capabilities than prior iterations of cell phones. Appx3230-3231 at ¶41. In other words, cell phones were beginning to tax cellular networks, and there were more cell phones competing for limited resources. *Id.* As a result, a need arose to make a network's allocation of resources (i.e., "bandwidth") more efficient in the face of increasing strain on base stations (e.g., cell towers). *Id.*

### A. The ’625 Patent And Relevant Claims

The ’625 patent solved problems concerning the communication of messages from a base station to a user equipment (“UE”) regarding the use of network resources. A base station is the anchor-point of a network and allows a UE to access a cellular network. A base station (or what the ’625 patent often refers to as “Node B,” particularly in its figures) most often takes the form of a cell tower in day-to-day consumer use. Appx109; Appx3231-3232. Likewise, a UE is typically a cell phone. *See*, Appx109; Appx3231-3232. In the ’625 patent, a base station is the source of information passed on to the UE about how the UE are permitted to use the network and its resources, as well as other relevant information. Appx109; Appx3231-3232 at ¶¶ 45-46.

A number of UEs are associated with that base station. Appx109; Appx3232 at ¶ 46. Those associated UEs are connected to the base station via channels that transmit information from the base station to the UE and vice versa. As discussed above, these channels are known as downlink and uplink channels respectively. To help regulate the amount of network resources being used by the UE via the uplink channels, the ’625 patent teaches the use of a dedicated downlink channel. The patent calls this channel the Enhanced Absolute Grant Channel (“E-AGCH”). Appx110; Appx3232 at ¶ 47.

The E-AGCH of the ’625 patent serves as a channel dedicated to telling the UE how much of the network’s resources the UE may use. Appx110. The E-AGCH of the ’625 patent accomplishes this task by providing a single UE multiple identifiers so that it can issue scheduling assignments more efficiently. Appx107; Appx110; Appx3235-3236 at ¶ 55; Appx3237-3238 at ¶¶ 61-62.

The E-AGCH channel works in the same way. Because they are assigned an individual, group and universal identifier, a UE can receive communications through the channel individually, as part of a group, or the channel can communicate at once with all UEs connected to the network. *See* Appx107 at Fig. 2; Appx3238 at ¶¶ 62-63.

Figure 2 of the ’625 patent provides a visual explanation of how this operation works in a cellular network:

FIG. 2




Appx107 at Fig. 2. In Figure 2, the box labeled Node B is a base station, or in the university email hypothetical above, the student. *See* Appx111. Each UE are assigned individual identifiers, such as UE1 or UE2. *Id.*; Appx3238 at ¶ 62. There are also identifiers for groups of UEs, as indicated by grouping bands labeled SA-G1 and SA-G2 which can receive scheduling assignments simultaneously among all UE in the grouping. Appx111; Appx3238 at ¶ 62. The E-AGCH also contains a third identifier, here represented by the large grouping band labeled SA-all that pertains to all UEs on the channel. Appx111; Appx3238 at ¶ 62.

The E-AGCH of the '625 patent makes use of absolute grants, but is in no way limited to using just them. The specification defines the channel broadly in that regard:

> An Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send *a scheduling command* to an user equipment. In other words, Node B transmits *a command as to how much transmission power or level of data rate transmission an UE is permitted to transmit*. This is also known as uplink scheduling or scheduling assignment.

Appx110 at 3:14-20. The ’625 patent simply states that an E-AGCH is used to transmit a scheduling command (i.e., a grant) to a UE. *Id.* There is no reference to the grant needing to be absolute or relative because there is no requirement that the content of the transmission either pertain to or ignore previous transmissions; the ’625 patent simply states that the E-AGCH is used to issue grants *generally*.

The ’625 patent derives its priority date from Korean patent application 10-2004-0022960 (the “Korean Application”) filed on April 2, 2004. Appx105; Appx1377. While the Korean Application contemplates the use of multiple channels for use in issuing scheduling assignments, it also teaches the use of a single common grant channel sharing all of the properties of the ’625 patent’s E-AGCH, though it does not call the channel by that specific name. *See* Appx1391; Appx1392 at Fig. 2; *see also* Appx3238-3241 at ¶¶ 63-66. Claim 1 of the Korean Application specifically teaches the transmitting of the scheduling assignment to a single UE, a group of UE, or all UE on the channel, while claim 2 couples this teaching with the use of multiple identifiers for the same purpose. Appx1388 at claims 1 & 2.

## III. RELEVANT ’625 PATENT CLAIMS

Relevant here, claims 16-19, 21, 22, 39, 40 and 42 of the ’625 patent address inventive uplink packet transmission channel scheduling systems and methods and read as follows:

16. A method of scheduling an uplink packet transmission channel for user equipment (UE), the method comprising:

> receiving a scheduling assignment in Enhanced Absolute Grant Channel (E-AGCH), wherein the scheduling assignment comprises an identifier for a plurality of UE;
>
> acquiring the contents of the scheduling assignment; and
>
> transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment.

17. The method of claim 16, wherein one of two identifiers are allocated to each EU.

18. The method of claim 16, wherein the scheduling contents include a scheduled power command for assigning a specific amount of power for the uplink pack transmission.

19. The method of claim 16, wherein the scheduling contents include a duration command for determining a length of period the scheduling assignments remains effective.

21. The method of claim 16, where in the scheduling assignment includes a command granting or denying transmission in the E-DCH.

22. The method of claim 16, wherein each EU of a shared channel in the E-AGCH has at least one UE identifier.

39. A method of scheduling a plurality of uplink packet transmission channels for corresponding plurality of user equipment (UE), the method comprising:

> receiving a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH), wherein the content of the scheduling assignment includes an identifier associated with a plurality of UE; and
>
> transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) in accordance with the content of the scheduling assignment.

40. The method of claim 39, wherein the content of the scheduling assignment includes information relating to the uplink transmission, and wherein two identifiers are allocated at least on EU.

42. The method of claim 40, wherein the content of the scheduling assignment further includes a command granting or denying transmission in the E-DCH.

Appx111-113.

## IV. ASSERTED REFERENCES

### A. The 3GPP References

Honeywell relies upon a series of 3GPP (3rd Generation Partnership Project) documents that were each published ***after*** the ’625 patent’s priority date based on the Korean Application. *See* Appx257. Herein, 3G will refer to those documents collectively as the “3GPP References.”

#### 1. Meeting45

Honeywell’s primary reference “Meeting45” is officially titled “TDoc R2-047730, *Inclusion of e.g. physical layer model, MAC architecture, detail Node B scheduler mechanism and QoS Control principles*, 3GPP TSG-RAN2 Meeting #45, Shin-Yokohama, Japan.” *See* Appx257. Meeting45 is a change request document

pertaining to how base stations and UE are to behave when signaling one another to indicate changes in bandwidth availability or consumption. *Id.*

Specifically, Meeting45 proposes a "new dedicated transport channel type," that transmits absolute grants from a base station, that channel "called E-AGCH." Appx1154-1155; Appx1158. The E-AGCH defined in Meeting45 issues absolute grants to a UE, but unlike the '625 patent's use of multiple identifiers issued to a single UE, only "one identity (E-RNTI) is allocated to a UE at a time." Appx1168. Nonetheless, the Board found that Meeting45 was sufficient to invalidate the challenged claims of the '625 patent under § 102. Appx42.

Meeting45 was published in December 3, 2004—well after the '625 patent's April 2, 2004 priority date.

**2. Meeting39**

"Meeting39," or more formally, Tdoc R1-041512, *Introduction of E-DCH*, by Ericsson, 3GPP TSG-RAN WG1 Meeting #39, Yokohama, Japan, was also relied upon by Honeywell, and is the result of another 3GPP working-group meeting. Appx1174. As with the other 3GPP References, Meeting39 was published after the '625 patent's priority date by Honeywell's own admission. Appx143.

Meeting39 describes the 3GPP's E-AGCH as pertaining solely to absolute grants—a requirement not found in the '625 patent. *Compare* Appx1219 *with* Appx110.

The Board, however, declined to make any findings pertaining to Meeting39, and found invalidity for claims 16-19, 21, 22, and 39 based solely on Meeting45 under § 102, and invalidity for claims 40 and 42 based on obviousness in view of Meeting45 and Meeting45bis. Appx42.

### 3. Meeting45bis

Honeywell also relied upon "Meeting45bis," officially titled TDoc R-2050136, *E-DCH Priority Based Scheduling*, 3GPP TSG-RAN WG2 Meeting#45bis, Sophia Antipolis, France. Meeting45bis is the result of a working group meeting subsequent to Meeting45, and is so signified by the "bis" suffix 3GPP typically appends under such circumstances. Appx3234. This temporary document contains guidelines that seek to minimize scheduling delay between base stations and UE by assigning two identifiers to a UE. Appx1376 ("Specify that the UE shall monitor ***two identities*** on the E-AGCH"); Appx3234. Notably, this differs from the capabilities of the '625 patent's E-AGCH, which is capable of assigning three identities, one for an individual UE, one for a group of UEs, and one for all UEs on the channel. Appx111; Appx3238.

By Honeywell's own admission, Meeting45bis was published no later than January 7, 2005, well beyond the '625 patent's priority date. Appx144.

### B. Chen

Honeywell stated in its Petition that it relied on U.S. Patent No. 7,155,236 ("Chen") only insofar as the challenged claims did not require "an Enhanced Absolute Grant Channel." Appx145. Chen discloses the use of a "Forward Grant Channel," or "F-GCH" which is capable of issuing scheduling grants from a base station to a UE. Appx1359. In one embodiment, Chen describes that grants may be given to a group of UE through the use of "a common (group) ID that is assigned to mobile stations in the group." Appx1364. Chen provides no disclosure, however, as to how or why individual control of a UE may also be permissible in such an embodiment as required by each claim, properly construed. Appx1364; Appx3234.

As with Meeting39, the Board declined to make any findings pertaining to Chen, as it found invalidity for the challenged claims on other grounds. Appx42.

## V. PROCEDURAL HISTORY

On March 4, 2021, Honeywell petitioned for *inter partes* review ("IPR") of claims 16-19, 21, 22, 39, 40, and 42 of the '625 patent. Appx114-201. Honeywell's Petition asserted five grounds of invalidity: grounds 1 and 4 on a § 102 basis, and grounds 2, 3, and 5 on a § 103 basis. Appx126. Core to Honeywell's arguments in its Petition was that either (1) the term E-AGCH was required by the claims, in which case the '625 patent would not be entitled to its priority date from the Korean Application, and would thus have to contend with the 3GPP References, or (2) the

term E-AGCH was not required by the claims, and thus the claims were invalidated by Chen, which does not disclose such a channel. *See* Appx123-125. 3G filed a Preliminary Response addressing these asserted grounds of unpatentability on June 15, 2021. Appx241-277. 3G's Preliminary Response included the following proposed construction for the claim term "E-AGCH": "a single common grant channel capable of assigning multiple identifiers to a single UE that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel." Appx255. 3G argued that because the Korean Application provided written description support for the '625 patent's E-AGCH, it was entitled to its priority date, which would eliminate the 3GPP References from consideration under § 102. Appx247. Further, Chen failed to invalidate the claims of the '625 patent because it failed to disclose two aspects of the E-AGCH channel. Appx266-272.

On July 26, 2021, a conference call was held between 3G, Honeywell, and Judges Parvis and Ullagaddi at the request of Honeywell. Appx279. Honeywell requested leave to file a reply to Patent Owner's Preliminary Response, seeking "an opportunity to address an unforeseeable claim construction that Patent Owner presented and purported to use to establish a different priority date and to distinguish prior art." *Id.* 3G opposed, asserting that Honeywell sought to "gap fill" and supplement its Petition, and the claim construction was not unforeseeable:

Honeywell claimed E-AGCH was a "term of art, [and so] Petitioner should have explained that, along with how to interpret such a claim term, in the Petition." *Id.* The Board granted additional briefing on 3G's claim construction. Honeywell filed its Reply in Support of Petition for *Inter Partes* Review on August 4, 2021, asserting that no claim terms required any construction beyond their plain and ordinary meaning. Appx297-309. 3G filed its Sur-Reply to Honeywell's Reply in Support of Petition for *Inter Partes* Review on August 12, 2021, providing further support for its position and attacking Honeywell's assertions that the term E-AGCH was an established term of art at the time of the filing of the '625 patent. Appx310-325.

On September 14, 2021, the Board granted institution on all challenged claims on all grounds. Appx388. Central to the Board's decision to institute was its declining to adopt the 3G's claim construction of E-AGCH. *See* Appx364. 3G had argued that the E-AGCH of the '625 patent differed from that evidenced in the 3GPP References, and that the patentee was acting as his own lexicographer by setting forth a definition that had different requirements, such as the use of multiple identifiers and the lack of a requirement for absolute grants. *See* Appx362. Nevertheless, the Board agreed with Honeywell that E-AGCH was a term of art consistently used in the 3GPP References to refer to a downlink channel used for issuing absolute grants, and further construed the term to require that the E-AGCH pertain to absolute grants. Appx364. The Board also found that 3G's proposed

construction included some ambiguity as to whether the E-AGCH itself was assigning multiple identifiers rather than the base station. Appx366.

In in its Response to institution (Appx468-497), 3G provided an updated construction of the term E-AGCH seeking to address this last point from the Board:

> [3G] proposes a different wording for the construction of the term E-AGCH that makes clear that the channel supports the use of multiple identifiers for a single UE and that channel itself does not do the assigning: "a single common grant channel that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel, said channel supporting a single UE being assigned multiple identifiers."

Appx483. In support of its revised construction, 3G rebutted numerous assertions made by the Board in its Institution Decision. Though the Board found that the '625 patent's specification "[did] not limit E-AGCH to a ***single***[1] channel," 3G noted that it had previously submitted three instances of the '625 patent and Korean Application demonstrating the E-AGCH as a single channel. Appx484. Consistent with this Court's holding in *Philips*, 3G offered the language of the specification as the best evidence of this fact which had been improperly discounted by the Board: "[a]n Enhanced Absolute Grant Channel (E-AGCH) *is a downlink channel*[2] used by a base station (Node B) to send a scheduling command to an user equipment (UE.)."

[1] Emphasis original.
[2] Emphasis original.

3G also reinforced its prior arguments that both Honeywell and the Board were reading requirements into the claims that did not exist:

> On the specific matter of the channel supporting only absolute grants, the ’625 patent’s specification is transparent; *there is simply no requirement than an E-AGCH pertain only to absolute grants:*[3]
>
> An Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send a scheduling command to an user equipment (UE). In other words, Node B transmits a command as to how much transmission power or a level of data rate transmission an UE is permitted to transmit. This is also known as uplink scheduling assignment or scheduling assignment. Under E-AGCH, each frame of the downlink transmission from Node B of scheduling assignment includes UE identifier (UE ID) and scheduling content. The UE ID is used to identify the receiving UE of the scheduling assignment for an uplink packet transmission.

Appx486. To the Board’s consideration that to acknowledge the specification’s lack of a requirement as to absolute grants would somehow be improper because the term “Enhanced Absolute Grant Channel” contains the words “Absolute Grant,” 3G countered that under *Vitronics Corp. v. Conceptronic* and *Microthin.com Inc. v. SiliconeZone USA, LLC*, the Board disregarded this Court’s clear precedent that reading-in requirements from third-party references is a practice only undergone when there is ambiguity in the claim term. *See* Appx486-487 (citing *Microthin.com Inc. v. SiliconeZone USA, LLC*, 377 Fed. Appx. 8, 10, (Fed. Cir. 2010); *Vitronics*

[3] Emphasis original

*Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). No such ambiguity exists with the ’625 patent’s explicit definition.

To the extent that the Board nonetheless required that the channel pertain to absolute grants, 3G provided the expert testimony of Mr. Stuart Lipoff, who provided testimony indicating that the Korean Application disclosed the concept of absolute grants because a POSITA would have understood that its scheduling grants pertained to them even if the term “absolute grants” was not used. Appx3318-3319 at ¶¶ 23-25. Mr. Lipoff based his testimony on his familiarity with a non-3GPP standard called DOCSIS, which he testified was “the foundation on which 3GPP wrote the air interface standards that are directly at issue in this case.” Appx3187 at 33:6-10.

In its Reply, Honeywell re-asserted its arguments that (1) E-AGCH was a term of art established by 3GPP at the time of the ’625 patent’s filing; (2) 3G had not established that the E-AGCH of the ’625 patent was not restricted to absolute grants; and (3) thus 3G had not established that the patentee was acting as a lexicographer in drafting a definition of E-AGCH in the ’625 patent’s specification. Appx595-603. Honeywell provided examples from the specification purporting to show that the ’625 patent’s E-AGCH was not limited to a single common grant channel to further attack 3G’s claim construction. Appx604-605. Honeywell’s only response

to Mr. Lipoff's assertions regarding the Korean Application's disclosure of absolute grants was mere attorney argument. *See generally* Appx606-610.

3G emphasized the poor foundation of Honeywell's arguments for the Board in its Sur-Reply. *See* Appx626-658. 3G (once more) addressed Honeywell's repeated insistence that "by its very name" the '625 patent's E-AGCH must be used solely for absolute grants by providing the uncontested fact that the '625 patent's definition holds no such requirement. Appx640. To Honeywell's confused point that "Patent Owner's argument is akin to saying that an organization called the Patent Trial and Appeal Board is not 'required' to adjudicate 'patents; trademarks and copyrights' are close enough," 3G noted that if one were to determine what the PTAB adjudicates, one would not rely on the name, but on the documents outlining its authority. Appx640. In much the same way, under this Court's precedent, if one wanted to know what a term concerned, one would not look to its name, but to the specification, which has long been established to be "the single best guide to the meaning of a disputed term," and indeed "[u]sually, it is dispositive." Appx641 (quoting *Philips v. AWH Corp.*, 415, F.3d 1303, 1315 (Fed. Cir. 2005)).

The Board issued its FWD on September 12, 2022, and held all challenged claims unpatentable. Appx1-45. In its Decision, the Board adopted Honeywell's recapitulated positions, and stuck largely to its findings in the Institution Decision. Because the 3GPP documents set forth an internally consistent version of an

E-AGCH, the Board determined that the 3GPP documents established that the term "E-AGCH" was a term of art at the time of the filing of the '625 patent. *See* Appx13-14. Under the terms of the 3GPP's definition of an E-AGCH adopted by the Board, the channel must pertain to absolute grants. Appx12; Appx18-19. Despite 3G's citations to the plain language of the specification which contain ***absolutely no reference*** to ***any*** requirement that the '625 patent's E-AGCH pertaining solely to absolute grants, and which ***do*** contain reference to the use of three identifiers—both of which are absent from the 3GPP's definition of the term—the Board nonetheless found that there was no evidence that the patentee sought to differentiate the '625 patent's E-AGCH from that which the Board determined was the established term of art. Appx15-18. The Board similarly found that there was no evidence of disclaimer under *Hill-Rom*. Appx18 (citing *Hill-Rom Servs. Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014). In so ruling, the Board improperly refused to consider evidence of the differences between the 3GPP's definition of an E-AGCH and the E-AGCH of the '625 patent. Appx31. Further, the Board discounted Mr. Lipoff's opinions regarding the Korean Application's disclosure of absolute grants by dismissing his testimony because it relied upon his knowledge of DOCSIS—a standard which Mr. Lipoff stated in unrebutted testimony was *foundational* to the technology being discussed in this case. Appx25; *see also* Appx3187 at 33:6-10.

The Board's improper finding that the E-AGCH of the '625 patent was the same as the E-AGCH used by the 3GPP References rendered the rest of the Board's analysis incorrect. The Board found that there was no support for the 3GPP's definition of an E-AGCH in the Korean Application that underlies the '625 patent, and thus the '625 patent was not entitled to its April 2, 2004 priority date. *See* Appx11-20; Appx25. This was a deceptively easy conclusion, as Honeywell itself notes that the ***3GPP's version*** of an E-AGCH was not developed until months after the filing of the Korean Application (Appx299)—which is not the '625 patent's version of the E-AGCH that ***is*** supported by the Korean Application. *See* Appx485-488. Without access to its priority date, the Board found that the 3GPP References rendered the '625 patent invalid, as the Board's construction made it impossible for the prior art to ***not*** read on the '625 patent's E-AGCH, despite the explicit language of the specification and the weight of the evidence.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The Board's decision was erroneous for at least two reasons.

(1) First, by applying the incorrect legal standard and declining to consider properly submitted arguments, the Board improperly construed the E-AGCH term. This incorrect construction tainted the Board's subsequent invalidity analysis—from the determination of the appropriate priority date of the '625 patent (*see* Appx21-

25) to the evaluation of whether the asserted prior art disclosed the innovations of the ’625 patent (*see* Appx30-36).

The Board’s claim construction analysis errs at its outset. Rather than relying first on intrinsic evidence to determine whether the inventors had defined the term E-AGCH meant to a POSITA in the context of the ’625 patent, the Board’s analysis began by determining whether an ordinary meaning existed as to the term E-AGCH based on extrinsic evidence, and *then* evaluated whether the patentee acted as a lexicographer in distinguishing from or disavowing parts of that ordinary meaning. Appx11-18.

This is precisely the order of analysis rejected by this Court in *Philips*: improperly limiting the role of the specification in claim construction by creating a presumption in favor of an extrinsic definition of a claim term in an out-of-context third-party reference and then determining if that external definition was “overcome by ‘an explicit definition of the term different from its ordinary meaning’ or whether the inventor ‘has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.’” *Philips v. AWH Corp.*, 415 F.3d 1303, 1320-1321 (Fed. Cir. 2005) (*quoting Tex. Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002)).

The Board then compounded this error by refusing to consider 3G’s claim construction arguments properly submitted under 37 C.F.R. 42.23(b), as they were

directly responsive to arguments raised by Honeywell in its Reply and did not rely on any new evidence. Appx25-26. 3G argued that the E-AGCH espoused by the 3GPP differed from that of the ’625 patent, and that this provided evidence of the patentee acting as their own lexicographer. Appx643. Specifically, that the E-AGCH of the ’625 patent is capable of issuing scheduling assignments to different groups of UE using three sets of identifiers—a capability not found in any 3GPP Reference asserted by Honeywell. *See id.* This evidence was raised by Patent Owner as early as its Preliminary Response (Appx256; Appx269-272; Appx479-482), yet the Board nonetheless stated that this was new evidence for a new argument and thus flatly declined to consider the argument, despite the dictates of 37 C.F.R. 42.23(b).

(2) Second, even had the Board’s construction followed precedent and the evidence in the record, the Board’s subsequent determination of the priority date for the ’625 patent was not supported by substantial evidence.

In finding an incorrect priority date, the Board disregarded the testimony of Appellant’s expert, Stuart Lipoff, as being unsupported. Mr. Lipoff provided a declaration showing written description support for the E-AGCH in the Korean Application. However, the Board wholly ignored Mr. Lipoff’s declaration. *See* Appx21-25. Instead, the Board focused on a different declaration from Mr. Lipoff which contained unrebutted testimony supporting and elaborating on his opinion as

the ’625 patent’s priority date, but which referred to the DOCSIS standard. *See id.* The Board’s rejection of Mr. Lipoff’s testimony regarding whether the Korean Application would be understood to disclose absolute grants to a POSITA is itself unsupported by the record, as it fails to take into account Mr. Lipoff’s prior declaration’s citations to intrinsic evidence.

For the above reasons, the Board’s Decision should be vacated or at least remanded.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court reviews the Board’s legal conclusions *de novo*, and its factual findings for substantial evidence. *Id.*; *see* 5 U.S.C. § 706(2); *see also Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013); *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015); *Chemours Co. FC, LLC v. Daikin Indus.*, 4 F.4th 1370, 1374 (Fed. Cir. 2021). Substantial evidence requires more than a “mere scintilla” and must be enough such that a reasonable mind could accept the evidence as adequate to support the conclusion. *Chemours* 4 F.4th at 1374 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Board’s “ultimate construction,” including analysis of any intrinsic evidence, is reviewed *de novo*. *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1061 (Fed. Cir. 2016) (internal quotation marks omitted). A decision based on legal error constitutes an

abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) (finding that a lower court abuses its discretion if it is based on an erroneous view of the law); *see also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1366 (Fed. Cir. 2017) (citing *Highmark Inc. v. Allcare Health Mgt. Sys., Inc.*, 572 U.S. 559, 563 (2014)).

## II. THE BOARD ERRED WHEN CONSTRUING E-AGCH

The Board's invalidity decision was improperly founded on its erroneous construction of the E-AGCH term (as "hav[ing] the same definition as disclosed in the 3GPP standard documents" that postdate the '625 patent's priority date), which led the Board to declare that the '625 patent could not claim priority to its parent Korean Application and therefore the 3GPP References qualified as invalidating prior art. *See* Appx18. But the meaning of EAGCH is clear—a single common grant channel capable of assigning multiple identifiers to a single UE that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel. Under that proper construction, it is undisputed that the Korean Application discloses the definition of E-AGCH as used in the '625 patent, disqualifying the 3GPP References as prior art, and, thus, warrants reversal or, at minimum, remand.

### A. The Meaning Of E-AGCH Is Clear From The Intrinsic Record—"A Single Common Grant Channel Capable Of Assigning Multiple Identifiers To A Single UE That Transmits Scheduling Grants To A Single User Equipment, Groups Of User Equipment, Or All User Equipment On The Channel"

The intrinsic record is clear—E-AGCH means "a single common grant channel that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel, said channel supporting a single UE being assigned multiple identifiers." Appx483. 3G's expert witness confirmed this would be understood as such by a POSITA. *See* Appx483; Appx3235-3236 at ¶¶ 54-57. There are three key components to that definition made clear in the intrinsic record: (i) an E-AGCH is a *single* channel; (ii) it transmits scheduling grants to a single UE, a group of UE, or all UE on the channel; (3) and it does so through the use of multiple identifiers assigned to a single UE.

First, the claim language confirms that the E-AGCH of the '625 patent is a *single* channel (the first element of the proper E-AGCH construction). The plain language of the claims refers to the channel in the singular, not the plural. *See, e.g.*, Appx111-113 at claim 1 ("transmitting a scheduling assignment *in an* Enhanced Absolute Grant Channel . . .."); claim 16 ("receiving a scheduling assignment *in an* Enhanced Absolute Grant Channel (E-AGCH), wherein . . .."); claim 23 ("a base station transmitting a scheduling assignment *in an* Enhanced Absolute Grant Channel (E-AGCH) for scheduling . . .."); claim 39 ("receiving a scheduling

assignment *in an* Enhanced Absolute Grant Channel (E-AGCH), wherein . . ..”). The plain language of the claims also evinces that such a *single* channel is capable of issuing multiple identifiers to a single UE (the second element of the proper E-AGCH construction). *See, e.g.*, Appx111-113 at claim 1, claim 2; claim 23; claim 39; claim 40. Each of these terms recites that the subsequent steps are occurring “in *an*” E-AGCH, the word “an” indicating that the E-AGCH is singular in nature.

Second, the specification of the ’625 patent expressly confirms all three key elements of an E-AGCH (as 3G repeatedly informed the Board, *see, e.g.*, Appx255-256; Appx317-318; Appx480-483; Appx640-644). For instance, the patentees provide the following explanation:

> An Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send a scheduling command to an user equipment (UE).

Appx110 at 3:13-16. This sentence clearly defines the E-AGCH as a *single* channel. *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (citing *Abbott Labs v. Andrx Pharms., Inc*. 473 F.3d 1196, 1210 (Fed. Cir. 2007)) (discussing that the word “is” is definitional); *TiVo, Inc. v. Echostar Communs. Corp.*, 516 F.3d 1290, 1303-04 (Fed. Cir. 2008) (meaning of claim term “a[] [widget] is by itself plainly indicative of the singular as a matter of plain English); *see also Norian Corp. v. Stryker Corp*. 432 F.3d 1356, 1359 (Fed. Cir. 2005) (finding

that the word "a" is singular particularly the specification or prosecution history regard it as singular).

Apart from the plain language of the specification, Figure 1 indicates that, while there may be multiple scheduling assignment channels working in concert, an E-AGCH (represented by CH-1 below) is a *single* channel.

FIG. 1




Appx106 at Fig. 1; Appx3239 at ¶ 63. The prosecution history of the '625 patent provides additional support, particularly in the identical disclosure made by the Korean Application regarding its common grant channel.

[Figure 1]



Appx1391 at Fig. 1.

The specification also discusses that the E-AGCH issues its commands to a single UE, groups of UE, or all UE on the channel:

> In E-AGCH, scheduling assignment(s) can be transmitted from Node B via shared channel(s) to an UE, group(s) of UEs, or all the UEs.

Appx110 at 3:42-44; *see also* Appx106 at Fig. 1; Appx107 at Fig. 2. Additional language in the specification indicates that this is achieved by the assigning of multiple ID's to a single UE such that they may be addressed in scheduling assignments singularly or in groups, including all UE on the channel. Appx110 at 3:41-60. Figure 2 provides a clear illustration of the process:

FIG. 2



Appx107 at Fig. 2. In Figure 2, the UE are provided specific, individual IDs, (e.g., UE1, UE2, UE3), IDs for groups (e.g., SA-G1), or an identifier for all on the channel (e.g., SA-all), which is used to issue the scheduling assignments (i.e., the "SAs").

In light of that clear intrinsic record, there is no need to resort to any extrinsic evidence to determine the meaning of E-AGCH. Regardless of whether the '625 patent retains its priority date, none of the alleged prior art asserted by Honeywell discloses a single common grant channel capable of assigning multiple identifiers to a single UE that can use those identifiers to issue grants to an individual UE, groups of UE, or all UE on the channel. *See*, Appx489-491; Appx643-644. Therefore, reversal is appropriate.

### B. The Board's Construction Of E-AGCH Was Legally Erroneous Because It First Settled On An Extrinsic Definition For That Term And Then Demanded Disclaimer Or Redefinition From The Intrinsic Record

Claim construction under *Philips* proceeds with the intrinsic record being evaluated *first*, as read from the perspective of a POSITA. The analysis then stops if the definition is clear from that intrinsic evidence—as it is here. Only if such intrinsic evidence is unclear (which, as detailed above, it was not), does extrinsic evidence come into play. *See Philips*, 415 F.3d at 1320-1321. The Board here did the opposite.

Despite the clear definition of E-AGCH from the intrinsic record, the Board turned *first* to the 3GPP References and declared that, outside the '625 patent, E-AGCH was a term of art. *See* Appx11 (reciting Patent Owner's construction, asserting that Patent Owner's arguments in support of its construction are unavailing "for the reasons discussed below," and turning immediately to the subject of "E-AGCH was a Term of Art Having an Accepted Meaning Known to a POSITA as of March 31, 2005."). Then the Board searched the record for evidence that the '625 patentees clearly disclaimed or redefined that extrinsic meaning. *See* Appx18 (finding that the '625 patent's E-AGCH should be limited to pertaining to absolute grants because that was what the extrinsic evidence suggested *despite* the fact that no such requirement exists (*see* Appx15)); *see also* Appx17-18 (finding that "[n]owhere does the '625 patent clearly express an intent to redefine E-AGCH" to support scheduling assignments using three identities despite 3G's citations to Appx107 and Appx110 which illustrate the same).

The Board's approach to construing E-AGCH as being consistent with the 3GPP's definition was legally erroneous. Indeed, this Court *en banc* in *Philips* directly rebuked as legal error "a methodology for claim interpretation in which the specification should be consulted only after a determination is made, whether based on a dictionary, treatise, or other source, as to the ordinary meaning or meanings of the claim term in dispute." *See Philips v. AWH Corp.*, 415 F.3d 1303, 1320-1321

(Fed. Cir. 2005). As this Court explained, it is "inconsistent" with precedent and the importance of the specification to define a claim term based on extrinsic reference *first* and then determine whether that "definition of the claim term has been overcome by 'an explicit definition of the term different from its ordinary meaning' or whether the inventor 'has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Id.* (quoting *Tex. Digital Sys. v. Telegenix, Inc.* 308 F.3d 1193, 1202 (Fed. Cir. 2002). In other words, this Court expressly rejected the very claim construction approach employed by the Board here—first determining the meaning of E-AGCH from the disputed extrinsic 3GPP References and *then* searching for disclaimer or redefinition of that external definition in the specification.

This Court corrected similar error in *The Trustees of Columbia University in the City of New York v. Symantec Corporation*. *See Trs. Of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016). There, the Court rejected the appellant's argument that "there is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time," which can only be "overcome in only two circumstances: the patentee has expressly defined a term or has expressly disavowed the full scope of the claim." *Id.* at 1363. As the Court explained, this was precisely the line of reasoning from *Texas Digital* that was

"rejected" in *Philips*. *Id.* at 1363. In addition, as the Court reaffirmed, the intrinsic record (like here) can confirm the meaning of a claim term directly (e.g., "An Enhanced Absolute Grant Channel (E-AGCH) is …," *see* Appx110 at 3:14) and also "by implication such that the meaning may be found or ascertained by a reading of the patent documents" (e.g., additional citations and discussion *supra* at Argument II.A). *Id.* at 1364.

Rather than following this Court's mandate in *Philips* (as confirmed in *Trustees of Columbia University*) to view the ordinary meaning of a claim term as "its meaning to the ordinary artisan *after reading the entire patent*[,]" the Board began its analysis here with whether E-AGCH was a term of art known in the field (Appx11), and then proceeded to see if the patentee had sought to contradict that known interpretation (Appx15-18). *See Philips*, 415 F.3d at 1321.

### C. The Board's Construction Of E-AGCH Erroneously Ignored Evidence Of Redefinition By The Patentee

Even if the Board's erroneous extrinsic-definition-dependent claim construction methodology is condoned on appeal, vacatur and remand is still warranted because the Board wrongfully precluded evidence that the patentee clearly intended for a definition of E-AGCH different than that used in the 3GPP References.

The Board did not adopt a word-for-word construction of the term E-AGCH, but rather found that its usage in the '625 patent was nonetheless wholly consistent

with its usage by the 3GPP in the 3GPP References asserted by Honeywell. Appx18 ("We consider E-AGCH as disclosed in the '625 patent to have the same definition as disclosed in the 3GPP standard documents disclosed above, and thus to also require an absolute grant."). But the patentee clearly did not intend for the E-AGCH of the '625 patent to have the same scope or meaning. For example, at *best*, the 3GPP E-AGCH supports issuing scheduling assignments a UE through the use of two identities (a "group identity" and an "individual identity"), whereas the E-AGCH of the '625 supports issuing scheduling assignments to three identities: (1) an individual UE, (2) a group of UE or (3) all UE on the channel. Appx1375; *compare* Appx110 at 3:42-44, 3:61-62, 4:19-22; *with* Appx1383-1384. Further, the E-AGCH of the 3GPP pertains solely to absolute grants Appx1219 (defining an E-AGCH as "a fixed rate (30kbps, SF=256) downlink physical channel carrying the uplink E-DCH absolute grant)"; the E-AGCH of the '625 patent has no such restriction to absolute grants (or on its channel rate) (*see* Appx110 at 3:14-25; Appx600 at fn. 5).

In response to an argument—raised for the first time in Honeywell's Reply—that the 3GPP's version of an E-AGCH supported issuing scheduling assignments to three identities (IDs for an individual, group, and universal use) (Appx600-601), 3G explained that the document relied upon by Honeywell contained *absolutely no reference* to a UE being issued identifiers of any kind, let alone three simultaneously.

Appx643. This argument raised by 3G provided further proof that the patentee's version of an E-AGCH differed from that of the 3GPP, in addition to corroborating 3G's novelty and non-obviousness arguments. However, in its Final Written Decision, the Board refused to consider this counter-argument, concluding that it "was not originally set forth in Patent Owner's Response and is therefore untimely." Appx31. The Board provided no further elaboration. *See id.*

The Board's Decision is contrary to 37 C.F.R. 42.23(b). Under that rule, a sur-reply "may only respond to arguments raised in the corresponding reply and may not be accompanied by new evidence other than deposition transcripts of the cross-examination of any reply witness." 37. C.F.R. 42.23(b). Here, 3G was replying to an argument arising for the first time in Honeywell's Reply. *See* Appx600-601. Specifically, Honeywell argued in its Reply that the use of multiple (three) identifiers is also found in the 3GPP References. Appx600-601. 3G's argument that the E-AGCH of the '625 patent issues three identifiers to a UE (as depicted in Figure 2), (1) one that identifies a UE individually (2) one that identifies the UE as a member of a group, and (3) one universal identifier common to all UE on the channel, was thus directly in response to Honeywell's position in its Reply. Therefore, 3G's argument was in compliance with the applicable regulation and should not have been excluded.

Insofar as the Board's holding implies that the underlying evidence of the E-AGCH using multiple identifiers for the purposes issuing scheduling assignments to (1) individual UE, (2) groups of UE on the channel, and (3) all UE on the channel appears for the first time in its Sur-Reply, this is incorrect. 3G raised this argument and its supporting evidence in 3G's Response, and as early as its Preliminary Response. *See* Appx256; Appx269-272; Appx479-482; *see also* Appx491. As a result, the evidence cannot be considered "new" under 37 C.F.R. 42.23(b).

The Board's refusal to consider 3G's argument directly undermines the Board's analysis regarding claim construction and the subsequent analyses depending therefrom. 3G's contention provides direct evidence that the patentee's definition differed from that of the 3GPP, and even under the Board's faulty *Texas Digital* analysis, such evidence would be highly relevant as it would show evidence of the patentee's efforts at lexicography. As with the other arguments and evidence discussed above, the Board's actions warrants at least remand. Accordingly, 3G respectfully requests that the Final Written Decision be vacated and the proceedings be remanded to the PTAB for further consideration of 3G's arguments.

## III. UNDER A CORRECT CONSTRUCTION OF E-AGCH, THE CHALLENGED CLAIMS CANNOT BE FOUND INVALID ON THE RECORD HERE

The Board's incorrect construction of E-AGCH was prejudicial and far from harmless. *See, e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 406, 409 (2009). The Board's

erroneous construction of the term E-AGCH materially infected its subsequent anticipation and obviousness analyses. Indeed, under the correct construction of that term, Honeywell's Petition fails for additional reasons that each independently warrant reversal (or at least remand).

First, it is indisputable that, but for the Board's construction, the '625 patent's priority date would have been that of the Korean Application. Accordingly, the 3GPP References would not have qualified as prior art, thus mandating a finding of non-obviousness and no anticipation across any grounds.

The Board (erroneously) determined that usage of the term E-AGCH in the '625 patent was indistinguishable from the usage of the term in the 3GPP References. Yet, the 3GPP References actually *post*-date the priority date of the '625 patent. Appx15-18. Based on its faulty construction, the Board found that the Korean Application did not support the *3GPP's* version of an E-AGCH, and thus determined that the '625 patent was not entitled to its priority date. Appx11-20; Appx25. It was only because the '625 patent was deprived of its proper priority date that the 3GPP references were even considered as prior art under § 102, otherwise the references would post-date the priority date of the '625 patent. *See*, Appx1148; Appx1174; Appx1374. Had the Board followed the dictates of *Philips*, the Board would have arrived at a proper construction based on the Korean Application. In other words, the '625 patent is entitled to properly rely on the Korean Application

for its priority date which predates the 3GPP references as prior art. As a result, all grounds relying on those references necessarily fail.

By Honeywell's own admission, the sole remaining reference is Chen which does not contain disclosures pertaining to the functionality of the E-AGCH. *See* Appx166; Appx168 ("If the Board determines that the Korean application, which does not mention "an Enhanced Absolute Grant Channel (E-AGCH)," nevertheless discloses that channel sufficiently to support the claims . . . then the same rule must apply to analyze Chen, and disclosure of specific 3GPP channels cannot be required."). Notably, in its Petition, Honeywell presumes that the 3GPP's definition of E-AGCH is identical to that of the '625 patent, despite the explicit language to the contrary. It was this assumption that led to a significant flaw in Honeywell's Petition that the Board allowed them to remedy through subsequent pre-institution reply briefing. Appx279-280; *see also* Appx313-312. Reversal is thus warranted on this ground alone if this Court adopts the correct construction of E-AGCH discussed above (or, at minimum, remand).

Second, regardless of whether the '625 patent retains its priority date, none of the alleged prior art asserted by Honeywell discloses a single common grant channel capable of assigning multiple identifiers to a single UE that can use those identifiers to issue grants to an individual UE, groups of UE, or all UE on the channel. *See*, Appx489-491; Appx643-644. Specifically, the only evidence raised by Honeywell

to support this assertion is a portion of Meeting45 which states that the 3GPP's version of E-AGCH issues absolute grants that are "valid for one UE, for a group of UE, or all UEs[.]" Appx643. Nowhere does that reference discuss the use of the three identifiers assigned to a single UE that is employed by the E-AGCH of the '625 patent. *See* Appx110 at Fig. 1., Fig. 2., 3:42-44, 3:61-62, 4:19-22. Therefore, reversal is appropriate (or, at minimum, remand).

## IV. UNDER THE BOARD'S CONSTRUCTION FOR E-AGCH, THE BOARD ERRED IN DETERMINING THAT THE '625 PATENT IS NOT ENTITLED TO THE PRIORITY DATE OF THE KOREAN APPLICATION

Even if the Board's claim construction for E-AGCH stands, reversal is still warranted because the Board's holding that the '625 patent is not entitled to its priority date was erroneous for at least three reasons.

*First*, the Board had a duty to "consider all evidence of [invalidity] and [validity] before reaching a determination." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1077 (Fed. Cir. 2012); *see also Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1382-1383 (Fed. Cir. 2019) (error to not consider cited evidence relevant to the validity inquiry); *Polygroup Ltd. MCO v. Willis Elec. Co.*, 780 F. App'x 880, 884 (Fed. Cir. 2019) (remanding when "[t]he Board failed to explain its decision to discount [certain] evidence concerning the knowledge and skill of a POSITA"). The Board violated that legal duty here.

3G's expert, Mr. Lipoff, provided a declaration regarding the written description support for the E-AGCH of the '625 patent found in the Korean Application. Appx3237-3241; *see also* Appx260-265; Appx316-317; Appx485-489. The Board improperly ignored critical information in that declaration. *See* Appx21-25. Indeed, the Board only rejected Mr. Lipoff's opinions regarding how the Korean Application disclosed the concept of "absolute grants" *by way of the non-3GPP DOCSIS standard*. *See id.* But Mr. Lipoff's first declaration *does not rely whatsoever on the DOCSIS standard.* (Appx3216-3295) Rather, Mr. Lipoff presents a clear basis for written description support in the Korean Application for the E-AGCH of the '625 patent. Appx260-265; Appx316-317; Appx485-489; Appx3237-3241 at ¶¶ 60-66.

For example, Mr. Lipoff notes that the '625 patent's method of issuing scheduling grants to individual UE, a group of UEs, or all of the UEs on the channel using identifiers capable of singling-out or grouping the UE as necessary is exemplified in the '625 patent's Figure 1, the same figure as Figure 1 of the Korean Application (Appx3238-3240):

FIG. 1




(Appx106)

[Figure 1]




Appx1391. The Board never addressed that critical evidence from Mr. Lipoff. That was legal error requiring at least remand. *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d at 1077.

*Second*, the Board's rejection of Mr. Lipoff's DOCSIS-related testimony was not supported by substantial evidence.

In his second declaration, Mr. Lipoff stated that it would have been well-known to a POSITA that under the non-3GPP DOCSIS standard there was no distinguishing between the concept of "grants" and the subtypes of "absolute grants" and "relative grants." Appx3318 at ¶ 24. Because a POSITA would have been

aware of the non-3GPP DOCSIS standard, Mr. Lipoff opined that a POSITA would understand that the concept of "grants" taught in the Korean Application as pertaining to absolute grants. Appx3240; Appx3317. Though the DOCSIS standard was not developed by 3GPP, Mr. Lipoff explained that it was nonetheless "the foundation on which 3GPP wrote the air interface standards that are directly at issue in this case." He specifically pointed to the fact that the grants disclosed in the Korean Application would be known to a POSITA to include the concept of absolute grants. Appx3187 at 33:6-10.

The Board rejected Mr. Lipoff's testimony by quoting Honeywell's assertion that "even if a POSITA was aware of DOCSIS, the fact that another standard *doesn't* use a particular term in its specification reveals nothing about a POSITA's understanding of the 3GPP standard's scheduling commands."[4] Appx24-25. But that was Honeywell's attorney argument, not the position of its expert, who rendered no opinion on the subject. *See* Appx608. Attorney argument is not evidence. *Wasica Fin. GmbH v. Cont'l Auto Sys.*, 853 F.3d 1272, 1284-85 (Fed. Cir. 2017) (citing *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009)) (finding that unsworn attorney argument is not evidence and thus cannot rebut evidence in the record); *Icon Health & Fitness, Inc. v. Strava, Inc.* 849 F.3d 1034, 1043 (Fed. Cir. 2017). Honeywell's attorney argument was the *only* rebuttal to Mr.

[4] Emphasis in original.

Lipoff's testimony that a POSITA would understand that the Korean Application to disclose the absolute grants the Board relied on for its construction of the term E-AGCH. *See generally* Appx606-610.

Thus, Mr. Lipoff's testimony was factually unrebutted by *any* independent evidence. Mr. Lipoff provided further unrebutted testimony that a POSITA would understand that the Korean Application's references of "scheduling commands" would be understood by a POSITA to be "virtually synonymous" with the '625 patent's scheduling grants and that a POSITA would understand the term to cover a superset consisting of absolute and relative grants. *See* Appx3240; Appx3317 ("In paragraph 40 of my first declaration I state that grants may be 'absolute' or 'relative,' both of which would have been recognized by a POSITA at the relevant time as subsets of 'grants'. In paragraph 65, I similarly state that absolute grants are a subset of scheduling grants, and thus I am of the opinion that the Korean Application—which discusses scheduling commands (ie., grants) at length—provides sufficient written support for the concept of absolute grants, as a POSITA would understand absolute grants to be a subset of scheduling grants more generally.") (internal citations omitted). Mr. Lipoff's opinion was well-founded and based on his extensive experience with DOCSIS, which he testified "was the building block, *the foundation on which 3GPP wrote the air interface standards that are directly at issue in this case, the scheduling*—the uplink scheduling." *See* Appx633-634 (citing

Appx3187 33:6-10). To further support his position, Mr. Lipoff even cited a 3GPP specification which indicates that the 3GPP recognized that there are two types of grants: absolute and relative. Appx3319; *see* Appx25.

Despite all of this clear (and factually unrebutted) evidence, the Board did not only discount Mr. Lipoff's testimony—it outright dismissed it entirely in *ipse dixit* form. Appx25 ("We determine that the fact that the cable standard, DOCSIS, does not qualify the term grant as either absolute or relative does not support a finding that a POSITA would have understood the term to "inherently disclose" both absolute and relative grants, particularly in the context of wireless cellular communications . . ..").

The Board's dismissal of Mr. Lipoff's supporting evidence from the 3GPP is also perplexing. The Board asserted that Mr. Lipoff's evidence regarding the 3GPP's recognition of absolute and relative grants was published four months after the filing of the Korean Application and thus was irrelevant to the consideration. *Id.* This position by the Board is at odds with Honeywell's (and the Board's) reliance on 3GPP References that came *after* the filing of the Korean Application. Mr. Lipoff used his post-filing 3GPP reference not as *independent* proof of a POSITA's understanding, but to show *consistency* of the understanding of a POSITA. This was the same purported rational that the Board accepted for using post-filing evidence when deciding that the term E-AGCH had a known meaning at the time of

invention—"to demonstrate how the definition, description and usage of this term remained *consistent*" in the field to the understanding of a POSITA. Appx14. Such selective application of logic in favor of only one side of an argument is a prime example of arbitrary and capricious decision making (and lack of substantial evidence).

Third, the Board also erred in determining that, even if 3G had shown that the Korean Application had support for common grants (of which absolute grants are a subset), 3G would run afoul of this Court's precedents in *Purdue Pharma L.P. v. Faulding Inc.* and *Ariad Pharmacies., Inc. v. Eli Lilly & Co.*. *See* Appx24. The Board reasoned that to determine the Korean Application disclosed absolute grants from its disclosure of common grants would be akin to *Purdue*'s prohibition against "disclo[sing] a forest in the original application, and then later pick[ing] a tree out of the forest and say[ing] here is my invention." Appx24 (quoting *Purdue*, 230 F.3d 1320 at 1326). Not so. Cases such as *Purdue* and *Ariad* pertained to pharmaceutical products, where there were potentially infinite possibilities—a truly vast "forest," in the terms of *Purdue*. That is not the situation here, and Mr. Lipoff's testimony is clear: a POSITA considering the term "common grants" (the superset disclosed by the Korean Application) is not facing an infinite forest, but a small yard containing just two trees—*absolute* grants and *relative* grants.

To provide sufficient support for the ’625 patent, the Korean Application need not disclose absolute grants *in haec verba*—it is enough that a POSITA reading it would immediately discern the limitation at issue. *Purdue*, at 1323. There is ample evidence in the record that a POSITA would understand these terms, per Mr. Lipoff’s testimony, as discussed above. The Board’s contrary conclusion was based on misapplied precedent and less than substantial evidence.

* * *

Should this Court determine that the Board correctly applied the law and underlying facts pertaining to the construction of the term E-AGCH, each of these three grounds independently warrants reversal or vacatur.

## V. CONCLUSION

For the foregoing reasons, the Court should reverse or vacate and remand the Board’s Final Written Decision.

April 4, 2023

Respectfully submitted,

DEVLIN LAW FIRM LLC

*/s/ Timothy Devlin*
Timothy Devlin
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
tdevlin@devlinlawfirm.com

*Attorney for Appellant*
*3G Licensing, S.A.*

## ADDENDUM TABLE OF CONTENTS



| Date | Description | Appx Nos. |
|---|---|---|
| 9/12/2022 | Final Written Decision | Appx00001 |
| | US Patent No. 7551625 | Appx00105 |

Trials@uspto.gov
571-272-7822

Paper 53
Entered: September 12, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CRADLEPOINT, INC.,
HONEYWELL INTERNATIONAL, INC., SIERRA WIRELESS, INC.,
TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED,
TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC.,
TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS INC., and
THALES DIS AIS DEUTSCHLAND GMBH,
Petitioner,

v.

3G LICENSING S.A.,
Patent Owner

---

IPR2021-00584
Patent 7,551,625 B2

---

Before BARBARA A. PARVIS, MONICA S. ULLAGADDI, and
AARON W. MOORE, *Administrative Patent Judges*.

ULLAGADDI, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

Cradlepoint, Inc., Honeywell International, Inc., Sierra Wireless, Inc., TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings, Inc., and Thales DIS AIS Deutschland GmbH (collectively "Petitioner")[1] filed a Petition (Paper 8, "Petition" or "Pet.") requesting an *inter partes* review of claims 16–19, 21, 22, 39, 40, and 42 (the "challenged claims") of U.S. Patent No. 7,551,625 B2 (Ex. 1001, "the '625 patent") pursuant to 35 U.S.C. §§ 311–319, accompanied by the supporting Declarations of Dr. Apostolos K. Kakaes (Ex. 1003) ("the Kakaes Declaration") and Mr. Craig Bishop (Ex. 1021) ("the Bishop Declaration"). 3G Licensing S.A. ("Patent Owner") filed a Preliminary Response. Paper 12 ("Preliminary Response" or "Prelim. Resp.").

In an email to the Board (Ex. 3001), Petitioner requested additional briefing to address what it characterized as Patent Owner's "unforeseeable claim construction." We held a conference call with the parties on July 26, 2021, and authorized each party to file 8 pages of additional arguments in our Order of July 27, 2021 (Paper 13). We limited the additional arguments to matters of "Patent Owner's proposed construction of 'E-AGCH'" and "priority issues that Petitioner contends are intertwined with the aforementioned claim construction." Paper 13, 2–3 (citing Ex. 1001, code (30)). Pursuant to our authorization, Petitioner filed a Preliminary Reply

[1] Petitioner originally included ZTE Corporation and ZTE (USA) Inc. ("ZTE") and Dell, Inc.—ZTE and Patent Owner entered into a settlement agreement and Dell, Inc. and Patent Owner entered into a settlement agreement. Papers 19, 36. As such, we terminated the proceeding as to ZTE and Dell and reconstituted Petitioner as the remaining entities absent ZTE and Dell. *Id.*

(Paper 15, "Pre-Reply") and Patent Owner filed a Preliminary Sur-Reply (Paper 16, "Pre-Sur-Reply").

Upon review of these papers and the record, we instituted *inter partes* review, pursuant to 35 U.S.C. § 314, as to the challenged claims based on the challenges set forth in the Petition. Paper 20 ("Institution Decision" or "Inst. Dec.").

Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 32, "PO Resp."), Petitioner filed a Reply to Patent Owner's Response (Paper 44, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 46, "Sur-Reply"). On June 16, 2022, we held an oral hearing. A transcript of the hearing is of record. Paper 52 ("Tr.").

For the reasons that follow, we conclude that Petitioner has proven by a preponderance of the evidence that the challenged claims of the '625 patent are unpatentable.

## II. BACKGROUND

### *A. Real Parties in Interest*

Petitioner identifies the following entities as real parties in interest:

> Cradlepoint, Inc., Dell Inc., Honeywell International, Inc., Sierra Wireless, Inc., TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings Inc., Thales DIS AIS Deutschland GmbH, ZTE Corporation, and ZTE (USA) Inc. (collectively "Petitioner"), as well as Dell Marketing L.P., Dell Products L.P., Dell Technologies Inc., Denali Intermediate Inc., Thales DIS AIS USA, LLC, Sierra Wireless America, Inc., Telefonaktiebolaget LM Ericsson, and Ericsson Inc.

Paper 14, 2–3.[2] Patent Owner identifies itself, 3G Licensing S.A., as the real party in interest. Paper 10, 2.

*B. Related Matters*

As required by 37 C.F.R. § 42.8(b)(2), the parties identify judicial matters that would affect, or be affected by, a decision in this proceeding. In particular, the parties indicate that the ’625 patent has been asserted in the following district court cases:

| Case Number | Venue | Filing Date |
|---|---|---|
| 3:20-cv-01289 | N.D. Tex. | May 18, 2020 |
| 1:20-cv-00649 | D. Del. | May 15, 2020 |
| 1:20-cv-00651 | D. Del. | May 15, 2020 |
| 1:20-cv-00652 | D. Del. | May 15, 2020 |
| 1:20-cv-00653 | D. Del. | May 15, 2020 |
| 1:20-cv-00654 | D. Del. | May 15, 2020 |
| 1:20-cv-00655 | D. Del. | May 15, 2020 |
| 1:20-cv-00656 | D. Del. | May 15, 2020 |
| 1:20-cv-00658 | D. Del. | May 15, 2020 |
| 1:20-cv-00659 | D. Del. | May 15, 2020 |
| 1:20-cv-22051 | S.D. Fla. | May 15, 2020 |
| 1:20-cv-22054 | S.D. Fla. | May 15, 2020 |

*C. The ’625 Patent*

The ’625 patent issued from Application No. 11/097,011, filed on March 31, 2005, which claims foreign priority to Korean Patent Application

[2] ZTE Corporation, ZTE (USA) Inc., and Dell, Inc. were terminated as to this proceeding. *Supra* n.1.

No. KR10-2004-0022960 ("the Korean Application"), filed on April 2, 2004. Ex. 1001, codes (21), (22), (30). In Sections III.C and III.D below, we discuss which of these two dates is the priority date of the challenged claims of the '625 patent.

The '625 patent concerns a "method of scheduling an uplink packet transmission channel in a mobile communication system." Ex. 1001, code (54). The '625 patent discloses a base station (Node B) that sends a scheduling assignment over a downlink channel—an Enhanced Absolute Grant Channel (E-AGCH)—to a user equipment (UE), specifying "how much transmission power or a level of data rate transmission [the] UE is permitted to transmit." *Id.* at 2:38–42, 3:14–20. The scheduling assignment may include (1) a UE identifier (UEID) for identifying a UE that receives the scheduling assignment; and (2) scheduling content specifying, for example, scheduled power, duration, and priority, for the uplink packet transmission. *Id.* at 2:42–49, 3:21–27. After receiving the scheduling assignment from Node B, the UE may transmit an uplink data packet to Node B on an E-DCH of 3GPP WCDMA[3] according to the contents of the scheduling assignment. *See*, *e.g.*, *id.* at 1:23–31, 3:11–12, claims 1, 16, 39.

According to the '625 patent, in an E-AGCH, one or more scheduling assignments can be transmitted from Node B via "shared channel(s)" to one UE, group(s) of UEs, or all the UEs. *Id.* at 3:42–45. As such, "[t]he scheduling assignment includes contents and UE IDs of each UE, UE IDs of specified group(s), or an UE ID that applies to all the UEs uniformly." *Id.* at 4:63–65. The '625 patent discloses that "[u]nder E-AGCH, a scheduling

[3] E-DCH refers to an "Enhanced Uplink Dedicated Channel" and 3GPPWCDMA refers to the "3*rd* Generation Partnership Project, Wideband Code Division Multiple Access." Ex. 1001, 1:24–25.

assignment is received by all UEs in a shared channel" without regard to "which UE the scheduling assignment is directed," but "the scheduling assignment would apply only to the UEs having the IDs corresponding to the IDs designated in the scheduling assignment." *Id.* at 4:48–53.

### *D. Illustrative Claim*

Petitioner challenges claims 16–19, 21, 22, 39, 40, and 42 of the '625 patent. Pet. 4. Claims 16 and 39 are independent. Claim 16 is illustrative and reproduced below.

> 16. A method of scheduling an uplink packet transmission channel for user equipment (UE), the method comprising:
>
> receiving a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH), wherein the scheduling assignment comprises an identifier for a plurality of UE;
>
> acquiring the contents of the scheduling assignment; and,
>
> transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment.

Ex. 1001, 7:40–48.

### *E. Asserted Grounds*

Petitioner presents the challenges summarized in the chart below. Pet. 4.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 16–19, 21, 22, 39 | 102(a)[4] | Meeting45[5] |
| 16–19, 21, 22, 39 | 103(a) | Meeting45, Meeting39[6] |
| 40, 42 | 103(a) | Meeting45, Meeting45bis[7] |
| 16–19, 21, 22, 39, 40, 42 | 102(e) | Chen[8] |
| 16–19, 21, 22, 39, 40, 42 | 103(a) | Chen |

## III. ANALYSIS

### *A. Legal Standards*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the

[4] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), included revisions to 35 U.S.C. §§ 102 and 103 that became effective after the effective filing date of the challenged claims. Therefore, we apply the pre-AIA version of 35 U.S.C. §§ 102 and 103.
[5] TDoc R2-042730, *Inclusion of e.g. physical layer model, MAC architecture, detail Node B scheduler mechanism and QoS Control principles*, 3GPP TSG-RAN2 Meeting #45, Shin-Yokohama, Japan (uploaded Dec. 3, 2004) (Ex. 1004, "Meeting45").
[6] TDoc R1-041512, *Introduction of E-DCH*, by Ericsson, 3GPP TSG-RAN WG1 Meeting #39, Yokohama, Japan (uploaded Nov. 21, 2004) (Ex. 1005, "Meeting39").
[7] TDoc R2-050136, *E-DCH Priority Based Scheduling*, 3GPP TSG-RAN WG2 Meeting #45bis, Sophia Antipolis, France (uploaded Jan. 7, 2005) (Ex. 1007, "Meeting45bis").
[8] US 7,155,236 B2, filed on Aug. 21, 2003 and issued Dec. 26, 2006 (Ex. 1006, "Chen").

invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness.[9] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic*, 815 F.3d at 1363 (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to patent owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burdens of proof in an *inter partes* review). Furthermore, petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

---

[9] Patent Owner does not present objective evidence of nonobviousness.

Thus, to prevail in an *inter partes* review, petitioner must explain how the prior art discloses the challenged claims or how the proposed combinations of prior art would have rendered the challenged claims unpatentable. We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### *B. Level of Ordinary Skill in the Art*

Petitioner contends that "[a] person of ordinary skill in the art ('POSITA') at the time of the alleged invention (March 2005) would have had a bachelor's degree in electrical engineering or a similar discipline, with at least three years of relevant industry or research experience (or additional education)," and that "[t]he relevant experience would include a working understanding of the development of new and then-existing wireless cellular communications standards." Pet. 17 (citing Ex. 1003 ¶ 40).

In its Preliminary Response, Patent Owner contended that "[a] person having ordinary skill at the time of the invention in the relevant art would be one with a bachelor's degree in electrical engineering or computer sciences and telecommunications networks, along with at least three or more years of practical experience in mobile communications." Prelim. Resp. 12 (citing Ex. 2001 ¶ 24). We adopted Petitioner's definition of the level of ordinary skill in the art as it was "consistent with the Specification of the '625 patent and asserted prior art of record," noting that "[o]ur preliminary findings and conclusions would not change under either definition." Inst. Dec. 9.

Patent Owner does not set forth a new level of ordinary skill in the art or reiterate the definition from its Preliminary Response but notes that, "[a]s the Board noted in its institution decision, apart from the disagreement about the earliest priority date of the '625 patent, there is no substantial difference

between the parties' definitions of the level of ordinary skill in the art." PO Resp. 7 (citing Inst. Dec. 9).

We adopt Petitioner's definition of the level of skill in the art, which is consistent with the Specification of the '625 patent and asserted prior art of record.

### *C. Claim Construction*

In *inter partes* review proceedings based on petitions filed on or after November 13, 2018, such as this one, we construe claims using the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), as articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny. *See* 37 C.F.R. § 42.100(b).

Independent claims 16 and 39 recite "receiving a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH)." In its Petition, Petitioner asserts that "[n]one of the terms in the challenged claims require construction beyond their plain and ordinary meaning." Pet. 5.

In the Preliminary Response, Patent Owner proposed that E-AGCH should be construed as "a single common grant channel capable of assigning multiple identifiers to a single UE that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel." Prelim. Resp. 15 (citing Ex. 2001 ¶ 54). In the Institution Decision, we determined that the E-AGCH disclosed in the '625 patent had "the same definition as disclosed in the 3GPP standard documents," and that it requires an absolute grant. Inst. Dec. 15.

#### *1. Patent Owner's Revised Construction of E-AGCH*

Patent Owner now revises its proposed construction of E-AGCH such that, according to Patent Owner, the construction

> makes clear that the channel supports the use of multiple identifiers for a single UE and that the channel itself does not do the assigning: "***a single common grant channel that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel, said channel supporting a single UE being assigned multiple identifiers***." [Patent Owner asserts that] [t]his rewording is meant only to clarify that the channel ***supports*** a UE being assigned multiple identifiers for the purpose of issuing scheduling assignments to either (1) a single UE, (2) groups of individual UE that are not ***all*** UE on the channel, or (3) all of the UE on the channel.

PO Resp. 11 (first emphasis added).

Petitioner points out that "Patent Owner's declarant does not offer any testimony on this revised proposed construction and instead continues to rely on the original construction for his opinions." Pet. Reply 14, n.7 (citing Ex. 1039, 103:1–9 ("Q. [MS. MERRILL] And is [Paragraph 54 of Exhibit 2001] the same proposed definition [for E-AGCH] on which you're relying for purposes of your second declaration in Exhibit 2006? A. [MR. LIPOFF] Yes, it is."); Ex. 2001 ¶ 54; Ex. 2006). Irrespective of this, Patent Owner's arguments in support of its revised construction are unavailing for the reasons discussed below.

*2. "E-AGCH" was a Term of Art Having an Accepted Meaning Known to a POSITA as of March 31, 2005*

As noted above, we determined at institution that "E-AGCH as disclosed in the '625 patent [has] the same definition as disclosed in the 3GPP standard documents" and thus "require[s] an absolute grant." Inst. Dec. 15.

Patent Owner disputes our preliminary determinations that:

> (1) the term E-AGCH was an established term of art with a plain and ordinary to meaning at the time of invention, (2) [] this plain and ordinary meaning derives from the 3GPP references, and (3)

> [] the patentee used that term in the ’625 patent in accordance with the 3GPP’s definition.

PO Resp. 2 (Inst. Dec. 20); *see id.* (citing Ex. 1001, Fig. 2, 3:14–20, 3:42–44, 3:61–62, 4:19–22; Ex. 1008, Figs. 1, 2, 7, 8, claims 1, 2). Patent Owner asserts that the “term ‘E-AGCH’ did not have any single accepted meaning at the time of the invention here, regardless of whether it should be labeled a ‘term of art.’” *Id.* at 8 (emphasis omitted).

The parties disagree as to whether the term had an accepted meaning at the time of filing the application underlying the ’625 patent at issue in this proceeding, March 31, 2005.

Meeting39 defines “[t]he E-DCH Absolute Grant Channel (E-AGCH) [a]s a fixed rate (30 kbps, SF=256) downlink physical channel carrying the uplink E-DCH *absolute grant*.” Ex. 1005, 46 (emphasis added); *see* Ex. 1004, 11, 22; Ex. 1007, 1; Ex. 1012, 47. Meeting45 discloses that “Absolute Grants . . . are valid for one UE, for a group of UEs or for all UEs” and that, “the absolute scheduling grant contains at least the identity . . . of the UE (or group of UEs) for which the grant is intended and the maximum resources the UE(s) may use.” Ex. 1004, 21; *see also* Ex. 1010, 1 (“Absolute scheduling grants, received on a shared channel . . . containing (at least) the identity of the UE (or group of UEs) for which the grant is intended and an upper limit on the amount of uplink resources the UE(s) may use.”); Ex. 1011, 25 (“A shared channel is used to transmit the absolute scheduling grants” and “[t]he absolute scheduling grant contains at least the identity of the UE (except if sent [to] all UEs) (or group of UEs) for which the grant is intended and the maximum resources the UE(s) may use.”). All of these documents predate the filing of the application underlying the ’625 patent.

With respect to Meeting45, Patent Owner argues that, "[p]rior to its publication, a change request is simply that—merely a request to change the standard" and that "[a]t the time Meeting45 was submitted, there is no evidence that the terminology had been known or used by anyone outside of the requester itself." PO Resp. 9. Patent Owner asserts that "[a] single change request cannot establish the baseline knowledge and lexicology of a person of ordinary skill in the art, as Petitioner argues." *Id.*

Petitioner persuasively responds that "Meeting45, published by at least December 3, 2004, specifies in the 'Reason for Change' ***on its face*** that it was authored by the RAN2 Working Group and documents the group's (not the requestor's) ***already-agreed*** changes to the standard discussed over two meetings." Pet. Reply 7 (quoting Ex. 1004, 1 ("25.309 should be updated to reflect the ***decisions*** taken during RAN2#44 and RAN2#45. In particular the physical layer model, MAC architecture, ***detail on the Node B scheduler mechanism*** and the QoS control principles ***have to be included in the TS***." (emphasis added by Petitioner)). Petitioner also points out Patent Owner's Declarant's testimony that acknowledges this point: "[t]his change request is a 3GPP working document, which is summarizing -- a consensus was -- which was reached during meeting 45." *Id.* (citing Ex. 1039, 79:5–18).

The record also shows that these 3GPP documents were available before the priority date. Petitioner argues, and we agree, that "3GPP expert Craig Bishop . . . confirmed this through his ***unrebutted testimony and supporting evidence***, which also demonstrates Meeting45 was published on the 3GPP website by at least December 3, 2004." *Id.* (citing Ex. 1021 ¶¶ 54–67) (emphasis added); *see* Ex. 1039, 39:4–18 (Mr. Lipoff testifying that he

had no reason to dispute the dates of public accessibility for Meeting39, Meeting45, and Meeting45bis set forth by Petitioner).

Accordingly, Patent Owner does not sufficiently support its argument that the construction is supported by only "[a] single change request [that] cannot establish the baseline knowledge and lexicology of a person of ordinary skill in the art." *Id.*

We note that Patent Owner does not present any evidence supporting its contention that there was no "single accepted meaning" for E-AGCH "at the time of the invention." *See* PO Resp. 8. Patent Owner does not present, *for example*, any other "accepted meaning" for E-AGCH as of March 31, 2005. *Id.* Nor does it persuasively argue, for example, why the usage and description of the term in the documents accompanying the 3GPP TS 25.211 v6.2.0 (2004-09) standard was not sufficient to constitute a definition.

We determine that the usage and description of the term E-AGCH in documents accompanying the 3GPP TS 25.211 v6.2.0 (2004-09) standard along with at least one later version—3GPP TS 25.211 v6.7.0 cited by Patent Owner in its infringement complaint (*see, e.g.,* Ex. 1017, 3)—are consistent and that E-AGCH would have been known and understood by a POSITA to carry the meaning set forth therein as of the filing date of the application underlying the '625 patent, March 31, 2005.[10] We further conclude that one of skill in the art would have understood that the patentee used that term in the '625 patent in accordance with the 3GPP's definition.

[10] We cite 3GPP TS 25.211 v6.7.0 cited by Patent Owner not to support our determination that E-AGCH is a term of art and would have had a particular meaning to a POSITA, but to demonstrate how the definition, description, and usage of this term remained consistent in later versions of the standard.

### 3. *The Record does not Include Evidence of Lexicography or Disavowal for the Claim Term E-AGCH*

Patent Owner contests our preliminary finding that the record lacked evidence of lexicography or disavowal with respect to the term E-AGCH. PO Resp. 7–8 (citing Inst. Dec. 14–15, 20). Patent Owner contends that "there is ample evidence that the *patentee here was acting as his own lexicographer*" and cites the '625 patent to support its argument that the claimed E-AGCH is not limited to absolute grant scheduling assignments:

> An Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send a scheduling command to an user equipment (UE). In other words, Node B transmits a command as to how much transmission power or a level of data rate transmission an UE is permitted to transmit. This is also known as an uplink scheduling assignment or scheduling assignment.

*Id.* at 9–10 (quoting Ex. 1001, 3:14–20) (citing Inst. Dec. 15) (emphasis added).

According to Patent Owner, "[t]he only 'evidence' Petitioners have provided that the '625 patent's term must be dedicated solely to absolute grants is that the channel name includes the words 'absolute grant.'" PO Resp. 10 (citing Inst. Dec. 15). Patent Owner argues that "there is no ***limitation*** in the '625 patent that the channel must be dedicated solely to such grants" and that "[i]nstead, the plain language of the specification ***explicitly provides a definition for the term*** that is broader." *Id.* (citing Ex. 1001, 3:14–20). We address whether the E-AGCH requires an absolute grant below in Section III.C.4.

We are not persuaded that the disclosures of the '625 patent cited by Patent Owner "'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *See Thorner v. Sony Comput.*

*Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (citing *Thorner*, 669 F.3d at 1365). "'To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning' and must 'clearly express an intent to redefine the term.'" *Id.* (quoting *Thorner*, 669 F.3d at 1365). "Disavowal requires that 'the specification [or prosecution history] make[] clear that the invention does not include a particular feature,' or is clearly limited to a particular form of the invention." *Id.* at 1372 (alterations in original) (internal citations omitted).

Petitioner argues, and we agree, that Patent Owner's cited excerpt does not make clear "that the inventor is redefining a known term" and instead appears to discuss, "without any suggestion that the discussion is complete—particular characteristics of the *already-known* E[-]AGCH." Pet. Reply 11 (emphasis added). Petitioner asserts that "all of the discussion (although not a complete description) is consistent with the 3GPP's E-AGCH." *Id.* (citing Ex. 1004, 20). Petitioner disputes that the 3GPP-defined E-AGCH differs from the E-AGCH of the '625 patent:

> Patent Owner claims that the 3GPP-defined E-AGCH is somehow narrower than the '625 patent's E-AGCH because the 3GPP version does not "support[] issuing scheduling assignments to three identities: (1) an individual UE, (2) a group of UEs, or (3) all UEs on the channel." . . . [T]his requirement of the '625 specification (which is, relevantly, found nowhere in the Korean application) was taken almost verbatim from the ***3GPP's*** own December 3, 2004 description of the E-AGCH in

> Meeting45" thus, "Patent Owner's argument thus inadvertently highlights evidence ***corroborating*** that the applicant copied the 3GPP's own description for the EAGCH into the '625 patent."

*Id.* at 11–12 (citing PO Resp. 10 (citing Ex. 1007, 2)).

Patent Owner's argument that the E-AGCH of the '625 patent differs from that of the 3GPP standard because it "supports issuing scheduling assignments to *three identities*: (1) an individual UE, (2) a group of UEs, or (3) all UEs on the channel," whereas "the 3GPP E[-]AGCH supports issuing scheduling assignments to *only two identities* (a 'group identity' and an 'individual identity')" is unavailing because it is unsupported by the record. PO Resp. 10 (citing Ex. 1007, 2; *comparing* Ex. 1001, Fig. 2, 3:42–44, 3:61–62, 4:19–22 *with*, Ex. 1008, 7–8) (emphases added). At best, the portions of the '625 patent cited by Patent Owner disclose that "each UE can have more than one identifier." Ex. 1001, 3:61–62. Nowhere does the '625 patent clearly express an intent to redefine E-AGCH so as to require *three identifiers or three identities* to issue scheduling assignments to an individual UE, a group of UEs, or all UEs on the channel, or in any way support limiting E-AGCH to three identities *instead of two identities*. *See e.g.*, *id.* at claim 17 (reciting that "one or two identifiers are allocated to each UE"). To redefine a term of art, there must be a clear expression of intent. *Hill-Rom*, 755 F.3d at 1371.

As to the term of art, E-AGCH, it is clear from the teachings of Meeting45 and Meeting45bis that there are two identities, a group identity and an individual identity (Ex. 1007, 2; Ex. 1004, 21), that support sending Absolute Grants "by the Serving E-DCH cell . . . [that] are valid for one UE, for a group of UEs or for all UEs" and that "can have an associated duration" (Ex. 1004, 21). Likewise, the '625 patent Specification discloses

that "scheduling assignment(s) can be transmitted from Node B via shared channel(s) to an UE, group(s) of UEs, or all the UEs." Ex. 1001, 3:42–44. The '625 patent also discloses that an "Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send a scheduling command to an user equipment (UE) . . . as to how much transmission power or a level of data rate transmission an UE is permitted to transmit." *Id.* at 3:15–19.

It is not apparent from the cited portions of the '625 patent Specification that patentee intended to redefine the term of art, E-AGCH, as the cited portions are substantially similar to the 3GPP TS 25.211 standards documents discussed above. None of the cited disclosures of the '625 patent supports Patent Owner's proposed construction. *See generally* Ex. 1001. Like in *Hill-Rom*, there is neither "disclaimer or lexicography" nor "words of manifest exclusion or restriction." *Hill-Rom*, 755 F.3d at 1372.

For the foregoing reasons, we see no clear expression of an intent to depart from the meaning of this term as it would have been understood by a POSITA. We consider E-AGCH as disclosed in the '625 patent to have the same definition as disclosed in the 3GPP standard documents discussed above and thus to also require an absolute grant. *Infra* § III.C.4.

*4. The Claim Term E-AGCH Should be Limited to Transmitting Absolute Grants*

Patent Owner contends that, even if the term E-AGCH is construed to "pertain solely to absolute grants, thus requiring the Korean Application to disclose the concept of an absolute grant," Patent Owner's expert testifies that the '625 patent and the Korean Application disclose the "superset" of grants, which would have been understood to encompass both absolute and relative grants. PO Resp. 15 (citing Ex. 2001 ¶¶ 21–26, 40, Exs. C, D).

Petitioner responds that:

> Patent Owner's attempt to broaden "Enhanced ***Absolute Grant*** Channel" to make it a generic "common grant channel" that transmits any type of grant is not supported by the '625 patent, which never refers to a 'common grant,' and contains no language that would support a new or different definition for this term of art.

Pet. Reply 14 (citing Pet. Reply § V.C).

Petitioner has the better position. We determine that E-AGCH requires transmitting absolute grants, as is consistent with the disclosure of Meeting45. We disagree that the term E-AGCH can be properly interpreted as a "common grant channel" that encompasses transmitting relative grants, as Patent Owner asserts.

Patent Owner also argues that the term "absolute grant" is "a term that is not found in the claims of the '625 patent," that "written support is not necessary for this term," and that, even if support is necessary "***it can readily be found in references to 'scheduling grants***.'" PO Sur-Reply 1. Patent Owner's assertions are problematic because an absolute grant *is* a necessary part of an Enhanced *Absolute Grant* Channel (E-AGCH), written description *is* necessary, and, as we discuss in further detail below, the Korean Application refers to schedule assignments and scheduling commands, not scheduling grants as Patent Owner contends. To make an absolute grant optional would be, in effect, to ascribe no meaning to the word "Absolute" in "Enhanced Absolute Grant Channel" and Patent Owner does not point to any authority that would support such a conclusion.

We determine whether the Korean Application provides written description support for the claim term E-AGCH in Section III.D below.

*5. Whether the Record Supports a Conclusion that E-AGCH is Limited to Single Channel as in Patent Owner's Claim Construction*

Patent Owner disputes our preliminary determination that the claim term E-AGCH is not limited to a single channel. PO Resp. 12 (citing Inst. Dec. 20). This determination is relevant to the challenges applying Chen, as Patent Owner distinguishes Chen on the basis that it discloses "***multiple*** channels to accomplish the same task of issuing scheduling assignments to different selections of UE," instead of a single channel. *Id.* at 17 (citing Ex. 1006, Fig. 6, 18:22–26; Ex. 2001 ¶ 68).

As we determine that claims 16–19, 21, 22, and 39 are unpatentable over Meeting 45 and claims 40 and 42 are unpatentable over Meeting45 and Meeting45bis by a preponderance of the evidence (*infra* §§ III.F, III.H), we need not specifically determine the unpatentability of these claims based on the § 102 and § 103 challenges applying Chen. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, *4 (Fed. Cir. 2020); *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984) (holding that once a dispositive issue is decided, there is no need to decide other issues). Accordingly, we need not determine whether E-AGCH is limited to a single channel. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *see also Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs.* in the context of an *inter partes* review).

*D. Priority Date*

Petitioner contends that the challenged claims are not entitled to a priority date of April 2, 2004—the filing date of the Korean Application listed on the face of the ’625 patent—because the Korean Application does not provide adequate written description support for “E-AGCH.” Pet. 14–16 (citing Ex. 1001, 3:14–16; Ex. 1003 ¶ 107). “E-AGCH” is recited in each of the challenged independent claims of the ’625 patent. Petitioner argues that “the Korean application makes only passing reference to generic ‘downlink channels to be used for transmitting scheduling commands’ in its discussion of the ‘conventional technology in the field,’” but it “lacks any disclosure of the claimed ‘E-AGCH’” “nor even a functional equivalent thereof” and “does not reasonably convey to one skilled in the art that the inventors had possession of that claim element at the time of filing of the Korean application.” *Id.* at 15–16 (citing Ex. 1003 ¶¶ 86–88, 91, 108–113; Ex. 1008 ¶ 7). Petitioner argues that, accordingly, “*March 31, 2005* (the date of filing of the U.S. application for the ’625 patent) is the correct priority date for the challenged claims.” *Id.* at 17 (emphasis added); *see id.* at 14.

Patent Owner contends that “[t]he majority of Petitioners’ grounds for invalidity of the challenged claims . . . are based on the Meeting45, Meeting39, and Meeting45bis references (collectively, the ‘3GPP references’), which post-date the *April 2, 2004* priority date of the ’625 patent.” PO Resp. 1 (Inst. Dec. 4) (emphasis added). Patent Owner further contends “that the Enhanced Absolute Grant Channel (‘E-AGCH’) taught by the ’625 patent has sufficient written description [in] the underlying Korean Application.” *Id.* at 1–2; *see id.* at 2 (citing Ex. 2001 ¶¶ 55, 60–67; Inst. Dec. 1, 4). Patent Owner further contends that:

> the characteristics of the E-AGCH as disclosed by the ’625 patent are supported as follows: (1) a single common grant channel; (2) support for a UE having multiple identifiers; and (3) using the multiple identifiers assigned to a single UE to issue scheduling grants to individual UE, groups of UE, or all of the UE on the channel.

*Id.* at 16 (Ex. 1008, Figs. 1, 2, claims 1, 2; Ex. 2001 ¶ 40; Ex. 2006 ¶¶ 61–65); *see id.* (citing Inst. Dec. 20; Ex. 2006 ¶¶ 21–26).

In support of Patent Owner’s assertion that a POSITA would have understood the Korean Application to provide written description support for E-AGCH, Mr. Lipoff testifies that:

> A POSITA would be aware of the influence of DOCSIS protocols on the development of protocols to support high speed packet switched data enhancements to 3GPP WCMA and would understand that the Korean patent need not qualify the general concept of scheduling commands (i.e., grants) as either absolute or relative but instead for understand that the mention of a grant in a 3GPP WCMA context would apply to subsets of the general concept of a grant included both absolute and relative types.
>
> For example an excerpt from a 2002 reference describing DOCSIS service flows introduces the request/grant scheduling mechanism and throughout the reference never qualifiers a “grant” as “absolute” or “relative” . . .
>
> That absolute and relative grants are subsets of scheduling grants is further supported by *3GPP specifications appearing four months after the priority date of the Korean Application*. 3GPP Specification 25.309 v0.3.0 illustrates the breakdown in a manner already understood in the industry:
>
>> 9 Node B controlled scheduling
>> 9.1 General Principle
>> The Node B controlled scheduling is based on uplink and downlink control together with a set of rules on how the UE shall behave with respect to this signaling. In the downlink, a resource indication (scheduling grant) is required to indicate

> to the UE the maximum amount of uplink resources it may use.
> - There are two types of grants:
> - The absolute grants provide an absolute limitation of the maximum amount of UL resources the UE may use;
> - The relative grants increase or decrease the resource limitation compared to the previously used value[.]

Ex. 2006 ¶¶ 24–26 (citing Ex. C, 1–2; Ex. D, 10–11) (emphasis added).

In order to obtain the benefit of the filing date of an earlier application, 35 U.S.C. § 120 requires that the earlier application include a disclosure that complies with the written description requirement of 35 U.S.C. § 112. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571–2 (Fed. Cir. 1997). To comply with the written description requirement, a specification "must describe the invention sufficiently to convey to a person of skill in the art that the patentee *had possession of the claimed invention* at the time of the application, i.e., that the patentee invented what is claimed." *Lizardtech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (emphasis added). The written description requirement "guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991). "[O]ne skilled in the art, reading the original disclosure, *must immediately discern the limitation at issue in the claims*." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (emphasis added). "Entitlement to a filing date extends only to the subject matter that is disclosed; *not to that which is obvious* . . . Therefore the parent application must actually or inherently disclose the elements of the later-

filed claims." *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 870 (Fed. Cir. 2010) (internal citations omitted) (emphasis added).

Even assuming, *arguendo*, that Patent Owner had sufficiently shown an equivalence between the scheduling assignments and scheduling commands that are set forth the Korean Application and the argued scheduling grants, Patent Owner does not point to any authority that would support the proposition that disclosing the broader, more generic concept of a channel that transmits a scheduling command or scheduling assignment in the Korean Application (*see generally* Ex. 1008) is sufficient to provide written description support for the narrower, more specific a channel that transmits an absolute grant. *See* PO Resp. 15; *Purdue*, 230 F.3d 1320 at 1326 ("One cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention."). Rather, the specification must provide "guides or 'blaze marks' to single out" the claimed invention. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1348 (Fed. Cir. 2010). We determine that the Korean Application does not "actually . . . disclose" the E-AGCH "of the later-filed claims." *Research*, 627 F.3d at 870.

The record also does not support the finding that the Korean Application "inherently disclose[s]" the E-AGCH "of the later-filed claims." *Id.* Petitioner discredits Mr. Lipoff's testimony because it is based on DOCSIS (Ex. 2006, Ex. C), a cable standard, whereas the '625 patent is related to wireless cellular communications, persuasively arguing that "even if a POSITA was aware of DOCSIS, the fact that another standard ***doesn't*** use a particular term in its specifications reveals nothing about a POSITA's understanding of the 3GPP standard's scheduling commands." Pet. Reply 19. Petitioner also persuasively argues that "while Mr. Lipoff, through his

own work in DOCSIS, might personally believe DOCSIS protocols somehow 'influenced' 3GPP, the record does not support that conclusion." *Id.* at 21.

We determine that the fact that the cable standard, DOCSIS, does not qualify the term grant as either absolute or relative does not support a finding that a POSITA would have understood the term to "inherently disclose" both absolute and relative grants, particularly in the context of wireless cellular communications such as those governed by the 3GPP standard and disclosed in the '625 patent. *See Research*, 627 F.3d at 870. We further determine that the fact that 3GPP Specification 25.309 v0.3.0 (Ex. 2006, Ex. D) indicates two types of grants, absolute grants and relative grants, *four months after* the filing of the Korean Application as Patent Owner acknowledges (*id.* ¶ 26), would not give us sufficient insight into what a POSITA would have understood in April of 2004, especially given the apparently rapidly evolving state of wireless cellular communications.

Because the Korean Application does not actually or inherently disclose an E-AGCH or provide support for a channel that transmits absolute grants, it does not provide sufficient written description to have conveyed to one skilled in the art that the inventors had possession of that claim element at the time of filing the Korean Application, April 2, 2004. Having reviewed the entire record developed during trial, we determine that the '625 patent is not entitled to the filing date of the Korean Application. Instead, the priority date of the '625 patent is its filing date, March 31, 2005.

*Patent Owner's Untimely Argument*

Patent Owner also contends that Mr. Lipoff "opines that the Korean Application discloses the concept of absolute grants even though it refers only to 'scheduling assignments,'" because "'scheduling assignments' are a

synonym for 'scheduling grants'" and "*the only kind of assignment or grant known at the time of the Korean Application to persons of ordinary skill were absolute grants*." PO Sur-Reply 4 (citing Ex. 2001 ¶ 65 ("The concept of scheduling grants—of which absolute grants are a subset—is a concept referenced throughout the Korean Application."); Ex. 2006 ¶ 24 ("the Korean patent need not qualify the general concept of scheduling commands (i.e., grants) as either absolute or relative but instead . . . the mention of a grant in a 3GPP WCMA context would apply to subsets of the general concept of a grant includ[ing] both absolute and relative types")) (emphasis added). This position is untimely, is not supported, and is at odds with the cited portions of Mr. Lipoff's testimony (*see, e.g.*, Ex. 2001 ¶ 65; Ex. 2006 ¶ 24) and Patent Owner's earlier position that "Patent Owner's expert has testified that grants may be 'absolute' or they may be 'relative' *but that both types would be recognized by a POSITA at the time of invention as subsets of the superset of 'grants*.'" PO Resp. 15 (citing Ex. 2001 ¶ 40) (emphasis added); *see* Tr. 26:8–27:6. As such, we do not now consider Patent Owner's argument that "the only kind of assignment or grant known at the time of the Korean Application to persons of ordinary skill were absolute grants," and even if we did, we would not find it persuasive for the reasons discussed above. PO Sur-Reply 4.

*E. Public Accessibility*

Petitioner asserts that Meeting45, Meeting39, and Meeting45bis qualify as prior art because each document was published and publicly available on the 3GPP website prior to March 31, 2005, the filing date of the U.S. application for the '625 patent. Pet. 17 (citing Ex. 1021 ¶¶ 54–79). Petitioner cites the Bishop Declaration for establishing the public availability

of the documents and describing in detail how a member of the public can access such documents. *Id.* at 17–23 (citing Ex. 1021 ¶¶ 64, 70, 73, 77–79).

Patent Owner does not dispute Petitioner's showing of public accessibility with respect to any of the cited references. *See generally* PO Resp. 17–18. For the reasons that follow, we find that Petitioner's showing sufficiently demonstrates public availability and accessibility for Meeting45, Meeting39, and Meeting45bis prior to March 31, 2005.

*1. Meeting45*

Petitioner asserts that Meeting45 (Ex. 1004) "is a 3GPP change request document that was publicly available on the 3GPP FTP server no later than December 3, 2004." Pet. 18 (citing Ex. 1021 ¶¶ 64, 77). In support of this assertion, Petitioner cites the Bishop Declaration, in which Mr. Bishop describes in detail how he searched for and found the Meeting45 document by navigating the 3GPP FTP website. Ex. 1021 ¶¶ 54–63. Based on this process, Mr. Bishop testifies that "by December 3, 2004, an interested POSITA using reasonable diligence could have located Meeting45 on the 3GPP website, downloaded the reference without providing any credentials, and disseminated the reference to others without restriction." *Id.* ¶ 64. We have reviewed the relevant portions of Mr. Bishop's Declaration and are persuaded that his testimony sufficiently demonstrates that Meeting45 was publicly available and accessible prior to March 31, 2005 (the earliest priority date to which the '625 patent is entitled). *See id.* ¶¶ 54–63; *see also id.* ¶¶ 55–57 (testimony as to availability and accessibility of attachment distributed via email and stored on an email list archive).

*2. Meeting39*

Petitioner asserts that Meeting39 (Ex. 1005) "is a change request to 3GPP TS 25.211 v6.2.0" that "was publicly available on the 3GPP FTP

server no later than November 21, 2004." Pet. 20–21 (citing Ex. 1021 ¶¶ 70, 78). In support of this assertion, Petitioner cites the Bishop Declaration, in which Mr. Bishop describes in detail how he searched for and found the Meeting39 document by navigating the 3GPP FTP website. Ex. 1021 ¶¶ 68–69. Mr. Bishop therefore opines that "by November 21, 2004, an interested POSITA using reasonable diligence could have located Meeting39 on the 3GPP website, downloaded the reference without providing any credentials, and disseminated the reference to others without restriction." *Id.* ¶ 70. We have reviewed the relevant portions of Mr. Bishop's Declaration and are persuaded that his testimony sufficiently demonstrates that Meeting39 was publicly available and accessible prior to March 31, 2005 (the earliest priority date to which the '625 patent is entitled). *See id.* ¶¶ 68–70.

*3. Meeting45bis*

Petitioner asserts that Meeting45bis (Ex. 1007) "is a 3GPP 'temporary document' submitted to the same 3GPP working group as Meeting45 and was publicly available on the 3GPP FTP server no later than January 7, 2005." Pet. 22 (citing Ex. 1021 ¶¶ 73, 79). In support of this assertion, Petitioner cites the Bishop Declaration, in which Mr. Bishop describes in detail how he searched for and found the Meeting45bis document by navigating the 3GPP FTP website. Ex. 1021 ¶¶ 71–72. Mr. Bishop therefore opines that "by January 7, 2005, an interested POSITA using reasonable diligence could have located Meeting45bis on the 3GPP website, downloaded the reference without providing any credentials, and disseminated the reference to others without restriction." *Id.* ¶ 73. We have reviewed the relevant portions of Mr. Bishop's Declaration and are persuaded that his testimony sufficiently demonstrates that Meeting45bis was publicly available and accessible prior to March 31, 2005 (the earliest

priority date to which the ’625 patent is entitled). *See id.* ¶¶ 71–73; *see also id.* ¶¶ 74–76 (testimony as to availability and accessibility of attachment distributed via email and stored on an email list archive).

### *F. Challenge Based on Meeting45*

Petitioner contends that claims 16–19, 21, 22, and 39 are unpatentable under 35 U.S.C. § 102(a) for anticipation based on Meeting45. Pet. 25–35. For the reasons that follow, we are persuaded that Petitioner has shown unpatentability of claims 16 and 39 over Meeting45 by a preponderance of the evidence.[11]

#### *1. Overview of Meeting45 (Ex. 1004)*

Meeting45 is a change request document made by a 3GPP working group to TS 25.309 v6.0.0, which is a technical specification “of the overall support of FDD Enhanced Uplink” in UMTS Terrestrial Radio Access (UTRA). Ex. 1004, 1, 7. In relevant part, Meeting45 describes the “E-DCH: Enhanced DCH, a new dedicated transport channel type,” setting forth the characteristics and physical layer model of the uplink transport channel, whereby an “E-DCH Absolute Grant is transmitted by a single cell, the Serving E-DCH cell . . . on a physical channel called E-AGCH.” *Id.* at 7, 9–11. Meeting45 also describes “Node B controlled scheduling . . . based on uplink and downlink control together with a set of rules on how the UE shall

---

[11] Patent Owner does not argue that any of Meeting45, the combination of Meeting45 and Meeting39, and the combination of Meeting45 and Meeting45bis fails to disclose the claimed subject matter. Rather, Patent Owner argues that this challenge should fail because none of Meeting45, Meeting39, and Meeting45bis qualify as prior art under 35 U.S.C. § 102(a). *See generally* PO Resp. According to Patent Owner, the priority date for the challenged claims of the ’625 patent is April 2, 2004, and each of Meeting45, Meeting39, and Meeting45bis was published after that date. *Id.*

behave with respect to this signaling." *Id.* at 20. This section explains that "[i]n the downlink, a resource indication (Scheduling Grant) is required to indicate to the UE the maximum amount of uplink resources it may use" and "control the maximum allowed power ratio." *Id.* at 5, 20. According to Meeting45, Scheduling Grants can be "Absolute Grants" (AG), which "provide an absolute limitation of the maximum amount of UL resources the UE may use"; "are valid for one UE, for a group of UEs or for all UEs"; and "can have an associated duration." *Id.* at 20–21. According to Meeting45, an AG also "contains at least the identity (E-RNTI) of the UE (or group of UEs) for which the grant is intended and the maximum resources the UE(s) may use." *Id.* at 21.

#### 2. *Independent Claim 16*

> *"A method of scheduling an uplink packet transmission channel for user equipment (UE), the method comprising:"*

Petitioner contends that Meeting45 discloses the preamble of claim 16 because "Meeting45 describes 'Node B controlled scheduling,' which 'is based on uplink and downlink control together with a set of rules on how the UE shall behave with respect to this signaling.'" Pet. 25 (quoting Ex. 1004, 20) (citing Ex. 1003 ¶¶ 125–126).[12]

> *"receiving a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH)"*

Petitioner contends that Meeting45 discloses this limitation of claim 16 because "[i]n a section entitled 'UE scheduling operation,' Meeting45 further explains that '[t]he UE shall be able to receive Absolute Grant from

---

[12] We need not determine whether the preamble is limiting because we agree with Petitioner that the reference discloses the subject matter of the preamble.

the Serving E-DCH cell'" and that an "'Absolute Grant' (scheduling assignment) 'is transmitted by a single cell, the Serving E-DCH cell . . . on a physical channel called E-AGCH.'" Pet. 27 (quoting Ex. 1004, 11, 21) (citing *id.* at 21–22; Ex. 1003 ¶ 132).

*Patent Owner's Argument*

In its Sur-Reply, Patent Owner argues that in the '625 patent,

> assignments made on the channel can be issued using three identifiers, each simultaneously assigned to a single UE: (1) one that identifies a UE individually, (2) one that identifies the UE as a member of a group, and (3) one universal identifier common to all UE on the channel. The E-AGCH of the '625 patent has this functionality, whereas the 3GPP's E-AGCH does not. (D.I. 32 at 12, 17-20.) The Meeting45 reference quoted by Petitioners does not indicate that the 3GPP E-AGCH has this functionality, nor discusses identifiers whatsoever[.]

Sur-Reply 14 (citing Inst. Dec. 32, 44; Ex. 2001 ¶ 55).

This argument that Meeting45 does not discuss identifiers was not originally set forth in Patent Owner's Response and is therefore untimely. As such, we do not address this argument in this Decision.

*"wherein the scheduling assignment comprises an identifier for a plurality of UE"*

Petitioner contends that Meeting45 discloses this limitation of claim 16 because it discloses that "Absolute Grants . . . are valid for one UE, *for a group of UEs* or for all UEs" and that "'the Absolute Grant contains at least the identity (E-RNTI) of the UE (*or group of UEs*) for which the grant is intended' (*i.e.*, 'an identifier for a plurality of UE')." Pet. 28 (quoting Ex. 1004, 21) (citing Ex. 1003 ¶ 135). According to Petitioner, "Meeting45 also notes that '[g]roup identities or dedicated identities are not distinguished by the UE,' and '[i]t is up to the UTRAN [radio network] to allocate the same identity to a group of UEs.'" *Id.* (quoting Ex. 1004, 21). Petitioner contends

that "[t]his means that an Absolute Grant intended for a group of UEs includes an identifier for the group of UEs as claimed." *Id.* (citing Ex. 1003 ¶ 136).

*"acquiring the contents of the scheduling assignment"*

Petitioner contends that Meeting45 discloses this limitation of claim 16 because it "elaborates that the UE acquires the contents of the scheduling assignment when it explains that the UE acts on the scheduling assignment by 'maintain[ing] a "Serving Grant" (SG)' that 'is set equal to the "Absolute Grant" value when one is received from the serving E-DCH cell.'" Pet. 29 (quoting Ex. 1004, 21) (citing Ex. 1003 ¶ 138).

*"transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment"*

Petitioner contends "Meeting45 discloses the 'E-DCH,' which it defines as the 'Enhanced DCH, a new dedicated transport channel type or enhancements to an existing dedicated transport channel type.'" Pet. 29 (quoting Ex. 1004, 7) (citing Ex. 1003 ¶ 141). According to Petitioner,

> Meeting45 also discloses the MAC architecture for the UE and explains that the "TSN field (6 bits) provides the transmission sequence number ***on the E-DCH***" and the "***PDU*** is forwarded . . . to layer 1 ***for transmission***." A POSITA would have understood that a PDU (Protocol Data Unit) is a packet, and therefore that packets are transmitted on the E-DCH in accordance with the instructions of the received Absolute Grant.
>
> Meeting45 further explains that the E-DCH Transport Format Combination (E-TFC) selection entity in the UE is "responsible for E-TFC selection ***according to the scheduling information*** (Relative Grants and Absolute Grants) received" and a packet is then "***transmitted . . . as instructed*** by the E-TFC selection function." Meeting45 explains that "Scheduling Grants" (including the "Absolute Grants" conveyed on the E-AGCH) are "are only to be used for the E-DCH TFC selection

> algorithm (i.e. they do not to influence the TFC selection for the DCHs)."

Pet. 30 (citing Ex. 1004, 12–14, 20; Ex. 1003 ¶¶ 143, 144) (alterations in original).

Patent Owner does not specifically contest Petitioner's arguments that Meeting45 discloses the limitations of claim 16. *See generally* PO Resp. We have reviewed the arguments and evidence, including the cited portions of Meeting45, and are persuaded that they disclose the limitations of claim 16. For the foregoing reasons, we are persuaded that Petitioner establishes unpatentability of independent claim 16 over Meeting45 by a preponderance of the evidence.

*3. Independent Claim 39*

Independent claim 39 recites substantially similar limitations as independent claim 16, except that it does not recite the "acquiring" limitation of claim 16. Accordingly, our analysis in Section III.F.2 is substantially applicable to independent claim 39, with the exception of the "acquiring" limitation.

Independent claim 39 also replaces "an uplink packet transmission channel for user equipment (UE)," as recited in claim 16, with "a plurality of uplink packet transmission channels for a corresponding plurality of user equipment (UE)." Petitioner addresses this limitation of claim 39 as follows:

> Meeting45 discloses the "E-DCH," an uplink packet transmission channel, which it defines as the "Enhanced DCH, a new dedicated transport channel type," and further sets out its channel attributes and uplink physical layer model. As a "dedicated" channel, there is one E-DCH for each UE, and therefore a plurality of E-DCH uplink packet transmission channels for a corresponding plurality of user equipment . . . "There is only one CCTrCH [(Coded Composite Transport Channel)] of E-DCH type per UE."

Pet. 34 (citing Ex. 1004, 7, 10–11; Ex. 1003 ¶ 151). Petitioner further points to its analysis of independent claim 16 in reiterating that "Meeting45 describes 'Node B controlled scheduling,' including an 'Absolute Grant,' which 'provide[s] an absolute limitation of the maximum amount of UL resources the UE may use' for transmission on the uplink, is 'valid for one UE, for a group of UEs, or for all UEs,' and 'contains at least the identity (E-RNTI) of the UE (or group of UEs) for which the grant is intended.'" *Id.* at 34–35 (citing Ex. 1004, 7, 20–21; Ex. 1003 ¶ 152).

Patent Owner does not specifically contest Petitioner's arguments that Meeting45 discloses the limitations of claim 39. *See generally* PO Resp. We have reviewed the arguments and evidence, including the cited portions of Meeting45, and are persuaded that they disclose the limitations of claim 39. For the foregoing reasons, we are persuaded that establishes unpatentability of independent claim 39 over Meeting45 by a preponderance of the evidence.

*4. Dependent Claims 17–19, 21, and 22*

*Claim 17 recites "wherein one or two identifiers are allocated to each UE"*

Petitioner contends that Meeting45's "Absolute Grant contains at least the identity (E-RNTI) of the UE (or group of UEs) for which the grant is intended." Pet. 31 (citing Ex. 1004, 21; Ex. 1003 ¶ 143). Meeting45 explains that "[o]ne identity (E-RNTI) is allocated to a UE at a time." *Id.* (citing Ex. 1004, 21; Ex. 1003 ¶ 145; Pet. § V.A.1.c).

*Claim 18 recites "wherein the scheduling contents include a scheduled power command for assigning a specified amount of power for the uplink packet transmission"*

According to Petitioner, "Meeting45 explains that the 'Absolute Grants provide an absolute limitation of the maximum amount of UL

resources the UE may use' for uplink packet transmission." Pet. 31–32 (citing Ex. 1004, 21; Ex. 1003 ¶ 146). Petitioner further contends that "Meeting45 discloses that an Absolute Grant controls 'the maximum allowed *power ratio*' between the physical channel that carries the E-DCH (the 'E-DPDCH') and another power-limited physical control channel (the 'DPCCH')." *Id.* at 32 (citing Ex. 1004, 20, 2, 5; Ex. 1003 ¶ 146). Petitioner contends that "[a] POSITA would have understood that providing a maximum allowance for this power ratio provides a 'scheduled power command for assigning a specified amount of power' (a maximum power limit) 'for the uplink packet transmission' on the E-DCH." *Id.* (citing Ex. 1003 ¶ 146; Ex. 1001, 3:27–30 ("[S]cheduled power, also referred to as rate, defines a maximum amount of power that can be allotted for transmission of the uplink packet transmission")).

*Claim 19 recites "wherein the scheduling contents include a duration command for determining a length of period the scheduling assignment remains effective"*

Petitioner contends that "Meeting45 discloses that 'Absolute Grants . . . can have an associated duration.'" Pet. 32 (citing Ex. 1004, 21; Ex. 1003 ¶ 147).

*Claim 21 recites "wherein the scheduling assignment includes a command granting or denying transmission in the E-DCH"*

Petitioner contends that "Meeting45 discloses that an 'Absolute Grant' (*i.e.*, scheduling assignment) provides 'the maximum amount of UL resources the UE may use' for uplink transmission on the E-DCH." Pet. 33 (citing Ex. 1004, 20; Ex. 1003 ¶ 148; Pet. § V.A.1.e).

*Claim 22 recites "wherein each UE of a shared channel in the E-AGCH has at least one UE identifier"*

Petitioner contends that Meeting45 teaches that "the Absolute Grant contains at least the identity (E-RNTI) of the UE (or group of UEs) for which the grant is intended." Pet. 33 (citing Ex. 1004, 21; Ex. 1003 ¶ 149; Pet. § V.A.1.c). According to Petitioner, "Meeting45 explains that "[o]ne identity (E-RNTI) is allocated to a UE at a time." *Id.* (citing Ex. 1004, 21; Ex. 1003 ¶ 149). Petitioner further contends that "Meeting45 discloses that '[g]roup identities or dedicated identities are not distinguished by the UE,' and '[i]t is up to the UTRAN to allocate the same identity to a group of UEs.'" *Id.* (citing Ex. 1004, 21; Ex. 1003 ¶ 149).

*Conclusion*

Patent Owner does not specifically contest Petitioner's arguments that Meeting45 discloses the limitations of claims 17–19, 21, and 22. *See generally* PO Resp. We have reviewed the arguments and evidence, including the cited portions of Meeting45, and are persuaded that they disclose the limitations of claims 17–19, 21, and 22. For the foregoing reasons, we are persuaded that Petitioner establishes unpatentability of claims 17–19, 21, and 22 over Meeting45 by a preponderance of the evidence.

*G. Challenge Based on Meeting45 and Meeting39*

Petitioner contends claims 16–19, 21, 22, and 39 are unpatentable under 35 U.S.C. § 103(a) for obviousness based on Meeting45 and Meeting39. Pet. 36–41. Petitioner explains that "while all of the limitations of claims 16-19, 21, 22, and 39, are disclosed by Meeting45 alone, to the extent that Patent Owner disputes that Meeting45 discloses the limitations of these claims . . . , the additional disclosure of Meeting39 also renders claims

16-19, 21, 22, and 39 obvious in combination with Meeting45." *Id.* at 36; *see id.* at 36–41 (citing Ex. 1003 ¶¶ 161–170; Ex. 1004, 7–8; Ex. 1005, 10, 12, 15, 46, Fig. 2B; Ex. 1017, 3–5).

As we determine that claims 16–19, 21, 22, and 39 are unpatentable over Meeting 45 alone by a preponderance of the evidence (*supra* § III.F), we need not specifically determine the unpatentability of these claims over the combination of Meeting45 and Meeting39. *See Boston Sci. Scimed*, 809 F. App'x 984, *4; *Beloit*, 742 F.2d at 1423.

### *H. Challenge Based on Meeting45 and Meeting45bis*

Petitioner contends that claims 40 and 42 are unpatentable under 35 U.S.C. § 103(a) for obviousness based on Meeting45 and Meeting45bis. Pet. 41–43. For the reasons that follow, we are persuaded that Petitioner establishes unpatentability of claims 40 and 42 over Meeting45 and Meeting45bis by a preponderance of the evidence. *Supra* n.9 (noting that Patent Owner argues only the prior art status—and not the subject matter—of Meeting45, Meeting45bis, and Meeting39).

#### *1. Overview of Meeting45bis (Ex. 1007)*

Meeting45bis is a 3GPP "temporary document" submitted to the same 3GPP working group as Meeting45 and similarly relates to the development of FDD Enhanced Uplink and E-DCH support and specifically addresses scheduling delay. Ex. 1007, 1–2. Meeting45bis describes that "multiple user identities can be used" on the UE "to allow users to perform transmissions with a minimum delay." *Id.* at 2. Meeting45bis also describes that, by using two user entities, such as a group entity and an individual entity, and monitoring their absolute grants, all inactive users can be quickly prohibited from transmitting. *Id.* Meeting45bis proposes accordingly that "all UEs

should monitor the absolute grants for two identities." *Id.*; *see also id.* at 3 ("Specify that the UE shall monitor two identities on the E-AGCH.").

*2. Claim 40*

Petitioner contends that Meeting45 in combination with Meeting45bis discloses dependent claim 40. Pet. 42.

> *"wherein the content of the scheduling assignment includes information relating to uplink transmission, and wherein two identifiers are allocated to at least one UE"*

Petitioner contends that "Meeting45 describes the process of Node B controlled scheduling using the E-AGCH and E-DCH, and Meeting45bis (titled 'E-DCH Priority Based Scheduling') describes priority-based scheduling grants on the E-AGCH" and "proposes that a UE should monitor two identities on the E-AGCH." *Id.* at 41 (citing Ex. 1007, 2–3).

*Motivation to Combine*

Petitioner reasons that a POSITA would have been motivated to combine Meeting45 and Meeting45bis for the same reasons as those discussed above for the challenge based on the combination of Meeting45 and Meeting39. Pet. 41 (citing *id.* at 36–37; Ex. 1003 ¶¶ 171–173).

With respect to Petitioner's rationale for combining Meeting45 and Meeting39, Petitioner reasons that "[a] POSITA would have combined Meeting45 with Meeting39 to produce the obvious, beneficial, and predictable results of a 3GPP UMTS system that incorporates the characteristics of the channels in the FDD mode of UTRA described in Meeting39 with the overall FDD Enhanced Uplink description in Meeting45." Pet. 36–37 (citing Ex. 1003 ¶¶ 161–165). Petitioner explains that both references are directed to the same field of invention—"wireless communications using the FDD mode of UTRA"—and that "there would have been an explicit teaching, suggestion, and motivation to combine these

two 3GPP documents" because they "contain changes to technical specifications in 3GPP Release 6 that are explicitly intended to be read and considered together." *Id.* at 37 (citing Ex. 1003 ¶¶ 163–165). Petitioner also explains that

> The proposed combination would have been nothing more than the combination of prior art elements (Meeting45's Node B controlled scheduling using Meeting39's descriptions of E-AGCH and E-DCH) according to known methods (Meeting45 explicitly states that its scheduling mechanism uses E-AGCH to schedule uplink transmission on E-DCH) to yield predictable results (Node B controlled scheduling of the E-DCH in a 3GPP UMTS system).

*Id.* at 37–38 (citing Ex. 1003 ¶ 164). And, according to Petitioner, "[a] POSITA would have had a reasonable expectation of success in implementing this combination because the E-AGCH and E-DCH channels described in Meeting39 are the same E-AGCH and E-DCH channels Meeting45 indicates are used in its Node B controlled scheduling mechanism." *Id.* at 38 (citing Ex. 1003 ¶¶ 164–165).

Petitioner also reasons that "[a] POSITA reviewing Meeting45bis would have been motivated to consider Meeting45bis with Meeting45, since both references propose changes to the same topics (E-AGCH and E-DCH scheduling) in the same specification (TS 25.309), and both were submitted to the same working group (TSG RAN2) within weeks of each other." *Id.* And, according to Petitioner, "[a] POSITA would have had a reasonable expectation of success in implementing this combination because the enhancements to the scheduling grants on the E-AGCH described in Meeting45bis are intended to be applied to the scheduling grant scheme on the same E-AGCH in Meeting45." *Id.* at 42 (citing Ex. 1003 ¶¶ 171–173).

We determine that Petitioner has provided sufficient reasoning, with rational underpinning, why a POSITA would have been motivated to combine Meeting45 with Meeting45bis in the manner Petitioner proposes, with a reasonable expectation of success.

Patent Owner does not specifically contest Petitioner's arguments that Meeting45 in combination with Meeting45bis discloses the subject matter of claim 40. *See generally* PO Resp. We have reviewed the cited portions of Meeting45 and Meeting45bis and are persuaded that they disclose or suggest the "wherein" limitation recited in claim 40. For the foregoing reasons, we are persuaded that Petitioner establishes unpatentability of dependent claim 40 over Meeting45 and Meeting45bis by a preponderance of the evidence.

*3. Claim 42*

Petitioner contends that Meeting45 in combination with Meeting45bis discloses dependent claim 42. Pet. 43.

> *"wherein the content of the scheduling assignment further includes a command granting or denying transmission in the E-DCH"*

Petitioner contends that "Meeting45's disclosure of a command granting transmission in the E-DCH teaches this limitation." Pet. 43 (citing Ex. 1003 ¶ 178). Petitioner further contends that "Meeting45bis expressly discloses a scheduling assignment that denies transmission on the E-DCH" and quotes the following disclosure: "[w]hen the load increases and the network needs to prohibit inactive users from transmitting[,] the rate zero is allocated to the 'group' identity. This quickly prohibits all inactive users from transmitting." Pet. 43 (quoting Ex. 1007, 2). According to Petitioner, a "POSITA would have understood that allocating 'rate zero' is the same as denying transmission." *Id.* (citing Ex. 1003 ¶ 179).

*Motivation to Combine*

Petitioner relies on the same motivation to combine as set forth for claim 40. *Supra* § III.H.2. For the same reasons set forth with respect to claim 40, we determine that Petitioner's motivation to combine Meeting45 with Meeting45bis in the manner Petitioner proposes has sufficient rational underpinning and a reasonable expectation of success.

Patent Owner does not specifically contest Petitioner's arguments that Meeting45 in combination with Meeting45bis discloses this limitation of claim 42. *See generally* PO Resp. We have reviewed the cited portions of Meeting45 and Meeting45bis and are persuaded, that they disclose or suggest the "wherein" limitation of claim 42. For the foregoing reasons, we are persuaded that Petitioner establishes unpatentability of dependent claim 42 based on Meeting45 and Meeting45bis by a preponderance of the evidence.

*I. Challenges Based On Chen*

Petitioner contends that each of the challenged claims is unpatentable under 35 U.S.C. § 102(e) for anticipation based on Chen, as well as under 35 U.S.C. § 103(a) for obviousness based on Chen. Pet. 44–65.

As we determine that claims 16–19, 21, 22, and 39 are unpatentable over Meeting45 by a preponderance of the evidence, and because we determine that claims 40 and 42 are unpatentable over Meeting45 and Meeting45bis by a preponderance of the evidence, we decline to address the unpatentability of these claims over Chen. *See Boston Sci. Scimed*, 809 F. App'x 984; *Beloit*, 742 F.2d at 1423.

## IV. CONCLUSION[13]

In summary:

| Claims Challenged | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 16–19, 21, 22, 39 | 102(a) | Meeting45 | 16–19, 21, 22, 39 | |
| 16–19, 21, 22, 39 | 103(a) | Meeting45, Meeting39[14] | | |
| 40, 42 | 103(a) | Meeting45, Meeting45bis | 40, 42 | |
| 16–19, 21, 22, 39, 40, 42 | 102(e) | Chen[15] | | |
| 16–19, 21, 22, 39, 40, 42 | 103(a) | Chen[16] | | |
| **Overall Outcome** | | | 16–19, 21, 22, 39, 40, 42 | |

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).
[14] As explained above, because we determine that claims 16–19, 21, 22, and 39 are unpatentable over Meeting45 by a preponderance of the evidence, we decline to address this ground.
[15] As explained above, because we determine that claims 16–19, 21, 22, and 39 are unpatentable over Meeting45 and claims 40 and 42 are unpatentable over Meeting45 and Meeting45bis by a preponderance of the evidence, we decline to address this ground.
[16] As explained above, because we determine that claims 16–19, 21, 22, and 39 are unpatentable over Meeting45 and claims 40 and 42 are unpatentable

## V. IV. ORDER

For the reasons given, it is:

ORDERED that Petitioner has established based on a preponderance of evidence that claims 16–19, 21, 22, 39, 40, and 42 of the ’625 patent are unpatentable as obvious under 35 U.S.C. § 103; and

FURTHER ORDERED because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

over Meeting45 and Meeting45bis by a preponderance of the evidence, we decline to address this ground.

FOR PETITIONER:

Kourtney Mueller Merrill
Amanda Tessar
Roderick O'Dorisio
PERKINS COIE LLP
merrill-ptab@perkinscoie.com
tessar-ptab@perkinscoie.com
odorisio-ptab@perkinscoie.com

Meredith Addy
Robert Hart
Gregory Gulliver
ADDYHART P.C.
meredith@addyhart.com
robert@addyhart.com
gbgulliver65@gmail.com

Benjamin Weed
Brian Bozzo
Erik Halverson
K&L GATES LLP
bejamin.weed.ptab@klgates.com
brian.bozzo@lkgates.com
erik.halverson@klgates.com

Jeremy Peterson
Bradford Cangro
PV LAW LLP
jeremy.peterson@pvuslaw.com
bradford.cangro@pvuslaw.com

Jacob Baron
Allison Lucier
HOLLAND & KNIGHT LLP
jacob.baron@hklaw.com
allison.lucier@hklaw.com

FOR PATENT OWNER:

Timothy Devlin
DEVLIN LAW FIRM LLC
td-ptab@devlinlawfirm.com

US007551625B2

(12) **United States Patent**
**Ahn et al.**

(10) **Patent No.: US 7,551,625 B2**
(45) **Date of Patent: Jun. 23, 2009**

(54) **METHOD OF SCHEDULING AN UPLINK PACKET TRANSMISSION CHANNEL IN A MOBILE COMMUNICATION SYSTEM**

(75) Inventors: **Joon Kui Ahn**, Seoul (KR); **Hak Seong Kim**, Seoul (KR); **Seung Hwan Won**, Gyeonggi-do (KR)

(73) Assignee: **LG Electronics Inc.**, Seoul (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 701 days.

(21) Appl. No.: **11/097,011**

(22) Filed: **Mar. 31, 2005**

(65) **Prior Publication Data**

US 2005/0220116 A1 Oct. 6, 2005

(30) **Foreign Application Priority Data**

Apr. 2, 2004 (KR) ...................... 10-2004-0022960

(51) **Int. Cl.**
***H04L 12/28*** (2006.01)

(52) **U.S. Cl.** .................................... **370/395.4**; 370/278

(58) **Field of Classification Search** ................. 370/395, 370/338, 346, 335; 709/227
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,526,357 A * 6/1996 Jandrell ...................... 370/346
5,550,575 A * 8/1996 West et al. .................... 725/28
5,862,452 A * 1/1999 Cudak et al. .................. 725/81
6,452,915 B1 * 9/2002 Jorgensen ................... 370/338
6,654,377 B1 * 11/2003 Pasternak et al. ........ 370/395.4
6,993,347 B2 * 1/2006 Bodin et al. ............. 455/456.3
7,013,143 B2 * 3/2006 Love et al. .................. 455/450
7,209,749 B2 * 4/2007 Kwak et al. .............. 455/452.2
7,236,738 B2 * 6/2007 Settle ........................ 455/3.01
7,321,780 B2 * 1/2008 Love et al. .................. 455/522
7,343,487 B2 * 3/2008 Lindqvist et al. ............ 713/162
7,397,790 B2 * 7/2008 Zeira et al. .................. 370/352
2003/0013451 A1 * 1/2003 Walton ....................... 455/447
2003/0105809 A1 * 6/2003 Yoshii et al. ................ 709/203
2003/0228865 A1 * 12/2003 Terry ....................... 455/422.1
2004/0042435 A1 * 3/2004 Soomro et al. .............. 370/338
2004/0071115 A1 * 4/2004 Earnshaw et al. ........... 370/335
2005/0025100 A1 * 2/2005 Lee et al. .................... 370/335
2005/0207359 A1 * 9/2005 Hwang et al. ............... 370/278
2007/0011334 A1 * 1/2007 Higgins et al. .............. 709/227

FOREIGN PATENT DOCUMENTS

CN 1328759 12/2001
CN 1379600 11/2002
WO WO 99/41918 8/1999

OTHER PUBLICATIONS

Siemens: "Node B controlled rate scheduling by fast UE transmission power limitation", R1-030791, TSG-RAN WG1#33 [online], Aug. 25, 2003.
Motorola, et al: "Node B controlled Time and Rate Scheduling", R1-030592, TSG-RAW WG1 #32[online], May 19, 2003.

* cited by examiner

*Primary Examiner*—Thong H Vu
(74) *Attorney, Agent, or Firm*—McKenna Long & Aldridge LLP

(57) **ABSTRACT**

A method of scheduling an uplink packet transmission channel in a mobile communication system is disclosed. The method of scheduling includes determining a scope of user equipments (UEs) to be applied to a scheduling assignment for scheduling the uplink packet transmission channel, and transmitting the scheduling assignment to the user equipments included in the determined scope, wherein the scheduling assignment includes an identifier for identifying the scope of the user equipments and scheduling contents for carrying information applicable to the scheduling assignment.

**42 Claims, 3 Drawing Sheets**



FIG. 1


SA-Gn
Ch-n
time
Scheduling Assignment Channel(s)
Ch-1
time
SA1 SA2 SA3 ... SA-G1 ... SA-all ... SAn-1 SAn SA1 SA2 ...

FIG. 2


SA-all
UE1
SA
SA
Node B
SA-G1
SA
SA
SA
UE2
SA
SA
UE3
......
SA
SA-G2
SA
UEn
SA
SA
UEn-1

FIG. 3



START
Determine RoT value
S31
S32
RoT≥RoTth1 ?
No
Yes
S34
RoTth2≤RoT <RoTth1 ?
No
Yes
S33
Each UE
Group of UEs
All UEs
S35
S36

# METHOD OF SCHEDULING AN UPLINK PACKET TRANSMISSION CHANNEL IN A MOBILE COMMUNICATION SYSTEM

This application claims the benefit of Korean Application No. P2004-22960, filed on Apr. 2, 2004, which is hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a method of scheduling in wireless packet communication system, and more particularly, to a method of scheduling uplink packets in wireless communication system. Although the present invention is suitable for a wide scope of applications, it is particularly suitable for transmitting scheduling information to specified groups of subscribers or to all subscribers.

2. Discussion of the Related Art

With increasing demand in speed and size of uplink transmission, methods of high-speed packet communication during the uplink from a mobile device to a base station are widely being discussed. E-DCH (Enhanced uplink Dedicated CHannel) of 3GPP WCDMA (3rd Generation Partnership Project, Wideband Code Division Multiple Access) is an example of one of the methods being discussed.

The E-DCH incorporates existing methods such as uplink packet scheduling from Node B (base station) in the 3GPP WCDMA uplink DCH (Dedicated CHannel) and HARQ (Hybrid Automatic Retransmission reQuest) in the Physical Layer (PHY) to increase the efficiency of uplink transmission. Through efficient construction of scheduling assignment from Node B, the system processing rate is increased.

Node B controlled scheduling is one of the methods that is applicable to the existing 3GPP WCDMA E-DCH. According to current discussions on standards, techniques such as Time Division Multiplex (TDM), Code Division Multiplex (CDM), or time and code division multiplex can be used to transmit Node B scheduling assignment (Similar to High Speed Downlink Packet Access (USDPA)). If any of the three techniques are used, scheduling assignment transmitted to each user equipment (UE) contains at least UE classification identification (UE ID) and the contents of scheduling assignment.

Each UE inspects the downlink channel which is used to transmit scheduling assignment via UE ID. If the UE ascertains that the scheduling assignment transmitted as a part of UE ID is correctly addressed, the UE acquires the contents of the scheduling assignment. According to the scheduling assignment, the UE starts, terminates, or holds transmission. Since the scheduling assignment is transmitted from Node B to each UE, a substantial amount of time is required to transmit the same scheduling assignment to a specified group of UEs or to all the UEs.

As discussed above, scheduling assignments are independently transmitted using time division, code division, or time-code division techniques to each UE. Consequently, a problem arises in transmitting scheduling assignments to a specified group(s) of UEs or to all the UEs in the PHY. In addition, transmitting using such techniques to individual UE causes traffic congestion due to sudden increase in uplink traffic in the PHY and cannot be dealt with quickly.

## SUMMARY OF THE INVENTION

Accordingly, the present invention is directed to a method of scheduling an uplink packet transmission channel in a mobile communication system that substantially obviates one or more problems due to limitations and disadvantages of the related art.

An object of the present invention is to provide a method of scheduling an uplink packet transmission channel in a base station of a mobile communication system.

Another object of the present invention is to provide a method scheduling an uplink packet transmission channel to efficiently deal with communication traffic congestion problems.

A further object of the present invention is to provide a method of scheduling an uplink packet transmission channel to transmit scheduling assignment, not only to individual user equipments, but also to a group of user equipments and/or to all user equipments.

Additional advantages, objects, and features of the invention will be set forth in part in the description which follows and in part will become apparent to those having ordinary skill in the art upon examination of the following or may be learned from practice of the invention. The objectives and other advantages of the invention may be realized and attained by the structure particularly pointed out in the written description and claims hereof as well as the appended drawings.

To achieve these objects and other advantages and in accordance with the purpose of the invention, as embodied and broadly described herein, a method of scheduling an uplink packet transmission channel in a base station is provided. In the method of scheduling an uplink packet transmission channel, a scope of user equipments (UEs) of a scheduling assignment for scheduling the uplink packet transmission channel is determined. Furthermore, the scheduling assignment to user equipments included in the determined scope is transmitted. Also, the scheduling assignment includes an user equipment identifier which identifies the scope of the user equipments, and scheduling contents for carrying information applicable to the scheduling assignment.

In another aspect of the present invention, a method of scheduling an uplink packet transmission channel in an user equipment (UE) is provided. In the method of scheduling an uplink packet transmission, The UE receives a scheduling assignment transmitted from a base station. Also, the scheduling assignment includes an user equipment identifier which identifies a scope of user equipments for the scheduling assignment. In addition, the scheduling assignment includes scheduling contents for carrying information applicable to the scheduling assignment and for transmitting packets through the uplink packet transmission channel according to the scheduling assignment.

It is to be understood that both the foregoing general description and the following detailed description of the present invention are exemplary and explanatory and are intended to provide further explanation of the invention as claimed.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are included to provide a further understanding of the invention and are incorporated in and constitute a part of this application, illustrate embodiment(s) of the invention and together with the description serve to explain the principle of the invention. In the drawings;

FIG. **1** shows scheduling assignment channels allocated along a timeline;

FIG. **2** illustrates grouped scheduling assignment channels; and

FIG. **3** is a flowchart for determining a method of transmitting a scheduling assignment.

## DETAILED DESCRIPTION OF THE INVENTION

Reference will now be made in detail to the preferred embodiments of the present invention, examples of which are illustrated in the accompanying drawings. Wherever possible, the same reference numbers will be used throughout the drawings to refer to the same or like parts.

Although the preferred embodiment of the present invention relates to an E-DCH, the present invention can be applied to voluntary wireless packet communication system.

An Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send a scheduling command to an user equipment (UE). In other words, Node B transmits a command as to how much transmission power or a level of data rate transmission an UE is permitted to transmit. This is also known as uplink scheduling assignment or scheduling assignment.

Under E-AGCH, each frame of the downlink transmission from Node B of scheduling assignment includes UE identifier (UE ID) and scheduling content. The UE ID is used to identify the receiving UE of the scheduling assignment for an uplink packet transmission.

The scheduling content includes various information such as scheduled power, duration, and priority. The scheduled power, also referred to as rate, defines a maximum amount of power that can be allotted for transmission of the uplink packet transmission. Furthermore, duration refers to how long the scheduling assignment remains effective in each UE while priority refers to a certain limitation assigned to the uplink packet transmission. For example, if Node B transmits a scheduling assignment to UE **1** with priority of C, where the order of alphabet starting with A indicating the highest priority of transmission, UE**1** transmits when it is its time to transmit. In other words, UE**1** transmits when it is time for UEs having priority C to transmit. Each scheduling assignment can also include any combination of information such as UE ID, scheduled power, and priority or UE ID, scheduled power, and duration.

In E-AGCH, scheduling assignment(s) can be transmitted from Node B via shared channel(s) to an UE, group(s) of UEs, or all the UEs. The transmitted scheduling assignment is then shared by all the UEs. In E-AGCH, the UEs of the shared channel receive and decode the transmitted scheduling assignment. After receipt and decoding of the scheduling assignment by the UEs of the shared channel, based on the UE ID included in a transmission packet of the scheduled assignment, the scheduled assignment is followed by the UE(s) whose ID corresponds to the ID(s) of the transmission. For example, assuming there are four UEs (UE**1**-UE**4**), Node B transmits via a shared channel a scheduling assignment, which applies only to UE**1**, to all four UEs. All four UEs receive, decode, and identify to which UE(s) the transmission is directed. In the transmission, in the packet of the scheduling assignment would contain an UE ID that corresponds only to the ID of UE**1**. Therefore, the scheduling assignment would be followed only by UE**1** and not by any other UEs. This example could also apply to groups of UEs.

In addition, under E-AGCH, each UE can have more than one UE identifier. Here, each UE can have an identifier for a scheduling assignment directed to the corresponding UE, and another identifier for a scheduling assignment forwarded by another UE which received the initial scheduling assignment from Node B. In other words, an UE identifier for following a scheduling assignment transmitted from Node B as well as another UE identifier for following a scheduling assignment forwarded by another UE in the shared channel. Such forwarding of scheduling assignment can reduce and minimize transmission in the channel between Node B and UE(s). A number of identifiers an UE can possess is not limited to two identifiers as explained above but can have many more for various purposes.

For example, continuing from the previous example, after the UEs receive and decodes the scheduling assignment transmitted from Node B which is directed to UE**4**, the UE**4** is further instructed to transmit the scheduling assignment to all UEs in the shared channel, i.e., UE**1**, UE**2**, UE**3**, and UE**4**. This time, the scheduling assignment is not from Node B but from another UE which received the initial assignment. Upon receipt of the scheduling assignment from UE**4**, all the UEs in the shared channel would receive and decode the assignment, as did with the assignment from Node B. Here, the scheduling assignment has identified UE**1**, UE**2**, and UE**4** to follow. By having another UE identifier in each UE, Node B can direct the scheduling assignment intended for multiple UEs to a single UE and have that UE further transmit to other intended UEs so as to minimize transmission of the same scheduling assignment.

Under Enhance Relative Grant Access Channel (E-RGCH), unlike E-AGCH, Node B has a pre-allocated channel of transmission, and the scheduling assignment is transmitted accordingly. In E-RGCH, the scheduling assignment is comprised of at least 1 bit, and ID is not transmitted as part of the transmission packet information. Subsequently, the UE receiving the scheduling assignment via the pre-allocated channel reads and follows the assignment. For example, assuming there are four UEs (UE**1**-UE**4**), Node B transmits a scheduling assignment, which applies only to UE**1**, to only UE**1**. Because the transmission channels are pre-allocated, transmissions to the remaining UEs are not made.

In addition, E-RGCH is not limited to transmitting scheduling assignment to a single UE at a time. Under E-RGCH, it is possible to pre-allocate a plurality of channels to transmit a same scheduling assignment to a plurality of UEs. For example, continuing from the previous example, if Node B has pre-allocated channels **1** and **2** which apply to UE**1** and UE**2**, respectively, to transmit the same scheduling assignment, the same scheduling assignment would then be transmitted only to UE **1** and UE**2** and not to other UEs (UE**3** and UE**4**). Only UE**1** and UE**2** would receive and follow the scheduling assignment.

As discussed above, the differences between E-AGCH and E-RGCH is clear. Under E-AGCH, a scheduling assignment is received by all UEs in a shared channel regardless to which UE the scheduling assignment is directed. However, the scheduling assignment would apply only to the UEs having the IDs corresponding to the IDs designated in the scheduling assignment. Under E-RGCH, the transmission channel(s) are pre-allocated by Node B, and only the UE(s) of the pre-allocated channel(s) would receive the scheduling assignment(s). The UE(s) not having been pre-allocated by Node B would not receive the scheduling assignment(s).

An embodiment of the present invention will be further explained with respect to E-AGCH. Node B utilizes various transmission techniques such as code division, time division, and code-time division methods to transmit scheduling assignment to UEs via scheduling assignment channels (Ch-**1**-Ch-n). The scheduling assignment includes contents and UE IDs' of each UE, UE IDs' of specified group(s), or an UE ID that applies to all the UEs uniformly. More specifically, scheduling content refers to the command transmitted from Node B to UEs which include information such as packet

transmission power (Tx_Power), Transmit Format Combination (TFC), packet transmission time. As explained above, UE ID is an identifier used to identify an UE or a group of UEs for transmitting scheduling assignment.

The operation of Node B in determining the scheduling assignment for UE(s) is as follows. At each transmit time interval (TTI), Node B determines the status of the uplink packet transmission channel. To accomplish this, various techniques can be employed such as Signal-to-Noise Ratio (SNR), Signal-to-Interference-plus-Noise Ratio (SINR) and Rise over Thermal noise (RoT). For example, RoT can be used to determine the uplink channel status. Here, Node B determines the RoT value based on the status of the uplink channel. The determined RoT value is then compared to at least one critical value. A critical value is set in a manner not to exceed a maximum RoT value permitted in the communication system. Based on whether the determined RoT value exceeds the critical value, Node B determines whether to transmit scheduling assignment to each UE, group(s) of UEs, or all the UEs. Although one critical value was used in the above example, a plurality of critical values can be used to determine the method of transmitting scheduling assignment(s). Moreover, as discussed above, a method of determining the uplink channel status is not limited to using RoT, and other methods can be used.

In FIG. **3**, an example having two critical values ($RoT_{th1}$, $RoT_{th2}$, except $RoT_{th1}>RoT_{th2}$) are used to further explain scheduling assignment. The first step (S**31**) begins by first determining RoT value at every TTI of scheduling assignment. The RoT value can be defined by calculating the power of receiving signals over thermal noise in the base station. After the RoT value is determined, the determined RoT value is compared with the $RoT_{th1}$ value (S**32**). Usually, the RoT value corresponds to noise/interference, hence when the noise/interference is low, the RoT value becomes large since the thermal noise compared to the power of receiving signal is small. On the contrary, if the noise/interference is high, the RoT value becomes small since the thermal noise compared to the power of receiving signal is large.

If the determined RoT value is larger or equal than the $RoT_{th1}$ value ($RoT \geqq RoT_{th1}$), which denotes low noise/interference, a scheduling assignment is transmitted to each UE (S**33**). When the transmission of scheduling assignment is made, the UE ID is used to define the receiving UE, and the scheduling contents are used to transmit command for the UE to follow.

If the determined RoT value is larger than $RoT_{th1}$ value, the determined RoT value is then compared to the $RoT_{th2}$ value. Since it was determined in the previous step that the determined RoT value is larger than $RoT_{th1}$, Node B determines if the determined RoT value is smaller than or equal to the value of $RoT_{th2}$ ($RoT_{th2} \leqq RoT < RoT_{th1}$) (S**34**). If so, the determined RoT value is smaller than $RoT_{th1}$ value but larger or equal to than $RoT_{th2}$ value. In such a case, the scheduling assignment(s) is/are transmitted to a group or groups of UEs, containing the UE ID and the scheduling contents (S**35**). The UE group IDs allow the UEs of the group to identify a scheduling assignment directed to them as a group. The UE group IDs can be pre-established using various techniques between Node B and the UEs.

If the determined RoT value is smaller than $RoT_{th2}$ ($RoT<RoT_{th2}$), which denotes high interference, therefore the low RoT value, the same scheduling assignment, including scheduling contents and an UE ID, is transmitted to all the UEs (S**36**). Using RoT value is one of many methods of determining the status of the uplink packet transmission channel. As mentioned above, other techniques such as SNR and SINR can also be used.

FIG. **1** shows a numerous scheduling assignment channels during different time frames per each channel. Here, each channel can transmit individual scheduling assignment as well as different sets of groups of scheduling assignments and the all the scheduling assignments grouped as one. In other words, different types of scheduling assignments are transmitted at different times.



As presented in FIG. **1**, Ch-**1**-Ch-n are, for example, orthogonal variable spreading factor (OVSF) code channels. In particular, n represents number of UEs capable of performing simultaneous decoding operation. Furthermore, SAi (i=1–n) represents scheduling assignment transmitted to $i^{th}$ UE, SA-Gi (i=1–k) represents scheduling assignment transmitted to $i^{th}$ group of UEs, and SA-all represents scheduling assignment transmitted to all the UEs.

FIG. **2** shows transmitting scheduling assignments to UEs as multiple groups or as a group consisting all the UEs. As discussed above, based on the noise/interference of the uplink packet transmission channel as determined by Node B, the scheduling assignment commands the uplink packet transmission.

As shown in FIG. **2**, Node B can transmit scheduling assignments to n number of UEs in groups as indicated by SA-G**1** and SA-G**2**. At the same time, scheduling assignments can be transmitted to all UEs simultaneously as indicated by SA-all. In transmitting scheduling assignments, specific UE ID(s) directed for specific group(s) of UEs or for all UEs are transmitted along with scheduling contents.

It is possible to transmit scheduling assignment to all the UEs using a separate or different channel than the channels used to transmit scheduling assignments to each UEs separately or to specific groups of UEs.

It is also possible to include in the scheduling assignment a command which grants or denies packet transmission. In other words, Node B determines either to grant or deny packet transmission depending on the status of channels. Subsequently, traffic congestion in the channels and shortage of resources can be alleviated, promoting efficiency of the entire system.

It will be apparent to those skilled in the art that various modifications and variations can be made in the present invention without departing from the spirit or scope of the inventions. Thus, it is intended that the present invention covers the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents.

What is claimed is:

**1**. A method of scheduling an uplink packet transmission channel in a base station, the method comprising:

transmitting a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH), wherein the contents of the scheduling assignment comprise an identifier associated with a plurality of UE, and,

receiving an uplink data packets on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment.

**2**. The method of claim **1**, wherein the scheduling assignment contents further comprise information related to the the transmission of the uplink data packets and wherein two identifiers are allocated to at least one UE.

**3**. The method of claim **2**, wherein the status of the E-DCH is determined as a function of a Rise over Thermal (RoT) value.

**4**. The method of claim **3**, wherein the RoT value is compared to at least one pre-selected value.

**5**. The method of claim **4**, wherein the scheduling assignment is transmitted to each of the plurality of UE if the RoT value is greater than or equal to the pre-selected value.

6. The method of claim **4**, wherein the scheduling assignment is transmitted to each of the plurality of UE if the RoT value is less than the pre-selected value and greater than or equal to a second pre-selected value.

7. The method of claim **4**, wherein the scheduling assignment is transmitted to each of the plurality of UE if the RoT value is less than the pre-selected value.

8. The method of claim **7**, wherein the scheduling contents include a priority transmission command for the E-DCH.

9. The method of claim **2**, wherein the scheduling contents include a scheduled power command for assigning a specified amount of power for the E-DCH.

10. The method of claim **2**, wherein the scheduling contents include a duration command for determining a length of period the scheduling assignment remains effective.

11. The method of claim **1**, further comprising:
determining the status of the E-DCH; and
determining whether the scheduling assignment is associated with each of the plurality of UE according to the status of the E-DCH.

12. The method of claim **1**, wherein the scheduling assignment includes a command granting or denying transmission in the E-DCH.

13. The method of claim **1**, wherein transmitting the scheduling assignment comprises:
transmitting the scheduling assignment to the plurality of UE via a shared channel in the E-AGCH, wherein the scheduling assignment is received and decoded by each of the plurality of UE.

14. The method of claim **1** further comprising:
transmitting a scheduling assignment to a specific UE according to a pre-allocated transmission channel in an Enhanced Relative Grant Channel, wherein the specific UE corresponds with the pre-allocated transmission channel.

15. The method of claim **14**, wherein the scheduling assignment can be transmitted to a plurality of UE according to a corresponding plurality of pre-allocated transmission channels.

16. A method of scheduling an uplink packet transmission channel for user equipment (UE), the method comprising:
receiving a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH), wherein the scheduling assignment comprises an identifier for a plurality of UE;
acquiring the contents of the scheduling assignment; and,
transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment.

17. The method of claim **16**, wherein one or two identifiers are allocated to each UE.

18. The method of claim **16**, wherein the scheduling contents include a scheduled power command for assigning a specified amount of power for the uplink packet transmission.

19. The method of claim **16**, wherein the scheduling contents include a duration command for determining a length of period the scheduling assignment remains effective.

20. The method of claim **16**, wherein the scheduling contents include a transmission priority command for the E-DCH.

21. The method of claim **16**, wherein the scheduling assignment includes a command granting or denying transmission in the E-DCH.

22. The method of claim **16**, wherein each UE of a shared channel in the E-AGCH has at least one UE identifier.

23. A method of scheduling an uplink packet transmission channel in a mobile communication system, the method comprising:



a base station transmitting a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH) for scheduling an Enhanced Uplink Dedicated Channel (E-DCH);
a plurality of user equipment (UE) receiving the scheduling assignment, wherein the content of the scheduling assignment includes an identifier associated with each of the plurality of UE, and transmitting packets through the E-DCH according to the scheduling assignment.

24. The method of claim **23**, wherein the scheduling assignment comprises scheduling contents relating to the the E-DCH and one or two identifiers allocated to each UE.

25. The method of claim **24**, wherein the scheduling contents include a scheduled power command for assigning a specified amount of power for the E-DCH.

26. The method of claim **24**, wherein the scheduling contents include a duration command for determining a length of period the scheduling assignment remains effective.

27. The method of claim **24**, wherein the scheduling contents include a transmission priority command associated with the E-DCH.

28. The method of claim **23**, further comprising;
determining the status of the E-DCH; and
determining whether the scheduling assignment is associated with each of the plurality of UE according to the status of the E-DCH.

29. The method of claim **23**, wherein the status of the E-DCH is based on a Rise over Thermal (RoT) value.

30. The method of claim **29**, wherein the RoT value is compared to at least one pre-selected value.

31. The method of claim **30**, wherein the scheduling assignment is transmitted to each UE if the RoT value is greater than or equal to the pre-selected value.

32. The method of claim **30**, wherein the scheduling assignment is transmitted to each UE if the RoT value is less than the pre-selected value but greater than or equal to a second pre-selected value.

33. The method of claim **30**, wherein the same scheduling assignment is transmitted to each UE if the RoT value is less than the pre-selected value.

34. The method of claim **23**, wherein the scheduling assignment includes a command granting or denying transmission for the E-DCH.

35. The method of claim **23**, wherein transmitting the scheduling assignment comprises:
transmitting the scheduling assignment to the plurality of UE via a shared channel in the E-AGCH, and wherein the scheduling assignment is received and decoded by each UE.

36. The method of claim **23** further comprising:
transmitting the scheduling assignment to a specific UE according to a pre-allocated transmission channel in an Enhanced Relative Grant Channel, wherein the specific UE corresponds with the pre-allocated transmission channel.

37. The method of claim **36**, wherein the scheduling assignment can be transmitted to a plurality of UE according to corresponding plurality of pre-allocated transmission channels.

38. The method of claim **23**, wherein at least one UE identifier applies to a plurality of UE of a shared channel in an Enhanced Absolute Grant Channel.

39. A method of scheduling a plurality of uplink packet transmission channels for a corresponding plurality of user equipment (UE), the method comprising:
receiving a scheduling assignment in an Enhanced Absolute Grant Channel (E-AGCH), wherein the content of

the scheduling assignment includes an identifier associated with a plurality of UE; and,

transmitting an uplink data packet on an Enhanced Uplink Dedicated channel (E-DCH) in accordance with the content of the scheduling assignment.

**40**. The method of claim **39**, wherein the content of the scheduling assignment includes information relating to uplink transmission, and wherein two identifiers are allocated to at least one UE.



**41**. The method of claim **40**, wherein the content of the scheduling assignment further includes a transmission priority command for the E-DCH.

**42**. The method of claim **40**, wherein the content of the scheduling assignment further includes a command granting or denying transmission in the E-DCH.

* * * * *

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared in a proportionally spaced typeface in 14-point font and includes 10,667 words, excluding the parts exempted under those Rules.

*/s/ Timothy Devlin*
Timothy Devlin

*Attorney for Appellant*
*3G Licensing, S.A.*