2023–1137

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

3G LICENSING, S.A.,

*Appellant*

v.

HONEYWELL INTERNATIONAL INC., SIERRA WIRELESS, INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC., TELIT CINTERION DEUTSCHLAND GMBH, F/D/B/A THALES DIS AIS DEUTSCHLAND GMBH,

*Appellees*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Case No. IPR2021-00584

---

**RESPONSE BRIEF OF APPELLEES HONEYWELL INTERNATIONAL INC., SIERRA WIRELESS, INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC., AND TELIT CINTERION DEUTSCHLAND GMBH, F/D/B/A THALES DIS AIS DEUTSCHLAND GMBH**

---

Tara L. Kurtis
PERKINS COIE LLP
110 N. Wacker Drive, Suite 3400
Chicago, IL 60606
Phone: (312) 324–8607
E-mail: tkurtis@perkinscoie.com

Kourtney Mueller Merrill
Amanda Tessar
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202
Phone: (303) 291–2388
E-mail: kmerrill@perkinscoie.com
    atessar@perkinscoie.com

**COUNSEL FOR APPELLEE SIERRA WIRELESS, INC.**

June 15, 2023                    *[additional counsel on inside cover]*

Bradford F. Cangro
PV LAW LLP
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 869-4667
bradford.cangro@pvuslaw.com

Jeremy D. Peterson
PV LAW LLP
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 871-0140
jeremy.peterson@pvuslaw.com

**COUNSEL FOR APPELLEES TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC.**

Benjamin E. Weed
Gina A. Johnson
K&L GATES LLP
70 W. Madison Street, Suite 3300
Chicago, IL 60602
(312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

Brian P. Bozzo
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500
brian.bozzo@klgates.com

**COUNSEL FOR APPELLEE HONEYWELL INTERNATIONAL INC.**

Guy Yonay
PEARL COHEN ZEDEK LATZER BARATZ
LLP
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0800
gyonay@pearlcohen.com

Kyle Auteri
PEARL COHEN ZEDEK LATZER BARATZ
LLP
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0824
kauteri@pearlcohen.com

**COUNSEL FOR APPELLEE TELIT CINTERION DEUTSCHLAND GMBH, F/D/B/A THALES DIS AIS DEUTSCHLAND GMBH**

**CLAIMS 16 AND 39 OF THE '625 PATENT**

**Claim 16.** A method of scheduling an uplink packet transmission channel for user equipment (UE), the method comprising:

[a] receiving a scheduling assignment in an ***Enhanced Absolute Grant Channel (E-AGCH)***, wherein the scheduling assignment comprises an identifier for a plurality of UE;

[b] acquiring the contents of the scheduling assignment; and,

[c] transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment.

**Claim 39.** A method of scheduling a plurality of uplink packet transmission channels for a corresponding plurality of user equipment (UE), the method comprising:

[a] receiving a scheduling assignment in an ***Enhanced Absolute Grant Channel (E-AGCH)***, wherein the content of the scheduling assignment includes an identifier associated with a plurality of UE; and,

[b] transmitting an uplink data packet on an Enhanced Uplink Dedicated channel (E-DCH) in accordance with the content of the scheduling assignment.

Appx112-113 (7:40-48, 8:63-9:5) (emphasis added).

## CERTIFICATES OF INTEREST

Counsel for Appellant Sierra Wireless, Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   **Sierra Wireless, Inc.**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   **Sierra Wireless America, Inc.**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

   **None**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

   (a) **Perkins Coie: David St. John-Larkin, Roderick O'Dorisio**

   (b) **Not applicable**

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   **Yes**

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information re-
   quired under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases)
   and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**


Dated:  June 15, 2023                    By: */s/ Kourtney Mueller Merrill*
                                         Kourtney Mueller Merrill

Counsel for Appellees TCL Communication Technology Holdings Limited; TCT Mobile International Limited; TCT Mobile, Inc.; TCT Mobile (US) Inc.; and TCT Mobile (US) Holdings Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

> **TCL Communication Technology Holdings Limited**
> **TCT Mobile International Limited**
> **TCT Mobile, Inc.**
> **TCT Mobile (US) Inc.**
> **TCT Mobile (US) Holdings Inc.**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

> **None/Not Applicable**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

> **TCL Electronics Holdings Limited**
> **TCT Mobile Worldwide Limited**
> **TCT Mobile (US) Holdings Inc.**
> **TCT Mobile (US) Holdings Inc.**
> **Winning Synergy Limited**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

> **None/Not applicable**

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

> **Yes**

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6.  **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  *See* Fed. Cir. R. 47.4(a)(6).

      **None/Not Applicable**

Dated:  June 15, 2023                    By: /s/ *Jeremy D. Peterson*
                                           Jeremy D. Peterson

Counsel for Appellee Honeywell International, Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   **Honeywell International, Inc.**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   **None/Not Applicable**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

   **None/Not Applicable**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

   **None/Not applicable**

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   **Yes**

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated:  June 15, 2023                By: /s/ *Benjamin E. Weed*
                                          Benjamin E. Weed

Counsel for Appellee Telit Cinterion Deutschland GmbH, F/D/B/A Thales Dis Ais Deutschland GmbH, certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

    **Telit Cinterion Deutschland GmbH**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

    **Telit Cinterion USA LLC**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

    **Thales S.A.**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

    **None/Not applicable**

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

    **Yes**

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated:  June 15, 2023                   By: /s/ *Guy Yonay*
                                            Guy Yonay

# TABLE OF CONTENTS

Certificates of Interest .................................................................. i

Table of Authorities .................................................................. xii

Table of Abbreviations and Conventions ................................... xiv

Related Cases .......................................................................... xv

Introduction .............................................................................. 1

Statement of Issues .................................................................... 4

Statement of the Case ................................................................ 4

I.    THE PARTIES ..................................................................... 5

II.   THE CLAIMED METHOD OF SENDING ABSOLUTE GRANT SCHEDULING
      ASSIGNMENTS OVER AN ENHANCED ABSOLUTE GRANT CHANNEL (E-
      AGCH) TO DIRECT UPLINK PACKET TRANSMISSIONS ...................... 6

      A.   The 3GPP Develops and Defines the E-AGCH in Late 2004 ......... 6

      B.   The '625 Patent's Specification and Disclosures ...................... 8

           1.   The Korean Application Discloses a Generic Downlink
                Channel ...................................................................... 8

           2.   The '625 Patent Specification Adds the E-AGCH for the First
                Time ........................................................................... 9

      C.   The Patentees Added the E-AGCH to the Challenged Claims
           During Prosecution ........................................................... 13

      D.   The Challenged Claims Are Directed to Using an E-AGCH .......... 14

III.  THE 3GPP PRIOR ART DISCLOSED THE CLAIMED INVENTION ........... 15

      A.   3GPP Meeting45 Document .................................................. 15

      B.   3GPP Meeting45bis Document ............................................. 16

      C.   3GPP Meeting39 Document ................................................. 17

      D.   The Pre-E-AGCH Alternative Chen Reference ......................... 17

IV.  THE BOARD'S FINAL WRITTEN DECISION FOUND ALL CLAIMS INVALID ..........18

    A.  The Board Correctly Defined a Sophisticated POSITA Knowledgeable About Industry Standards ................................18

    B.  The Board Construed "E-AGCH" to Have its Plain Meaning ................18

        1.  The Board Determined "E-AGCH" Was a Term of Art with an Accepted Meaning Known to a POSITA by March 31, 2005 ..........................................................................19

        2.  The Board Determined That There Was No Evidence of Lexicography or Disavowal ...........................................20

        3.  The Board Did Not Need to Determine Whether The E-AGCH Is Limited to a Single Channel ..........................22

    C.  The Board Found That the Korean Application Lacked Written-Description Support for the E-AGCH Limitation ....................22

    D.  The Board Found the Claims Unpatentable for Anticipation or Obviousness ................................................................24

Summary of Argument ................................................................25

Argument ..................................................................................28

I.  STANDARDS OF REVIEW ..........................................................28

II.  THE BOARD CORRECTLY FOUND THE CHALLENGED CLAIMS UNPATENTABLE ......................................................................29

    A.  The Board Properly Construed "E-AGCH" ..............................29

        1.  The Board Performed a Legally Sound Claim-Construction Analysis ..........................................................30

        2.  3G Licensing Improperly Argues a Construction on Appeal that it Abandoned Before the Board ...............38

        3.  The '625 Patent Uses the E-AGCH Consistent with its Plain Meaning ..........................................................39

    B.  Substantial Evidence Supports the Board's Finding that the '625 Patent Cannot Claim Priority to the Korean Application ....................52

1.      The Board Had Substantial Evidence to Determine that the Korean Application Did Not Disclose an E-AGCH ......................52

2.      The Board Gave Due Weight to Mr. Lipoff's Declaration............56

3.      The Board's Analysis Properly Relied on Precedent Finding No Written-Description Support Where the Specification Disclosed a Broad Generic Concept But the Claims Recited Only a Narrow Subset of that Concept ...........................................58

C.    The Court Should Remand If It Reverses the Board's Claim Construction for E-AGCH.........................................................................61

Conclusion .........................................................................................................62

Certificate of Compliance with Type-Volume Limitation .....................................64

Certificate of Authority...................................................................................64

## TABLE OF AUTHORITIES

### CASES

*Amkor Tech., Inc. v. Int'l Trade Comm'n*,
    692 F.3d 1250 (Fed. Cir. 2012) ............................................28

*Ancora Techs., Inc. v. Apple, Inc.*,
    744 F.3d 732 (Fed. Cir. 2014) ...............................30, 31, 50

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) (en banc) ......................55, 58, 59, 61

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
    533 F.3d 1362 (Fed. Cir. 2008) ............................................44

*Blue Calypso, LLC v. Groupon, Inc.*,
    815 F.3d 1331 (Fed. Cir. 2016) ............................................28

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
    320 F.3d 1339 (Fed. Cir. 2003) ......................................29, 30

*Celgene Corp. v. Peter*,
    931 F.3d 1342 (Fed. Cir. 2019) ............................................38

*Consol. Edison Co. of New York v. N.L.R.B.*,
    305 U.S. 197 (1938)............................................................28

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
    881 F.3d 1354 (Fed. Cir. 2018) ............................................38

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966)................................................................44

*In re Brandt*,
    886 F.3d 1171 (Fed. Cir. 2018) ............................................28

*In re Google Tech. Holdings LLC*,
    980 F.3d 858 (Fed. Cir. 2020) .............................................39

*In re Miracle Tuesday, LLC*,
    695 F.3d 1339 (Fed. Cir. 2012) ............................................57

*In re Nuvasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ......................................................56

*KCJ Corp. v. Kinetic Concepts, Inc.*,
   223 F.3d 1351 (Fed. Cir. 2000) ......................................................49

*Knowles Elecs. LLC v. Cirrus Logic, Inc.*,
   883 F.3d 1358 (Fed. Cir. 2018) ......................................................60

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005) ......................................................50

*Novartis AG v. Torrent Pharms. Ltd.*,
   853 F.3d 1316 (Fed. Cir. 2017) ......................................................57

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .................................................31, 33

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
   315 F.3d 1335 (Fed. Cir. 2003) ......................................................57

*Purdue Pharma L.P. v. Faulding Inc.*,
   230 F.3d 1320 (Fed. Cir. 2000) ..........................................23, 58, 59

*Roemer v. Peddie*,
   132 U.S. 313 (1889).......................................................................44

*Starhome GmbH v. AT&T Mobility LLC*,
   743 F.3d 849 (Fed. Cir. 2014) .................................................31, 32

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015).................................................................28, 38

*Trs. of Columbia Univ. v. Symantec Corp*,
   811 F.3d 1359 (Fed. Cir. 2016) ......................................................33

*ULF Bamberg v. Dalvey*,
   815 F.3d 793 (Fed. Cir. 2016) ........................................................28

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| Abbreviation | Term |
|---|---|
| '625 patent | U.S. Patent No. 7,551,625 |
| Appx# | Joint Appendix page number |
| Appellees | Appellees Honeywell International Inc., Sierra Wireless, Inc., TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings, Inc., and Telit Cinterion Deutschland GmbH, F/D/B/A Thales Dis Ais Deutschland GmbH |
| BB## | Appellant's Principal Brief at page ## |
| Board | Patent Trial and Appeal Board |
| DOCSIS | Data Over Cable Systems Interface Specification |
| E-AGCH | Enhanced Absolute Grant Channel |
| E-DCH | Enhanced Uplink Dedicated Channel |
| E-RGCH | Enhanced Relative Grant Channel |
| LG | Patentee LG Electronics Inc. |
| POSITA | Person of ordinary skill in the art |
| PTO | United States Patent and Trademark Office |
| Sisvel | Sisvel S.P.A. |
| UE | User Equipment |
| 3G Licensing | Appellant 3G Licensing, S.A. |
| 3GPP | Third Generation Partnership Project |
| $(x{:}y\text{-}z)$ | column $x$, lines $y$-$z$ of the '625 patent |

## RELATED CASES

No other appeals relating to this case have been before this Court or any other appellate court.  This appeal may directly affect or be directly affected by *Sisvel Int'l S.A. v. Honeywell Int'l, Inc.*, No. 20-cv-00652 (D. Del.); *Sisvel Int'l S.A. v. Xirgo Techs.*, No. 20-cv-00659 (D. Del.); *Sisvel Int'l S.A. v. HMD Am., Inc.*, No. 20-cv-22061 (S.D. Fla.); *Sisvel Int'l S.A. v. VeriFone, Inc.*, No. 20-cv-00656 (D. Del.); and *3G Licensing S.A. v. TCL Commc'n Tech. Holdings Ltd.*, No. 20-cv-00654 (D. Del.).

# INTRODUCTION

The '625 patent claims methods for scheduling transmissions of data packets in a cellular communication system through the use of a specific downlink channel called the "Enhanced Absolute Grant Channel" ("E-AGCH"). The Board construed the E-AGCH to be consistent with the existing definition for that term as developed and published by the Third Generation Partnership Project ("3GPP") cellular standard-setting organization before the '625 patent's application was filed. There is no dispute that, under the Board's construction of "E-AGCH" based on the 3GPP standard, all of the challenged claims of the '625 patent are invalid as anticipated or obvious in view of 3GPP working group documents defining the E-AGCH that predate that patent's filing date. The only disputes are to the Board's construction of "E-AGCH" and whether the challenged claims are entitled to the earlier priority date of Korean Application No. 10-2004-0022960, which was filed before the 3GPP's work and never even mentions the claimed E-AGCH.

3GPP first coined the term "Enhanced Absolute Grant Channel" or "E-AGCH" in late 2004, defining and standardizing that term in the process. Shortly after, LG Electronics ("LG") filed a United States patent application claiming this "E-AGCH" as its own; that application eventually issued as the '625 patent now at issue in this case. Years later, 3G Licensing S.A. ("3G Licensing") acquired the '625 patent and filed a spate of suits against companies that practice the 3GPP

standard. Because the 3GPP technical documents indisputably invalidate the '625 patent's claims, 3G Licensing was forced to take the uncomfortable position that the '625 patent is entitled to the priority date of an early 2004 Korean parent application that pre-dates 3GPP's introduction of E-AGCH even though that parent application does not and could not mention E-AGCH (either in name or in concept) because it did not yet exist when LG filed the Korean application. Here is the timeline for these key events:



To try to claim priority back to the Korean application, 3G Licensing's argument to the Board relied on a contorted construction for the "Enhanced Absolute Grant Channel" that reads out the "absolute" grant. 3G Licensing asked the Board to ignore the 3GPP-defined E-AGCH—even as it simultaneously accused 3GPP standard-compliant products of infringement in district court cases—and instead find that LG's general descriptions defined a ***different*** channel that LG just happened to also call "E-AGCH."

The Board got it right when it found that LG had used "E-AGCH" according to its industry-accepted plain meaning, *i.e.*, the 3GPP standard's E-AGCH.  The Board correctly relied on the language of the claims and specification referring to the 3GPP, turning to the extrinsic evidence only to confirm that E-AGCH was a term of art when LG filed the '625 patent's application.  A POSITA (who would be up to date on technical specifications) would have understood the term to have a clearly defined meaning consistent with the 3GPP standards when LG filed the '625 patent's application, even though the term had no meaning at all to a POSITA at the time of filing the Korean application—*i.e.*, before the 3GPP had coined the term.

The Board was also correct in finding that the Korean application did not disclose the concept of an E-AGCH and, therefore, did not support the '625 patent's priority claim.  The Korean application disclosed only a different, general downlink channel, not the E-AGCH.  This makes sense:  a general downlink channel was the state of the art when LG filed the Korean application, whereas the specific E-AGCH channel would not be created and defined by 3GPP until several months after the Korean application's filing date.  Only after 3GPP created the E-AGCH framework did LG try to claim it for itself in its United States application.

3G Licensing's repetition of the same types of arguments and evidence it presented to the Board (now criticizing the Board for supposedly elevating "extrinsic" evidence over the intrinsic record) cannot change the fact that '625 patent is invalid.

Nor has 3G Licensing demonstrated that the Board committed any legal error or failed to appropriately consider the evidence presented. The Board, after careful review and analysis, determined that the Korean application did not disclose the claimed invention of the '625 patent and, therefore, that the 3GPP publications were invalidating prior art. The Court should affirm that decision.

## STATEMENT OF ISSUES

1.   Did the Board correctly construe "E-AGCH" according to its plain meaning, *i.e.*, consistent with the literal words of the term itself and the industry-recognized definition set forth in the 3GPP standards when the patentee filed the '625 patent's application?

2.   Did the Board correctly determine that the Korean application lacked written-description support for the claimed "E-AGCH" when that concept was first established by a 3GPP working group—and subsequently added to the application that would become the '625 patent—several months ***after*** the Korean application was filed, such that the '625 patent cannot claim priority to the Korean application?

## STATEMENT OF THE CASE

This is an appeal from a Final Written Decision of the Board finding claims 16-19, 21, 22, 39, 40, and 42 of the '625 patent unpatentable for obviousness or anticipation based on the prior-art 3GPP references "Meeting45" and "Meeting45bis." Appx41-42.

## I.    THE PARTIES

Appellees Sierra Wireless, Honeywell, TCL, and Telit (collectively, the "Appellees")[1] manufacture and sell electronics modules or devices used for a wide array of applications, from Internet of Things to transportation to industrial manufacturing to healthcare.  Appellees' products can support, among other things, connectivity to the Third Generation Partnership Project's ("3GPP") LTE cellular network, which is sometimes referred to as 4G.  Appellant 3G Licensing, along with parent company Sisvel, has filed a dozen complaints alleging infringement of the '625 patent to date, including complaints against Honeywell, TCL, and certain Sierra Wireless and Telit customers.

Appellees thus joined together and with several additional parties (who have since resolved their disputes with 3G Licensing) to file a petition for IPR challenging the asserted claims of the '625 patent.  *See generally* Appx114-195.  On September 12, 2022, the Board issued a Final Written Decision concluding that Appellees had proven by a preponderance of the evidence that all challenged claims of the '625 patent were unpatentable as anticipated or obvious.  Appx42-43.

---

[1]    3G Licensing confusingly refers to Appellees collectively as "Honeywell" even though the Appellees are not related.  BB6.

II.    **THE CLAIMED METHOD OF SENDING ABSOLUTE GRANT SCHEDULING AS-SIGNMENTS OVER AN ENHANCED ABSOLUTE GRANT CHANNEL (E-AGCH) TO DIRECT UPLINK PACKET TRANSMISSIONS**

The '625 patent is titled "Method of scheduling an uplink packet transmission channel in a mobile communication system" and is directed to base-station-controlled uplink scheduling, *i.e.*, wireless communications systems in which the base station instructs or "schedules" user equipment ("UE")—often a cellular telephone—to transmit data packets to the base station. Appx105, Appx109 (1:12-18). These instructions are called "uplink scheduling assignments" or "scheduling assignments," and all claims of the '625 patent were amended during prosecution to require that UEs receive their uplink scheduling assignments from the base station via a specific downlink channel:  the Enhanced Absolute Grant Channel or "E-AGCH."

A.    **The 3GPP Develops and Defines the E-AGCH in Late 2004**

Cellular networks control the flow of traffic to their base stations (referred to as "Node B" in the '625 patent) by sending scheduling assignments to UEs. Appx109 (1:20-33).  The assignments include, among other things, information that identifies which UEs the assignment is meant for and the amount of power or resources the UE can use to send its data over the uplink channel. *Id.* (2:25-37, 2:41-49).

The Third Generation Partnership Project ("3GPP") develops technical specification standards for use in wireless telecommunications. Appx1061 (¶ 54); Appx109 (1:20-26). In 2002, 3GPP developed a new uplink protocol (FDD Enhanced Uplink), which improved uplink data rates and capacity. Appx1067 (¶ 66); *see also* Appx1397-1400. In 2004, the group began looking at ways to implement that new uplink protocol into the networking standards. Appx1067-1068 (¶ 67). The relevant 3GPP working group determined that a Node-B-controlled scheduling system could enhance uplink-transfer performance. *Id*. This precipitated the creation of a new uplink channel, known as the "Enhanced Dedicated Channel," or "E-DCH." Appx1068 (¶ 68); Appx1596-1597, Appx1622.

3GPP next had to determine an appropriate downlink scheme to send instructions to UEs on how to schedule uplink communications over the new E-DCH. Appx1068 (¶ 68); Appx1596, Appx1604. A joint 3GPP working group met in August 2004 to devise that new downlink scheme. Appx1069 (¶ 70); Appx1401. At that meeting, the group created two types of scheduling grants to instruct UEs on when and how to use the E-DCH—*absolute* grants and *relative* grants. Appx1068-1069 (¶ 71); Appx1401. Absolute grants instruct UEs regarding the maximum (or absolute) amount of uplink resources they can use to transmit data. Appx1069 (¶ 71); Appx1167-1168; Appx1426, Appx1428-1429. Relative grants, by contrast, give their instructions based on (or relative to) the uplink resources previously used

– 7 –

by the UE.  *Id.*  For example, a relative grant may tell the UE to use more, less, or the same power as the previous uplink transmission.

3GPP then introduced and defined new downlink channels to convey these scheduling grants to UEs.  Appx1069 (¶ 72).  The E-DCH *Absolute* Grant Channel ("E-AGCH") at issue in this case transmits *absolute* grants, while the E-DCH *Relative* Grant Channel ("E-RGCH") conveys *relative* grants.  Appx1070 (¶¶ 74-75); Appx1158.  3GPP defined these channels through its technical specifications, which specify the requirements for the E-AGCH and E-RGCH.  *See, e.g.*, Appx1070 (¶¶ 73-75); Appx1148-1173 (adding absolute grants and the E-AGCH to the 3GPP TS 25.309 "FDD Enhanced Uplink; Overall description; Stage 2" technical specification ("Meeting45")); Appx1174-1231 (adding absolute grants and the E-AGCH to the 3GPP "Physical channels and mapping of transport channels onto physical layers (FDD)" TS 25.211 technical specification ("Meeting39")).  3GPP formally adopted the E-AGCH into the standard in November 2004.  Appx1070 (¶ 75); Appx1158.

### B.    The '625 Patent's Specification and Disclosures

#### 1.    The Korean Application Discloses a Generic Downlink Channel

The '625 patent claims priority to Korean Application No. 10-2004-0022960, filed on April 2, 2004, several months before 3GPP's August 2004 meeting. Appx1377.  In its discussion of the state of the art, the Korean application mentions the problem caused by sending scheduling assignments to each individual UE and

the known, standard solution of using dedicated "downlink channels" to send scheduling commands. Appx1383-1384 (¶¶ 7-9) (certified English translation). The Korean application does ***not*** disclose any specific downlink channels, instead referring only generically to the concept of a downlink channel. *Id.* Moreover, the Korean application discloses only the general concept of scheduling information; it does not distinguish between absolute grants and relative grants, nor does it discuss downlink channels dedicated to either absolute or relative grants. *Id.*; Appx1074-1075 (¶¶ 87-88). This makes sense because the concepts of absolute and relative grants, and the specific E-AGCH and E-RGCH downlink channels to transmit each, respectively, were not created by the 3GPP until several months later. Appx1074-1075 (¶ 87). In fact, the Korean application notes the applicability of its proposed solution "to the existing 3GPP WCDMA E-DCH in the node B controlled scheduling method." Appx1382-1383. The 3GPP standards at that time detailed seven different transmission channels, none of which specified absolute or relative grants. Appx1183-1184.

### 2. The '625 Patent Specification Adds the E-AGCH for the First Time

Several months after the 3GPP developed and adopted the E-AGCH technical specifications, LG filed the application that would issue as the '625 patent, claiming priority to the Korean application. Although it repeats some of the content from the Korean application, the new application also describes the E-AGCH for the first

time—and eventually frames the claims squarely around that newly added channel. Appx1076 (¶ 91).

In particular, the specification describes ideas not found in the Korean application, including a method of scheduling uplink packet transmissions using the E-AGCH to convey newly defined scheduling assignments to UEs. *Compare* Appx110 (3:14-60, 4:58-59) *with* Appx1377-1393 (no mention of the E-AGCH or absolute grants). The description refers to 3GPP's E-DCH as "an example of one of the methods being discussed," and the specification explains that the preferred embodiment of the claimed invention "relates to" this 3GPP E-DCH. Appx109 (1:20-26); Appx110 (3:11-13).

The '625 patent specification describes its E-AGCH consistently with the 3GPP's defined E-AGCH, without announcing a special definition, as a patentee would do for a term that it newly coined. For instance, the '625 patent states that "[a]n Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send a scheduling command to a[] user equipment (UE)." Appx110 (3:14-16). The specification further explains that, when using the E-AGCH, a Node B transmits a command about the amount of power or level of data rate transmission the UE can use, calling this the "scheduling assignment." Appx110 (3:16-20).

The '625 patent also describes the use of UE identifiers similarly to the 3GPP's E-AGCH. Namely, scheduling assignments can be sent to "a[] UE, group(s) of UEs, or all the UEs." Appx110 (3:42-44). Each scheduling assignment includes UE-identifier information and scheduling content. Appx110 (3:21-25). The "scheduling assignment(s) can be transmitted from Node B via shared channel(s) to a[] UE, group(s) of UEs, or all the UEs" through the E-AGCH. Appx110 (3:42-44). All UEs "receive, decode, and identify to which UE(s) the transmission is directed," and then the identified UE(s) act on that scheduling information. Appx110 (3:54-60). A UE "can have more than one identifier," such that it can respond to different scheduling assignments based on which identifier is called out. Appx110 (3:61-62, 4:8-23).

In addition to newly describing the E-AGCH, the specification also recites for the first time the Enhanced Relative Grant Access Channel ("E-RGCH"), which had also been recently defined by the 3GPP. Appx110 (4:24-35).

The '625 patent specification shows the use of various channels and identifiers in exemplary figures. Figure 1 (pictured below) "shows scheduling assignment channels allocated along a timeline." Appx109 (2:64-65). Figure 1 shows "Ch-1-Ch-n" scheduling assignment channels, which "are, for example orthogonal variable spreading factor (OVSF) code channels." Appx111 (6:6-12). Figure 1 depicts numerous scheduling assignment channels and different groupings of UEs over time

on each channel; SA represents individual UEs, SA-G represents a group of UEs, and SA-all represents all UEs.  Appx111 (5:66-6:13).



Appx106.

Figure 2 (pictured below) "illustrates grouped scheduling assignment channels."  Appx109 (2:66-67).  According to the '625 specification, Figure 2 depicts Node B transmitting scheduling assignment to n number of groups (SA-G1 and SA-G2) while sending scheduling assignments to all UEs simultaneously (SA-all) through the use of "specific UE ID(s)."  Appx111 (6:14-25).



Appx107.

The Korean application also included Figures 1 and 2. Appx1391-1392. Neither figure, nor their accompanying explanations in the Korean application or the '625 patent, describes or mentions the 3GPP's E-DCH, E-AGCH, or E-RGCH, or the concepts of absolute grants or relative grants.

### C. The Patentees Added the E-AGCH to the Challenged Claims During Prosecution

LG filed the application that issued as the '625 patent in the United States on March 31, 2005, claiming the benefit of the Korean application. Appx105; Appx1075-1076 (¶ 90). The Examiner rejected all claims, including certain dependent claims that required the E-AGCH; LG ultimately overcame those rejections by amending the independent claims to specifically *add* limitations directed to the E-

AGCH and E-DCH and to specify a "plurality of UEs" element for the UE identifier. Appx998-1008; Appx1077-1078 (¶¶ 94-96).

Notably, there is no record that the patentee provided an English translation of the Korean application to the Examiner. The Examiner therefore could not check LG's priority claim, accepted it at face value, and did not search for any prior art post-dating the Korean application. Appx1078 (¶ 97). It is not surprising, therefore, that the Examiner did not locate any of the 3GPP references disclosing "E-AGCH," given that the name and concept only came into existence months *after* the Korean application's priority date. *Id*.

## D. The Challenged Claims Are Directed to Using an E-AGCH

All of the challenged claims recite the E-AGCH. Claim 16 is representative of the issues on appeal and recites:

> 16. A method of scheduling an uplink packet transmission channel for user equipment (UE), the method comprising:
>
> > [a] receiving a scheduling assignment in an ***Enhanced Absolute Grant Channel (E-AGCH)***, wherein the scheduling assignment comprises an identifier for a plurality of UE;
> >
> > [b] acquiring the contents of the scheduling assignment; and,
> >
> > [c] transmitting an uplink data packet on an Enhanced Uplink Dedicated Channel (E-DCH) according to the contents of the scheduling assignment.

Appx112 (7:40-48) (emphasis added). The claim requires using an E-AGCH to transmit scheduling assignments to a plurality of UEs, where the scheduling

assignment includes an identifier for the UEs, and transmitting an uplink packet via the E-DCH according to the contents of the scheduling assignment. Independent claim 39 is similarly directed to a method for scheduling a plurality of uplink packet transmission channels for a plurality of UEs and requires receiving a scheduling assignment in an E-AGCH, where the assignment includes an identifier for the plurality of UEs, and transmitting an uplink packet on the E-DCH according to the scheduling assignment. Appx112-113 (8:63-9:5).

Each of the dependent challenged claims also recites an E-AGCH. Claims 18, 19, and 40 recite further information to be included in the scheduling assignment, claims 21 and 42 require a command to grant or deny transmission in the E-DCH, and 22 requires the UE to have at least one identifier. Appx112 (7:51-56, 60-64), Appx113 (9:6-9, 10:4-6).

## III. THE 3GPP PRIOR ART DISCLOSED THE CLAIMED INVENTION

3G Licensing does not dispute that, under the Board's construction of E-AGCH and without the benefit of the Korean application's priority date, each of the challenged claims is anticipated or obvious in view of the 3GPP references. Appx29 n.11; Appx36, Appx40, Appx41; *see generally*, BB24-49.

### A. 3GPP Meeting45 Document

Meeting45 is titled "Tdoc R2-042730, Inclusion of e.g. physical layer model, MAC architecture, detail Node B scheduler mechanism and QoS Control

principles." Appx1148-1173. Meeting45 was published no later than December 3, 2004, and identified changes already agreed upon by the 3GPP working group (RAN WG2) responsible for developing the E-AGCH to revise 3GPP Technical Specification 25.309 v6.0.0, which is the specification for "the overall support of FDD Enhanced Uplink" in UMTS Terrestrial Radio Access ("UTRA"). Appx140-141; Appx1148, Appx1154. Meeting45 defined the E-AGCH and disclosed receiving a scheduling assignment in an E-AGCH that included an identifier for a plurality of UEs. Appx1154-1155, Appx1167. Meeting45 disclosed that "[a]bsolute Grants … are valid for one UE, for a group of UEs or for all UEs," and that the "absolute scheduling grant contains at least the identity … of the UE (or group of UEs) for which the grant is intended and the maximum resources the UE(s) may use." Appx1168.

### B.    3GPP Meeting45bis Document

Meeting45bis, titled "R2-050136, E-DCH Priority Based Scheduling," was a technical document submitted to the same 3GPP working group as Meeting45 (RAN WG2). Appx1374-1376. Meeting45bis was published no later than January 7, 2005, and was directed to providing "a differentiated set of grants" for use with the development of FDD Enhanced Uplink and E-DCH support, with the aim of addressing scheduling delay issues from Meeting39 (discussed below) and Meeting45. *Id.* Meeting45bis added the option of having multiple identities for UEs. Appx1375.

### C.     3GPP Meeting39 Document

Meeting39, titled "Tdoc R1-041512, Introduction of E-DCH," was a change request to 3GPP TS 25.211 v6.2.0, which is the 3GPP technical specification that "describes the characteristics of the Layer 1 transport channels and physical channels in the FDD mode of UTRA." Appx1181; *see* Appx1174-1332. Meeting39 was published no later than November 21, 2004, and disclosed that an E-AGCH was a fixed rate downlink channel that carried the E-DCH uplink absolute grant. Appx1174, Appx1219; Appx1085 (¶ 118).

### D.     The Pre-E-AGCH Alternative Chen Reference

U.S. Patent No. 7,155,236 ("Chen") disclosed allocating uplink channel resources to different subsets of mobile stations by issuing one or more individual access grants to one subset and a single common grant to another subset. Appx1333-1373. Chen was filed on August 21, 2003, well before the Korean application. Appx1333. Chen, like the Korean application, was directed generally to uplink scheduling, not the 3GPP's later-defined E-AGCH. Appellees presented Chen as an alternative ground in the event the Board concluded that the challenged claims were entitled to the Korean application's priority date. *See* Appx125. Before the Board, 3G Licensing disputed whether Chen disclosed the claimed E-AGCH, Appx265-272; Appx489-492; Appx644-647, although it could not plausibly dispute Chen's similarity to the Korean application's disclosure.

– 17 –

## IV.   THE BOARD'S FINAL WRITTEN DECISION FOUND ALL CLAIMS INVALID

The Board found the challenged claims unpatentable for obviousness or anticipation based on Meeting45 and Meeting45bis.  Appx30-41.

### A.   The Board Correctly Defined a Sophisticated POSITA Knowledgeable About Industry Standards

The Board defined a person of ordinary skill in the art ("POSITA") as having "a bachelor's degree in electrical engineering or a similar discipline, with at least three years of relevant industry or research experience (or additional education)," and that "[t]he relevant experience would include a working understanding of the development of new and then-existing wireless cellular communications standards." Appx9-10 (adopting Appellees' definition).  The Board noted that this level of skill was consistent with both the '625 patent specification and the prior art before the Board (*i.e.*, mostly 3GPP references).  Appx10.

### B.   The Board Construed "E-AGCH" to Have its Plain Meaning

The Board then turned to claim construction for one term, "E-AGCH," finding that it has its plain meaning, *i.e.*, its meaning in the 3GPP standards, including that an E-AGCH must send only absolute grants.  Appx10-19.

3G Licensing initially proposed construing "E-AGCH" to mean: "a single common grant channel capable of assigning multiple identifiers to a single UE that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel."  Appx255.  3G Licensing later proposed a

revised construction in its Patent Owner's Response to allegedly clarify that the E-AGCH makes use of multiple identifiers, but does not perform the assignment of identifiers itself: "a single common grant channel that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel, said channel supporting a single UE being assigned multiple identifiers." Appx483. The Board's analysis first noted that 3G Licensing's expert's opinions were based *only* on 3G Licensing's original, abandoned construction, but nonetheless considered the revised construction anyway. Appx11.

### 1. The Board Determined "E-AGCH" Was a Term of Art with an Accepted Meaning Known to a POSITA by March 31, 2005

The Board looked at the term "E-AGCH" in the context of the '625 patent and determined that it was a term of art when LG had filed its United States application. Appx11-14. The Board then analyzed whether the term had an accepted meaning in the art, considering, for example, Meeting39, Meeting45, Meeting45bis, and the parties' expert declarations. Appx12. The Board found that the prior art consistently used "E-AGCH" to describe a channel dedicated to transmitting only absolute grants. Appx12-14. The Board rejected 3G Licensing's argument that Meeting45 was only a change request and therefore did not represent the state of the art, finding instead that the document explicitly stated that it was reporting already-agreed changes to the 3GPP standards. Appx13. The Board further explained that

unrebutted testimony and supporting evidence demonstrated that the 3GPP documents were published on the 3GPP website before LG filed the '625 patent's application. Appx13. Moreover, the Board noted that 3G Licensing presented no evidence supporting its contention that there was no "single accepted meaning" for E-AGCH in the art. Appx14. The Board concluded:

> We determine that the usage and description of the term E-AGCH in documents accompanying the 3GPP TS 25.211 v6.2.0 (2004-09) standard along with at least one later version—3GPP TS 25.211 v6.7.0 cited by Patent Owner in its infringement complaint (*see, e.g.*, [Appx1824])—are consistent and that ***E-AGCH would have been known and understood by a POSITA to carry the meaning set forth therein as of the filing date of the application underlying the '625 patent, March 31, 2005***. We further conclude that one of skill in the art would have understood that the patentee used that term in the '625 patent in accordance with the 3GPP's definition.

Appx14 (emphasis added).

### 2. The Board Determined That There Was No Evidence of Lexicography or Disavowal

The Board next looked to the specification and determined that the patentees had not used lexicography or disavowal to redefine the plain meaning of "E-AGCH." Appx15-18. 3G Licensing posited that three features distinguished the patent's use of the term from the 3GPP's usage, but none was supported by the record: (1) the E-AGCH transmits scheduling grants to a single UE, group of UEs, or all UEs, (2) the E-AGCH transmits scheduling grants through use of multiple identifiers assigned to each UE, and (3) the E-AGCH is a single channel.

3G Licensing had argued that the E-AGCH transmits scheduling grants generally (rather than only absolute grants), pointing to the specification's statement that "[a]n Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) to send a scheduling command to an user equipment (UE)." Appx15. But the Board found that 3G Licensing's cited language was not "definitional" because it was, at most, an incomplete recitation of known features of an E-AGCH. Appx15-16.

Critically, the Board found that the patent's use of the E-AGCH was limited to sending only absolute grants. Appx18-19. Namely, usage of "E-AGCH" in the art was limited to absolute grants and could not be understood as simply a "common grant channel" also encompassing relative grants. Appx19. As the Board noted, "[t]o make an absolute grant optional would be, in effect, to ascribe no meaning to the word 'Absolute' in 'Enhanced Absolute grant Channel.'" *Id.*

The Board also rejected 3G Licensing's argument that the '625 patent required issuing scheduling identities to three groups (an individual UE, a group of UEs, or all UEs), while the 3GPP standards only supported using two identities (an individual UE and a group identity). Appx17. The patent did not expressly require the use of three identifiers, nor did it require using three identities instead of two. Appx17-18. Moreover, the patent's recitation of the three possible groupings was "substantially similar to the 3GPP" standards. Appx18. The Board also considered and

rejected 3G Licensing's reliance on Figures 1 of the '625 patent and the Korean application, and 3G Licensing's declarant Mr. Lipoff's testimony regarding those figures, to allegedly show the use of multiple identifiers. Appx11-12 (citing both Figs. 1); *see also* Appx21-22 (citing Fig. 1 of Korean application, Appx3237-3241 (¶¶ 60-67)). The Board therefore found "no clear expression of an intent to depart from the meaning of ['E-AGCH']" and concluded that the E-AGCH had the same definition as disclosed in the 3GPP standard documents. Appx18.

### 3. The Board Did Not Need to Determine Whether The E-AGCH Is Limited to a Single Channel

The Board did not make findings as to whether the E-AGCH must be a single channel (rather than allowing for multiple channels) because that determination was only relevant to Appellees' alternative Chen-based unpatentability grounds, which the Board did not have to reach. Appx20.

### C. The Board Found That the Korean Application Lacked Written-Description Support for the E-AGCH Limitation

Based on its plain-meaning construction of "E-AGCH," the Board next found that the Korean application did not provide written-description support for an E-AGCH and, therefore, that the '625 patent could not claim priority to that application. Appx21-26. Instead, the Board found that the Korean application described the concept of only general scheduling grants, not absolute or relative grants, and thus did not describe the E-AGCH. *Id.*

The Board considered and rejected 3G Licensing's contention that the disclosure of scheduling grants necessarily disclosed the subsets of absolute and relative grants as well.  Appx24.  The Board started from the established notion that "[o]ne cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention."  Appx24 (citing *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326 (Fed. Cir. 2000)).  The Board additionally considered 3G Licensing's expert, Mr. Lipoff's, argument that DOCSIS (a cable network standard) showed that LG had possession of an E-AGCH at the time it filed the Korean application.  Appx24-25.  Mr. Lipoff had argued that the cable standards set forth in DOCSIS described scheduling grants generally and not as either absolute or relative grants, and therefore a POSITA would have understood the Korean application's general description of scheduling grants in connection with wireless cellular communications to likewise disclose absolute and relative grants.  Appx24. The Board found Mr. Lipoff's testimony not persuasive because DOCSIS is a cable standard, not a cellular (or even wireless) communications standard.  Appx24-25.  It further noted that the absence of a discussion of absolute and relative grants in the DOCSIS standards did not show how POSITAs would have understood the Korean application's disclosure of scheduling grants.  Appx25.

Mr. Lipoff had also opined that 3GPP's amendment of the technical specification to refer to both absolute and relative grants several months ***after*** LG filed the

Korean application demonstrated that a POSITA would have understood the application's disclosure of scheduling grants to include both types of grants. Appx25. In other words, Mr. Lipoff had incongruously argued that the 3GPP's subsequent *revision* of its technical specifications to *add* the E-AGCH meant that a POSITA would have understood that the E-AGCH was there all along. The Board found that the 3GPP standard's addition of absolute grants "*four months after* the filing of the Korean Application" gave "insufficient insight into what a POSITA would have understood" at the time of filing. Appx25 (emphasis added). This was even more true "given the apparently rapidly evolving state of wireless cellular communications." Appx25.

Because the Korean application did not expressly or inherently disclose an E-AGCH or a channel dedicated to sending only absolute grants, it did not provide written-description support for the term "E-AGCH" in the later-filed '625 patent's application. Thus, the challenged claims could not claim priority to the Korean application, making their priority date the filing date of the '625 patent's application—March 31, 2005. Appx25.

### D. The Board Found the Claims Unpatentable for Anticipation or Obviousness

Because the Board gave the '625 patent its 2005 priority date, the 3GPP references (Meeting45, Meeting45bis, and Meeting39) were all prior art. Accordingly, the Board found claims 16 and 39 invalid for anticipation by Meeting45 and the

remaining challenged claims invalid for obviousness based on Meeting45 and Meeting45bis. Appx29-41. 3G Licensing never disputed in its Patent Owner's Response that, if the 3GPP references *were* prior art, then each of the challenged claims was invalid as anticipated or obvious. Appx29 n.11, Appx36, Appx40, Appx41.

3G Licensing had presented a new argument in its sur-reply that Meeting45 did not discuss identifiers, which 3G Licensing argued supported its claim-construction and written-description arguments. The Board concluded that 3G Licensing's new "identifier" argument was untimely. Appx31. But even if the argument were timely, the Board had already separately determined that the '625 patent did not require the use of three identifiers and had further found that Meeting45 and Meeting45bis clearly described using the E-AGCH with at least two identifiers and in language "substantially similar" to the later-filed '625 patent. Appx16-17.

The Board did not address Appellees' Chen-based grounds because it had already determined that the challenged claims were unpatentable on other grounds by a preponderance of the evidence. Appx41.

## SUMMARY OF ARGUMENT

The Court should affirm the Board's unpatentability determination. The Board properly construed "E-AGCH" to have its plain meaning to a POSITA, consistent with the 3GPP standards. The Board also correctly found that the Korean application did not provide written-description support for the E-AGCH and,

therefore, the '625 patent could not claim priority to that application. Accordingly, the 3GPP references were invalidating prior art.

*First*, 3G Licensing ignores the Board's careful analysis of the '625 patent's claims and specification to accuse the Board of improperly elevating the extrinsic evidence over the intrinsic record. The Board did no such thing. Rather, the Board performed a legally proper claim-construction analysis, beginning with the claims and specifications to determine that "E-AGCH" was a term of art and only turning to the extrinsic evidence to confirm that term's consistent meaning in the art. Moreover, the Board thoroughly considered and addressed each of 3G Licensing's arguments on claim construction; just because the Board reached a different conclusion does not mean that the Board did not account for all of the relevant evidence. And even if the Board erred in its analysis, any error was harmless because a *de novo* review of the intrinsic record and substantial-evidence review of the Board's underlying factual findings reaches the same result.

3G Licensing cannot avoid the fact that "E-AGCH" had become a term of art by the time that LG filed the '625 patent's application. It had an established, accepted, and well-defined meaning, namely, the one set forth in the 3GPP standards. An E-AGCH sent only ***absolute*** grants and could make use of, but did not require, multiple identifiers for a single UE. LG expressly acknowledged that the '625 patent applied to systems operating under the 3GPP standards. Moreover, the '625 patent

used "E-AGCH" consistently with its industry-accepted meaning, and the patentees did not engage in lexicography or otherwise disavow that plain meaning. At best, the '625 patent described certain general features of an E-AGCH but did not seek to redefine the term.

*Second*, the Korean application did not disclose an E-AGCH. This makes sense—the '625 patent uses "E-AGCH" in accordance with its plain meaning, and the E-AGCH was not developed or defined by the 3GPP until several months after LG filed the Korean application. Instead, the Korean application disclosed downlink channels generally, which was the state of the art at the time LG filed that application. The record does not support 3G Licensing's argument that disclosing a general downlink channel inherently disclosed a subsequently defined channel for transmitting absolute grants. Those concepts were created months later by the 3GPP working group. The Board properly rejected 3G Licensing's expert's testimony—including his reliance on Figures 1 of the Korean application and the '625 patent, his use of standards from the cable industry (DOCSIS), and his citation to a 3GPP reference that post-dated the Korean application—as unsupported by the record, speculative, and irrelevant.

Accordingly, the '625 patent is not entitled to the Korean application's priority date. With the '625 patent's filing date as its priority date, there is no dispute that

the 3GPP references are invalidating prior art. Therefore, the Court should affirm the Board's unpatentability determination.

## ARGUMENT

## I.    STANDARDS OF REVIEW

This Court reviews the Board's ultimate claim construction *de novo*, but it reviews any underlying factual determinations for substantial evidence. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325-26 (2015). Likewise, this Court reviews *de novo* the Board's legal conclusion of obviousness, but it reviews the underlying factual determinations for substantial evidence. *In re Brandt*, 886 F.3d 1171, 1175 (Fed. Cir. 2018). "Priority of an invention is a question of law to be determined based upon underlying factual determinations." *Amkor Tech., Inc. v. Int'l Trade Comm'n*, 692 F.3d 1250, 1254 (Fed. Cir. 2012) (quotation omitted). This Court reviews the Board's anticipation and written-description rulings for substantial evidence, as both are questions of fact. *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1341 (Fed. Cir. 2016); *ULF Bamberg v. Dalvey*, 815 F.3d 793, 797 (Fed. Cir. 2016). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

## II.    THE BOARD CORRECTLY FOUND THE CHALLENGED CLAIMS UNPATENTABLE

As explained below, the Board performed a proper claim-construction analysis to construe "E-AGCH" according to its plain meaning and found no written-description support for that concept in the Korean application, which never referred to or described absolute grants or an Enhanced Absolute Grant Channel.  Thus, the Board did not err in concluding that "the '625 patent is not entitled to the filing date of the Korean Application."  Appx25.  3G Licensing did not dispute that, if the 3GPP references are prior art, they anticipate or render obvious all challenged claims. Appx29 n.11.  The Board's decision should therefore be upheld.

### A.    The Board Properly Construed "E-AGCH"

The Board correctly gave "E-AGCH" its industry-standard plain meaning as described in the 3GPP references.  Consistent with its descriptive name, the E-AGCH is limited to sending only absolute grants and supports the use of, but does not require, multiple identifiers for a single UE.  The Board performed a proper claim-construction analysis to reach this conclusion.

When a patentee uses an industry-recognized term in its claims, it must be held to that standard meaning unless the specification shows a clear intent to deviate. For example, in *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1348 (Fed. Cir. 2003), the patentee used the term "ATCC-VR2332" in its claims.  The Court held that the term meant the specific viral strain that the

patentee had deposited with the relevant standards organization (ATCC). *Id.* The term "on its face" referred to the deposited strain, and the patentee had not otherwise defined the term or attempted to claim the virus "in terms of more general functional and structural properties disclosed by the specification." *Id.* Similarly, in *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 738 (Fed. Cir. 2014), the terms "non-volatile memory" and "volatile memory" had "so clear an ordinary meaning that a skilled artisan would not be looking for clarification in the specification." That is, there was "no facial ambiguity or obscurity in the claim term." *Id.* Moreover, the specification's "few passing references" to a potentially different meaning did "not amount to a redefinition or disclaimer," and those references did not "assert, in a passing and indirect manner, a meaning sharply in conflict with clear usage." *Id.*

Likewise, here, the '625 patent "on its face" claims the industry-recognized term "E-AGCH" as it was used in the context of the 3GPP's standards. As described below, the patentees did not redefine an E-AGCH or claim the various functional properties it now attempts to ascribe to that term. Thus, the Board properly construed the term in accordance with its industry-recognized meaning, as set forth in the 3GPP references.

### 1.    The Board Performed a Legally Sound Claim-Construction Analysis

3G Licensing alleges that the Board committed several errors in its claim-construction analysis. None of 3G Licensing's arguments has merit.

### a.    The Board Followed This Court's Claim Construction Precedent and First Considered Intrinsic Evidence

3G Licensing accuses the Board of ignoring the Court's claim construction guidance in *Phillips* and starting with the extrinsic record in its analysis.  BB33-36. This is wrong.  The Board correctly began with the words of the claims and specification, found that "E-AGCH" had an industry-defined plain meaning, and found no disavowal or disclaimer of that meaning.  Appx11-14.  The Board relied on extrinsic evidence only to confirm that "E-AGCH" had an industry-recognized meaning, which is entirely consistent with the Court's precedent.  In short, the Board did not improperly elevate extrinsic evidence over the intrinsic record.

This Court in *Phillips* "recognized that there is no magic formula or catechism for conducting claim construction."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005).  "The sequence of steps … in consulting various sources is not important; what matters is … to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  *Id.*

Consistent with *Phillips*'s framework, the Court in *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014), began its claim-construction analysis with the notion that the term "gateway" "had a well-understood meaning in the art at the time the patentees filed the application," and confirmed that notion by looking to "technical dictionaries."  *See also Ancora*, 744 F.3d at 738 (where a term had "so clear an ordinary meaning[,] … a skilled artisan would not be looking for

clarification in the specification."). Then, the Court went on to examine whether the "context of the claims and specification" showed an intent to "depart from the ordinary meaning." *Starhome*, 743 F.3d at 857-58.

The Board took the same analytical steps here. The Board began with the disputed term, E-AGCH, and examined "whether the term had an accepted meaning at the time of filing the application underlying the '625 patent." Appx12. The Board looked to the 3GPP technical publications and confirmed that "E-AGCH" had a consistent, industry-wide meaning at the relevant time. Appx11-14. 3G Licensing's expert even confirmed that there was "a consensus … reached at" Meeting45 as to the pertinent technical specifications at issue here. Appx3198 (79:5-18). The Board further noted that 3G Licensing failed to provide any evidence of some other accepted meaning for an E-AGCH in the art at the time. Appx14.

Next, the Board determined whether the patentees had used "E-AGCH" consistently with its plain meaning. Appx14-18. It looked at the specification for evidence of lexicography or disavowal departing from the clear definition of the E-AGCH in the art at the relevant time. Appx15. Finding no language of redefinition in the specification, the Board adopted the plain meaning of the E-AGCH. Appx18. The Board further analyzed the "features" that 3G Licensing ascribed to the '625 patent's E-AGCH, explaining why they were either not supported by the record or not necessary to determine for purposes of applying the prior art. Appx18-20.

3G Licensing's reliance on *Phillips* and *Columbia* is misplaced.  In both cases, the Court dealt with terms that did not have obviously settled industry-standard definitions and that required examination of the specification to understand their meanings in the appropriate context.  *Trs. of Columbia Univ. v. Symantec Corp*, 811 F.3d 1359, 1363, 1365-68 (Fed. Cir. 2016) ("byte sequence feature" and "probabilistic model of normal computer system usage"); *Phillips*, 415 F.3d at 324-27 ("baffles") (en banc).  Here, by contrast, "E-AGCH" could ***only*** have its industry-standard definition unless redefined by the patentees.  Moreover, as explained below, the Board fully considered the term "E-AGCH" in the context of the claims and the specification.  The Board's findings are entirely consistent with the intrinsic record, which is the import of *Phillips* and *Columbia*.

### b.    The Board Considered the '625 Patent's Specification and 3G Licensing's Arguments

3G Licensing also accuses the Board of ignoring several statements from the specification which, according to 3G Licensing, show that the patentees intended something other than the 3GPP definition of E-AGCH.  BB36-37.  These arguments are meritless.

3G Licensing argues that the Board ignored the specification's alleged description of the E-AGCH as something other than the 3GPP-adopted term.  *Id.*  As explained in detail below, there is no language of redefinition in the specification.  The Board properly found that the patentees had not expressed a clear intent to

depart from the plain meaning of "E-AGCH." Appx15-18. That the Board disagreed with 3G Licensing's arguments does not mean it "ignored" the intrinsic record.

3G Licensing also alleges that the Board erred when it refused to consider the argument that the patent's E-AGCH makes use of three UE identities, whereas the 3GPP references did not disclose "a UE being issued identifiers of any kind, let alone three simultaneously." BB37-39 (citing Appx31). The Board *expressly* considered the threshold issue to 3G Licensing's argument—whether the patent's E-AGCH required use of three identifiers—in its claim-construction analysis. The Board addressed 3G Licensing's "argument that the E-AGCH of the '625 patent differs from that of the 3GPP standard because it 'supports issuing scheduling assignments to *three identities* …,' whereas 'the 3GPP E[-]AGCH supports issuing' scheduling assignments to *only two identities*.'" Appx17 (emphasis added). The Board found the argument "unavailing because it is unsupported by the record." Appx17 (citing Appx482; Appx1375; *comparing* Appx107 (Fig. 2), Appx110 (3:42-44, 3:61-62, 4:19-22) *with* Appx1383-1384). In particular, the Board found that 3G Licensing's citations at most showed that the '625 patent's UE can have more than one identifier, but did not "clearly express and intent to redefine E-AGCH so as to require *three identifiers* … or in any way support limiting E-AGCH to three identities *instead of two identities*." Appx17 (emphasis added).

The Board did not separately address the second issue in 3G Licensing's argument—whether the 3GPP references disclosed the use of three identifiers—because it was a new argument that 3G Licensing had not raised until sur-reply and therefore had forfeited. Appx31; Appx643. But the Board had no need to consider this question anyway because it had already found that the '625 patent's E-AGCH did not require the use of three identifiers. Appx17.

Further, the Board properly found that 3G Licensing's argument was new. In its Patent Owner Response before the Board, 3G Licensing argued that the patent requires the use of three identifiers, but the 3GPP's E-AGCH uses only two identifiers. Appx482. Appellees explained in their reply before the Board that LG had not redefined the E-AGCH to require the use of three identities. Appx600-601. Appellees pointed to Meeting45's description of sending absolute grants for "one UE, for a group of UEs, or for all UEs," and noted that the '625 patent used that language almost verbatim. Appx600-601. This showed that the patent used "E-AGCH" consistently with the 3GPP's usage.

3G Licensing's sur-reply to the Board went beyond a proper responsive argument and contradicted the argument it made in its Patent Owner's Response. 3G Licensing had previously argued that the 3GPP references disclosed the use of two identifiers instead of the patent's three identifiers. Appx482. But it argued the ***opposite*** in its sur-reply, stating for the first time that Meeting45 does not "discuss[]

identifiers whatsoever." Appx643.  3G Licensing had not stated that position at any point before its sur-reply.  The citations that 3G Licensing provides to allege that it raised this argument prior to its sur-reply do not help.  BB39 (citing Appx256; Appx269-272; Appx479-482; Appx491).  None of the cited pages contains an argument that Meeting45 does not disclose identifiers at all.  Appx256; Appx269-272; Appx479-482; Appx491.  Thus, the Board was correct in finding the "argument that Meeting45 does not discuss identifiers … untimely."  Appx31.

Moreover, even if it were a proper sur-reply argument, and even if the '625 patent required the use of three identifiers, the 3GPP references likewise disclosed such use.  Briefly, as detailed further below, the 3GPP's E-AGCH issues absolute grants to three categories of UEs, which would require identifiers for each of the three categories; further, the references disclose issuing "*at least*" two identifiers, which means that more identifiers could be issued.  Appx1168 (emphasis added).

Although it is not clear, to the extent that 3G Licensing's argument was that the patent requires issuing three identifiers "*simultaneously*" (Appx643 (emphasis added); *see* BB37-38), that argument was also new and not responsive to Appellees' reply argument about the 3GPP references' disclosure of multiple identifiers.  3G Licensing never raised a "simultaneous identifiers" argument before its sur-reply to the Board; the citations that 3G Licensing provides all pertain to the issuance of

multiple identifiers generally, not the requirement that they be issued **simultaneously**.  BB39 (citing Appx256; Appx269-272; Appx479-482; Appx491).

### c.  Any Error in the Board's Claim-Construction Analysis Was Harmless

Even if the Board's analysis were improper (which it was not), any error would be harmless.  A *de novo* review of the intrinsic evidence yields the same result, and the Board's underlying factual findings are supported by substantial evidence.

As detailed below, the intrinsic evidence supports the Board's plain-meaning construction, *i.e.*, the 3GPP's definition of the E-AGCH.  The '625 patent uses the term consistently with its industry-recognized definition to require sending only absolute grants, and it can include multiple channels and identifiers.  By contrast, LG never expressed a clear intent to deviate from that plain meaning.  Nothing in the patent requires the E-AGCH to be capable of sending both absolute and relative grants, requires the E-AGCH to make use of (or issue) three identifiers for a single UE, or limits the E-AGCH to a single channel, nor did the patentees attempt to claim such functionality.

Moreover, substantial evidence supports the Board's findings regarding the extrinsic evidence.  As discussed further below, the Board found that the E-AGCH had a clearly defined standard meaning in the art at the time LG filed the application leading to the '625 patent.  The Board based its findings on the consistent disclosures

in the references themselves, Appellees' expert Dr. Kakaes's well-founded testimony, and 3G Licensing's expert's confirmation of "consensus" in the industry. *See, e.g.*, Appx12; Appx1219; Appx1168; Appx1401; Appx1429; Appx1375; Appx1069-1070 (¶ 71-74); Appx3198 (79:5-18).   The Court should not second-guess the Board's factual findings or credibility determinations.  *See Teva*, 574 U.S. at 325-26; *Celgene Corp. v. Peter*, 931 F.3d 1342, 1351-52 (Fed. Cir. 2019); *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1358 (Fed. Cir. 2018).

### 2.    3G Licensing Improperly Argues a Construction on Appeal that it Abandoned Before the Board

3G Licensing's appeal arguments should be further rejected because they are based on a proposed construction that 3G Licensing ultimately abandoned before the Board.  In 3G Licensing's Patent Owner's Preliminary Response, it posited that "E-AGCH" be construed to mean "a single common grant ***channel capable of assigning multiple identifiers to a single UE*** that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel." Appx255 (emphasis added).  It then modified its construction in its Patent Owner's Response to "a single common grant channel that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel, said ***channel supporting a single UE being assigned multiple identifiers***." Appx483 (emphasis added).  3G Licensing stated that the change specified that the E-AGCH makes use of, rather than performs the assignment of, multiple identifiers.

– 38 –

Appx483.  Yet, on appeal, despite quoting its revised construction at one point (BB29), 3G Licensing argues its original, abandoned construction.  BB28 ("the meaning of E[-]AGCH is clear—a single common grant channel capable of assigning multiple identifiers to a single UE that transmits scheduling grants …"), BB29 (same at subheading II.A.); BB15 (same); BB33 (same); BB41 (same).

It is improper for 3G Licensing to argue a different construction on appeal than it urged to the Board and that the Board considered in its Final Written Decision.  3G Licensing's proposed construction should be rejected on this basis alone.  *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020) (finding forfeiture of claim construction not presented to the Board).  Moreover, the revised construction was never considered or addressed by 3G Licensing's expert witness, contrary to 3G Licensing's representation on appeal.  *Compare* BB29 *with* Appx3235-3236 (¶¶ 54-57) (continuing to rely on 3G Licensing's abandoned construction).  3G Licensing is therefore left with its original construction, which it abandoned below and has therefore forfeited on appeal, or proceeding with its revised construction that it neglected to share with its expert witness and therefore presents solely as unsupported attorney argument.  But it cannot do both.

### 3.    The '625 Patent Uses the E-AGCH Consistent with its Plain Meaning

In any event, neither version of 3G Licensing's proposed construction is correct; "E-AGCH" should be given its plain meaning.  That plain meaning, as defined

by industry standards, requires that the channel sends only absolute grants and supports the use of, but does not require, multiple identifiers for a single UE.  This is precisely how the '625 patent uses the term.

3G Licensing asserts that LG demonstrated clear lexicography to redefine E-AGCH because the '625 patent's version of the E-AGCH allegedly includes three features that distinguish it from the industry-standard E-AGCH: (1) the E-AGCH is a single channel, (2) the E-AGCH transmits scheduling grants to a single UE, group of UEs or all UEs, and (3) the E-AGCH transmits scheduling grants through use of multiple identifiers assigned to each UE.  But neither the intrinsic nor extrinsic records support 3G Licensing's lexicography arguments.  Rather, 3G Licensing has cherry-picked non-limiting—and unclaimed—features from the '625 patent.

### a.    E-AGCH Was an Industry-Recognized Term of Art with a Standard Definition that Would Have Been Known to a POSITA

The Board found that, at the time LG filed the '625 patent's application, "E-AGCH" had an industry-recognized, standard definition, *i.e.*, the 3GPP's definition.  Appx11-14.  As explained above, in August 2004, the 3GPP working groups met and agreed on "a framework for the downlink signaling with respect to E-DCH scheduling" and defined, for the first time, "absolute grants" and "relative grants."  Appx1401; Appx1068-1069 (¶¶ 70-71).  The 3GPP working group also devised new downlink channels for transmitting the new grant schemes, including a new

downlink physical channel—the "E-AGCH." Appx1158; Appx1069-1070 (¶¶ 73-75). These changes were adopted by the 3GPP and became the new standard for scheduling grants. Appx1069-1070 (¶¶ 71-75); Appx1542-1544; Appx1148; Appx1174-1332; Appx1374-1376; Appx109 (1:20-44); Appx1405-1467; Appx3198 (79:5-18).

As the Board found, the art of record all used the term "E-AGCH" consistently. Appx12. In particular, the standardized E-AGCH definition required sending only absolute grants—following directly from the channel's literal name of "Enhanced *Absolute Grant* Channel." Meeting39 stated that "[t]he E-DCH Absolute Grant Channel (E-AGCH) is a fixed rate . . . downlink physical channel carrying the uplink E-DCH *absolute grant*." Appx1219 (emphasis added). Meeting45 likewise disclosed that "*Absolute Grants* … are valid for one UE, for a group of UEs or for all UEs." Appx1168; *see also* Appx1401; Appx1429. 3G Licensing does not dispute this. BB37 (admitting that "the E-AGCH of the 3GPP pertains solely to absolute grants").

Further, 3GPP's E-AGCH can use multiple identifiers for a single UE. Meeting45bis proposed allocating multiple identities to the UE to "allow users to perform transmissions with a minimum delay" over an E-AGCH. Appx1375. Meeting45 likewise disclosed allocating scheduling grants that are "valid for one UE, for a group of UEs, or for all UEs," and that "the absolute scheduling grant contains at

least the identity … of the UE (or group of UEs) for which the grant is intended and the maximum resources the UE(s) may use." Appx1168.

Other references the Board relied on similarly demonstrated that the E-AGCH is an absolute-grant channel that uses multiple identifiers for the UEs. Appx1401 (describing absolute and relative grants); Appx1429 (describing "[a] shared channel … used to transmit the absolute scheduling grants" and stating that "[g]rants can be valid for one UE, for a group of UEs, … or all UEs"). Consistent with these disclosures, Appellees' expert, Dr. Kakaes, likewise testified that the 3GPP working group defined "two types of Scheduling Grants …: Absolute Grants and Relative Grants," and 3G Licensing's expert did not rebut that testimony. Appx1069 (¶ 71). Dr. Kakaes further testified that in "August 2004, a concept for a common grant channel transmitting Absolute Grants scheduling E-DCH first appeared," and that it was coined "E-AGCH" and given standard specifications by November 2004. Appx1069-1070 (¶ 72-74). 3G Licensing's own expert confirmed that there was "a consensus … reached at" Meeting45 on the pertinent technical specifications at issue here, which were published as the 3GPP TS 24.309 standard. Appx3198 (79:5-18).

The Board's conclusion that "E-AGCH" was a term of art with an accepted meaning is further supported by the Board's definition of a highly educated POSITA with "relevant experience" including "a working understanding of the development of new and then-existing wireless cellular communications standards." Appx9-10.

The Board explained that this level of skill was consistent with both the '625 patent's specification and the asserted prior art of record. Appx10. The Board's determinations are therefore consistent with a POSITA's knowledge and experience with the relevant standards of the preeminent wireless cellular standard-setting body.

### b. The '625 Patent's E-AGCH Transmits Only Absolute Grants, Not Common or Other Types of Scheduling Grants

Consistent with the 3GPP standard, the '625 patent also uses "E-AGCH" according to its plain meaning in which the channel sends only *absolute* grants. Tellingly, the patent calls its channel an "E-AGCH," literally an "Absolute Grant" channel, not a common grant channel. Appx110 (3:13-15). By contrast, 3G Licensing's proposed reading would remove *absolute* from "Enhanced *Absolute* Grant Channel." As the Board found, "[t]o make an absolute grant optional would be, in effect, to ascribe no meaning to the word 'Absolute' in 'Enhanced Absolute Grant Channel' and [3G] does not point to any authority that would support such a conclusion." Appx19.

Moreover, the '625 patent specifically discloses another embodiment in which *relative* grants are transmitted, which was added to the specification only after that channel was also defined and standardized by the 3GPP. That embodiment refers to another, different transmission channel for these relative grants called the E-RGCH, or Enhanced *Relative* Grant Access Channel. Appx110 (4:24-57). This is the same

terminology that the 3GPP references used to refer to the relative-grant transmission channel, further confirming that LG was using terms and defined channels pulled straight from the 3GPP's newly-adopted specifications. Thus, the use of "E-AGCH" in the claims is clearly meant to distinguish it from an E-RGCH, both of which had already been defined by the 3GPP.

Additionally, LG's claim amendments during prosecution of the '625 patent disclaimed the interpretation that 3G Licensing now asserts, *i.e.*, that the claims are directed to something other than an absolute grant channel. LG's original independent claims did not specify which channel would transmit scheduling assignments. Appx858-866. During prosecution, LG amended its independent claims to add the specific E-AGCH limitation in order to overcome the examiner's rejection. *See* Appx974-985; Appx998-1008. 3G Licensing cannot now argue that the claims cover a generic downlink channel, which LG specifically gave up in favor of claiming the E-AGCH. *See, e.g.*, *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 33 (1966); *Roemer v. Peddie*, 132 U.S. 313, 317 (1889); *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1369–70 (Fed. Cir. 2008).

Although its argument is not entirely clear, 3G Licensing appears to point to the specification's disclosure that "scheduling assignment(s) can be transmitted from Node B via shared channel(s) to an UE, group(s) of UEs, or all the UEs," Appx110 (3:42-44) and to Figures 1 and 2, to argue that the '625 patent's E-AGCH transmits

scheduling assignments generally and is not limited to sending only absolute grants. BB32-33.  But nothing in the cited language modifies or redefines the E-AGCH (in which the "A" stands for "Absolute") to allow sending of any kind of scheduling grant rather than just absolute grants; to the contrary, Figures 1 and 2 and their accompanying descriptions do not even mention the E-AGCH.  Appx106-107, Appx111 (5:66-6:25).  Additionally, the language that 3G Licensing cites comes almost verbatim from the 3GPP, which 3G Licensing admits is limited to absolute grants:

> -  Absolute ~~Grants~~ scheduling grants are sent by the Serving E-DCH cell ~~supported~~:
>    -  They are valid for one UE, for a group of UEs or for all UEs;

Appx1168; *see also* Appx601 (arguing same); Appx110 (3:42-44).  3G Licensing therefore advocates ***against*** adopting the 3GPP's definition for the E-AGCH while simultaneously pointing ***to*** the 3GPP's own definition for the E-AGCH.

3G Licensing's citation to the '625 patent's discussion of "scheduling assignments" is similarly inapposite.  3G Licensing's argument would require interpreting the cited paragraph's specific reference to "E-AGCH" as discussing a common grant channel instead.  But common grant channels and the E-AGCH are two separate concepts never treated as interchangeable in the '625 patent.  *See* Appx1069-1070 (¶¶ 71-75), Appx1080-1082 (¶¶ 107-110).

Finally, 3G Licensing contends that the specification discloses both absolute and relative grants with no set channel rate, whereas the 3GPP's E-AGCH sets a fixed rate, thus indicating an intent to depart from the plain meaning. BB37. But this argument only further confirms that the patentees intended the E-AGCH to have its industry-standard meaning—there is no need to describe channel-rate details in the patent because they are subsumed as part of the 3GPP's E-AGCH.

Thus, the Board had substantial evidence to demonstrate that the patentee used the term "E-AGCH" consistent with the industry-standard definition and did not disavow or otherwise change that term to redefine E-AGCH as transmitting any scheduling grant generally.

### c.    The '625 Patent Describes Using Multiple Identifiers for a Single UE, And So Do the 3GPP References

As explained above, 3G Licensing's argument as to its proposed "identifiers" feature for the E-AGCH claim term changed on appeal and should be rejected for that reason alone. But while 3G Licensing attempts to revert to its original, abandoned construction, 3G Licensing simultaneously argues that the '625 patent's E-AGCH uses multiple identifiers for UEs. 3G Licensing's shifting approach to claim construction makes it difficult to pin down its argument on appeal.

To the extent 3G Licensing's proposed construction requires that the E-AGCH assigns the identifiers, that is not supported by the specification, as 3G Licensing all but admitted when it changed its construction before the Board.

Appx3238-3239 (¶¶ 63–64); Appx110 (3:61–62) (stating that "under E-AGCH, each UE can have more than one UE identifier" but ***not*** indicating that the E-AGCH channel itself performs the assignment); Appx483 ("Patent Owner thus proposes a different wording for the construction of the term E-AGCH that makes clear that … the channel itself does not do the assigning.").

To the extent 3G Licensing's argument is that the E-AGCH merely makes use of multiple identifiers rather than assigning multiple identifiers itself, that is already subsumed in the plain meaning of the term. As 3G Licensing admitted, the 3GPP's E-AGCH uses multiple identifiers. *See* Appx1375; Appx1168; BB37.

To the extent 3G Licensing is instead arguing that the E-AGCH specifically requires use of ***three*** identifiers, that is not supported by the specification. At most, as the Board found, the specification discloses that "each UE ***can*** have more than one identifier," which can sometimes be three identifiers. Appx110 (3:61–62) (emphasis added); Appx17. 3G Licensing encouraged the Board, and now encourages this Court, to improperly import limitations from the specification into the claim language. In fact, dependent claims specifically refer to ***one or two identifiers***, not three, directly contradicting 3G Licensing's interpretation. *See* Appx111-112 (claim 2 ("wherein ***two identifiers*** are allocated to at least one UE"), claim 17 ("wherein ***one or two identifiers*** are allocated to each UE"), claim 24 ("wherein the scheduling assignment comprises scheduling contents relating to the [] E-DCH and ***one or two***

*identifiers* allocated to each UE"), claim 40 ("wherein *two identifiers* are allocated to at least one UE") (emphases added)).

Even if the '625 patent did require the use of three identifiers, the 3GPP references disclosed such use. Specifically, the 3GPP references disclosed issuing absolute grants to "one UE, for a group of UEs, or for all UEs," which necessarily requires separate identifiers for each of the groupings. Appx1168; Appx1429. The '625 patent copied 3GPP's language almost verbatim. Appx110 (3:42-44) (E-AGCH scheduling assignments can be sent "to an UE, group(s) of UEs, or all the UEs"). Meeting45 also disclosed that "the absolute scheduling grant contains *at least* the identity … of the UE (or group of UEs) for which the grant is intended and the maximum resources the UE(s) may use," meaning that additional identities were explicitly contemplated beyond the two recited. Appx1168.

Thus, the patentee did not demonstrate a clear intent to deviate from the industry-standard definition of the E-AGCH, and 3G Licensing has not pointed to any evidence to overcome the Board's factual determination on this issue.

### d. The '625 Patent's E-AGCH Describes One or More Channels

Contrary to 3G Licensing's assertions, the '625 patent does not limit its E-AGCH to a single channel. Rather, the specification repeatedly refers to the E-AGCH as either a single or multiple channels. For example, the patent states that "[i]n E-AGCH, scheduling assignment(s) can be transmitted from Node B *via*

*shared channel(s)*.” Appx110 (3:42-43). It further discloses that, “with respect to E-AGCH,” Node B uses “various transmission techniques … to transmit scheduling assignments to UEs *via scheduling assignment channels (Ch-1-Ch-n)*.” Appx110 (4:58-63). The patent also refers to “the *channels* used to transmit scheduling assignments.” Appx111 (6:26-29); *see also* Appx112 (claim 15 (referring to a “plurality of pre-allocated transmission channels”)).

To support its lexicography argument, 3G Licensing points to the claims’ use of the singular “an” with reference to the E-AGCH. But while the claims may refer to a singular E-AGCH, there is nothing that prevents the E-AGCH itself from consisting of multiple channels. *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (“This court has repeatedly emphasized that an indefinite article ‘a’ or ‘an’ in patent parlance carries the meaning of ‘one or more’ in open-ended claims containing the transitional phrase ‘comprising.’”).

3G Licensing next alleges that the specification defines the E-AGCH as a single channel, citing the statement that “[a]n [E-AGCH] is a downlink channel used by a base station (Node B) to send a scheduling command to an user equipment (UE).” BB30 (citing Appx110 (3:13-16)). But the language 3G Licensing points to is not definitional, and the threshold to signal an intent to change the meaning of a term is high:

> When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their

– 49 –

> ordinary meaning, he must clearly express that intent in
> the written description.  We have repeatedly emphasized
> that the statement in the specification must have sufficient
> clarity to put one reasonably skilled in the art on notice
> that the inventor intended to redefine the claim term.

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005)

(citation omitted).

At most, the cited passage is a description of an E-AGCH's general function-ality that does "not amount to a redefinition or disclaimer"—the "passing and indi-rect language" does not "assert … a meaning sharply in conflict with clear usage." *Ancora*, 744 F.3d at 738.  Moreover, a POSITA would require more detailed infor-mation, such as channel rate or spreading factors, to recognize the passage as rede-fining the E-AGCH.  *Compare* Appx1219 (defining the E-AGCH as "a fixed rate (30 kbps, SF=256) downlink physical channel carrying the uplink E-DCH absolute grant") *with* Appx105-113 (no mention of channel rate or spreading factor in the '625 patent).  That the '625 specification does ***not*** include this detailed information further confirms that LG used "E-AGCH" in accordance with its 3GPP meaning— the industry standards already provide detailed technical descriptions, so there would be no need to repeat them in the patent.  In any event, nothing in 3G Licensing's cited passage prohibits the use of multiple channels to make up an E-AGCH or af-firmatively limits it to a single channel.

3G Licensing also points to Figure 1 (below) in both the '625 patent and the Korean application as showing the consistent use of a single E-AGCH channel. BB31-32 (citing Appx106 (Fig. 1); Appx3239 (¶ 63); Appx1391 (Fig. 1)).



Appx106; *see also* Appx1391 (same but in Korean application).

3G Licensing admits that the figures show the use of "***multiple scheduling assignment channels*** working in concert," but argues that the E-AGCH itself is only one of those channels. BB31 (emphasis added). 3G Licensing cites only the figure itself and its expert's declaration as support for its proposition that the E-AGCH is solely "represented by CH-1" in Figure 1. BB31 (citing Appx106 (Fig. 1) and Appx3239 (Mr. Lipoff's testimony)). However, neither Figure 1 nor the corresponding specification discussion specify an E-AGCH at all, let alone that the E-AGCH is limited to a single channel. *See* Appx109 (2:64-65) (describing Fig. 1 as showing "scheduling assignment channels allocated along a timeline"). The cited expert testimony does no better—it is entirely conclusory and merely cites back to Figure 1

itself without any explanation for why a POSITA would believe that any channel, let alone only CH-1, is an E-AGCH.  Appx3238-3239.

Finally, even if the '625 patent were limited to a single channel, that does not suggest that LG meant something other than the 3GPP's definition for E-AGCH. The 3GPP documents do not require multiple channels for the E-AGCH, and 3G Licensing does not suggest otherwise, so there would be no inconsistency between the '625 patent's usage of the term and the 3GPP standards.  *See, e.g.*, Appx1219; Appx1429.

In sum, 3G Licensing has not shown that LG provided a clear intent to limit the E-AGCH to a single channel.

### B.    Substantial Evidence Supports the Board's Finding that the '625 Patent Cannot Claim Priority to the Korean Application

The Board correctly found that the Korean application did not have written-description support for the E-AGCH term in the '625 patent.  As such, the patent could not claim priority to the Korean application, and the 3GPP references were invalidating prior art.

### 1.    The Board Had Substantial Evidence to Determine that the Korean Application Did Not Disclose an E-AGCH

The Board had substantial evidence to find that the Korean application lacked written-description support for an E-AGCH.

Unsurprisingly, the Korean application did not describe or even mention an E-AGCH, a concept that did not exist until the 3GPP developed the idea months after LG filed the Korean application. At most, the Korean application disclosed the general concept of a channel transmitting scheduling commands. As the Board found, a POSITA at the time of filing would not recognize that generic disclosure to provide support for the later-claimed E-AGCH. Appx24. That is, although absolute and relative grants are now recognized subsets of scheduling grants, there was nothing in the Korean application showing possession of a channel that specifically transmits absolute grants (*i.e.*, an E-AGCH) at the time of filing. Appx24; Appx1074-1076 (¶¶ 86–88, 91), Appx1081-1083 (¶¶ 108–113); Appx1383.

The Board expressly considered and rejected 3G Licensing's arguments allegedly showing support for an E-AGCH in the Korean application. 3G Licensing's expert relied on specifications from the DOCSIS standards, arguing that because DOCSIS did not distinguish between absolute and relative grants when discussing scheduling commands, a POSITA would understand that the mention of scheduling grants in the Korean application disclosed both absolute and relative grants. Appx22, Appx24-25. But DOCSIS is a wired cable standard, not a wireless cellular standard. Appx3318 (¶ 23), Appx3323 (DOCSIS "is the leading standard for data over cable networks"). Moreover, the Board found that the DOCSIS reference's failure to recite absolute grants did not inform how a POSITA would understand the

Korean application's disclosure of scheduling grants generally. Appx25. The Board further found that Mr. Lipoff's personal belief that DOCSIS influenced the 3GPP standards was not supported by the record. Appx24-25. 3G Licensing presented no evidence to support Mr. Lipoff's beliefs with respect to DOCSIS, and in fact Mr. Lipoff admitted that he never attended a 3GPP meeting, Appx3185 (28:11-19), and was not familiar with the 3GPP working group responsible for the 3GPP prior art references relevant in this proceeding. Appx3187 (35:1-8). Notably, the POSITA in this case is knowledgeable about wireless cellular communication standards, not wired cable standards. Appx9.

The Board also properly rejected Mr. Lipoff's reliance on a 3GPP specification (3GPP TS25.309) that *post-dates* the Korean application by four months because it did not explain how POSITAs thought of scheduling grants *at the time that LG filed the Korean application*. Appx25. The 3GPP specification that 3G Licensing relied on could not give "sufficient insight into what a POSITA would have understood" at the time that LG filed the Korean application, "especially given the apparently rapidly evolving state of wireless cellular communications." Appx25; Appx3330-3341; Appx3319-3320 (¶ 26). Moreover, 3G Licensing incongruously argued on the one hand that the '625 patent's E-AGCH is *different* from the 3GPP's E-AGCH (Appx17) while pointing to the 3GPP's own technical documents to argue that the Korean application disclosed the *same thing* as the standards (Appx25).

Both positions cannot simultaneously be right, and the fact that 3G Licensing's expert relied on 3GPP documents (even those post-dating the Korean application) further demonstrates the import of 3GPP and its definition for an E-AGCH to a POSITA.

Further, the Board's finding is not contradictory to its claim construction analysis—the 3GPP prior art *pre-dates* the '625 patent's filing date and is pertinent to a POSITA's understanding at that time, but 3GPP TS25.309 that 3G Licensing relied on cannot possibly inform a POSITA's understanding of scheduling grants in the Korean application when it *did not exist* when LG filed that application. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010) (en banc) ("Because written description is determined as of the filing date … evidence of what one of ordinary skill in the art knew [a year or two later] cannot provide substantial evidence … that the asserted claims were supported by adequate written description."). Thus, despite 3G Licensing's assertions otherwise, the Board rejected Mr. Lipoff's testimony based on a thorough analysis and substantial evidence, relying on more than just attorney argument.

Finally, as discussed above, the Board rejected 3G Licensing's contention that the '625 patent's E-AGCH encompassed both absolute and relative grants and that it required the use of multiple identifiers. The patent's E-AGCH also is not limited

to a single channel.  Therefore, 3G Licensing's argument that the Korean application disclosed these features is inapposite; they do not show possession of E-AGCH.

### 2.    The Board Gave Due Weight to Mr. Lipoff's Declaration

3G Licensing also argues that the Board did not consider Mr. Lipoff's first declaration in which he pointed to Figures 1 of both the Korean application and the '625 patent as disclosing the E-AGCH.  As an initial matter, 3G Licensing forfeited this argument.  Mr. Lipoff's declaration and the "Figure 1" argument were included only as part of 3G Licensing's Preliminary Patent Owner Response.  Appx261-262.  3G Licensing failed to raise the "Figure 1" argument again in its Patent Owner Response during the trial phase of the IPR.  *See* Appx485-489.  It has thus forfeited that argument on appeal.  *See In re Nuvasive, Inc.*, 842 F.3d 1376, 1380 (Fed. Cir. 2016) (patent owner forfeited argument that was raised during preliminary phase of IPR but was not raised again during trial phase).

In any event, the Board did in fact consider, and properly reject, the arguments raised in the declaration.  Mr. Lipoff's first declaration, in support of 3G Licensing's Preliminary Patent Owner Response (and its later-withdrawn, now reasserted, claim construction for "E-AGCH"), pointed to Figures 1 of the Korean application and '625 patent as both disclosing the concepts of a single common grant channel and the use of multiple identifiers for a single UE.  Appx3238-3240 (¶¶ 63-64).  In both its claim construction and written description analyses, the Board recognized 3G

Licensing's reliance on Figure 1 and Mr. Lipoff's testimony regarding the same as allegedly showing the features that defined the patent's E-AGCH. Appx11-12 (citing both Figs. 1), Appx21-22 (citing Fig. 1 of Korean application (Appx1391), and Mr. Lipoff's declaration (Appx3237-3241 (¶¶ 60-67))). The Board expressly and thoroughly considered 3G Licensing's arguments that the '625 patent's E-AGCH requires various features, as discussed above. *See* Appx11-25. The Board was not required to recite every piece of evidence that 3G Licensing raised so long as it addressed the argument, which it did. *See, e.g.*, *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017); *In re Miracle Tuesday, LLC*, 695 F.3d 1339, 1348 (Fed. Cir. 2012); *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1343 (Fed. Cir. 2003).

Moreover, any oversight by the Board was harmless for at least two reasons. *First*, Figure 1 of the Korean application does ***not*** disclose the E-AGCH. Like the rest of the specification, it at most discloses sending scheduling commands generally over a common grant channel. *See* Appx1081-1082 (¶¶ 110-111); *see also* Appx1074-1076 (¶¶ 86–88, 91), Appx1081-1083 (¶¶ 108–113). The fact that the '625 patent reproduces this figure has no bearing on whether the Korean application disclosed the E-AGCH, *i.e.*, use of the same figure does not retroactively modify the disclosures of the Korean application to include the E-AGCH. And, while LG may have revised its description of Figure 1 in the '625 patent, neither the '625 patent

specification nor the Korean application specification purported to show that Figure 1 discloses absolute grants, let alone an absolute grant channel. *Compare* Appx1386 (Figure 1 shows a "method wherein the entire terminal or terminals belonging to a specific group receive identical scheduling commands simultaneously while n terminals receive scheduling individually") *with* Appx111 (Figure 1 shows "different types of scheduling assignments … transmitted at different times").

*Second*, the Board found that the Korean application did not provide written-description support for an E-AGCH because its disclosure of scheduling commands did not expressly or inherently disclose absolute grants. Appx24-25. Once the Board found that the Korean application did not disclose absolute grants, that alone necessitated a finding of no written-description support. The Board did not need to also consider whether the Korean application failed to disclose even more features that 3G Licensing alleged were present in the '625 patent's E-AGCH.

### 3. The Board's Analysis Properly Relied on Precedent Finding No Written-Description Support Where the Specification Disclosed a Broad Generic Concept But the Claims Recited Only a Narrow Subset of that Concept

3G Licensing attacks the Board's reliance on *Purdue* and *Ariad* for the proposition that disclosing a generic concept (here, scheduling commands) does not constitute written-description support for a more specific concept (here, absolute grants), alleging that those cases dealt with pharmaceutical products in which the generic disclosure encompasses "potentially infinite possibilities." BB48 (citing

*Purdue Pharma*, 230 F.3d at 1326; *Ariad Pharms.*, 598 F.3d at 1355).  3G Licens-

ing's arguments are unfounded.  In *Purdue*, the limitation at issue was a $C_{max}/C_{24}$ ra-

tio greater than two, not a particular genus of drug compounds.  *Purdue*, 230 F.3d at

1324.  There, the Court held that the specification's disclosure of "a substantially

flat serum [c]oncentration curve" did not disclose the specifically claimed

$C_{max}/C_{24}$ ratio.  *Id.*  In fact, even though the specification disclosed data from which

$C_{max}/C_{24}$ ratios could be calculated, that was not a sufficient disclosure because "one

of ordinary skill in the art would not be directed to the $C_{max}/C_{24}$ ratio as an aspect of

the invention."  *Id.* at 1326.   And while *Ariad* did involve a broad genus of pharma-

ceutical compounds—in that case, the ***claims*** recited a broad genus (598 F.3d at

1356-57)—*Purdue* itself recognized that a drug-compound genus/species "rationale

applies equally" in other contexts, for example, to cases in which the specification

discloses a broad concept but the claims recite a specific subset of that concept not

called out in the specification.  230 F.3d at 1326.  Here, the specification disclosed

only the generic concept of scheduling commands.  A POSITA reading the Korean

application "would not be directed to [an E-AGCH or absolute grants] as an aspect

of the invention."  *Id.*

3G Licensing's assertion that the concept of scheduling grants only includes

two possible subsets (absolute and relative grants) does not help its written-descrip-

tion argument.  As an initial matter, 3G Licensing's premise is flawed.  The Korean

application stated that its alleged invention applies "to the existing 3GPP WCDMA E-DCH in the node B controlled scheduling method." Appx1382-1383. But "the existing 3GPP WCDMA E-DCH" did not include defined absolute or relative grants or specified the requirements for dedicated channels for transmitting absolute or relative grants. Tellingly, the 3GPP standard specified requirements for "***seven*** types of common transport channels," none of which were specified for transmitting absolute or relative grants. *See* Appx1183-1184 (emphasis added). There are countless different ways the 3GPP could have defined and specified grants and channels. That the 3GPP eventually conceived of and defined requirements for absolute and relative grants and particular dedicated channels for transmitting those grants in no way means that those grants and channels were present in the Korean application's disclosure of scheduling grants generally.

Moreover, the inquiry is not the size of the generic disclosure but whether that disclosure shows possession of the more specific claim limitation. For example, in *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1366 (Fed. Cir. 2018), the specification's generic disclosure of attaching solder pads was not a sufficient disclosure of the particularly claimed solder reflow method of attachment where solder reflow was one of just several solder-attachment methods. Likewise, the Korean application's disclosure of scheduling grants in general did not (and could not) show possession of the specific absolute grants later defined; simply put, they did not exist

yet.  Appx1068-1070 (¶¶ 70-74).  Accordingly, the Korean application provides no "guides or 'blaze marks'" to show the later-claimed E-AGCH.  *Ariad*, 598 F.3d at 1348.

Finally, even if the Board's analysis were legally erroneous, any error is harmless because the Board had substantial evidence to support its factual finding that disclosing scheduling grants in general does not disclose absolute grants, as described above.

### C.    The Court Should Remand If It Reverses the Board's Claim Construction for E-AGCH

If the Court adopts 3G Licensing's proposed construction—either the abandoned construction presented on appeal or the ignored construction on which its expert never opined—then remand is warranted to allow the Board to consider Appellee's Chen-based unpatentability grounds in the first instance.  Chen pre-dates the Korean application, and there is no dispute that it is prior art to the '625 patent.  3G Licensing baldly claims that Appellees admitted Chen does not disclose an E-AGCH under 3G Licensing's construction.  BB41.  That is wrong.  What 3G Licensing cites as support is simply Appellees' argument that, to the extent that the Korean application discloses an E-AGCH, Chen's similar description of generic scheduling channels likewise discloses this purportedly re-defined, genericized version of an E-AGCH.  *See* Appx166, Appx168.  Thus, if the Court adopts 3G Licensing's

construction, the case must be remanded to the Board for further consideration of the Chen-based unpatentability grounds.

## CONCLUSION

The Board's decision finding all challenged claims unpatentable should be affirmed.

June 15, 2023                                                    Respectfully submitted,

                                                                */s/ Kourtney Mueller Merrill*
Tara L. Kurtis                                                  Kourtney Mueller Merrill
PERKINS COIE LLP                                                Amanda Tessar
110 N. Wacker Drive, Suite 3400                                 PERKINS COIE LLP
Chicago, IL 60606                                              1900 Sixteenth St., Suite 1400
Phone: (312) 324–8607                                          Denver, Colorado
E-mail: tkurtis@perkinscoie.com                                Phone: (303) 291–2388
                                                               E-mail: kmerrill@perkinscoie.com
                                                                        atessar@perkinscoie.com

**COUNSEL FOR APPELLEE SIERRA WIRELESS, INC.**

Brian P. Bozzo
K&L GATES LLP
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500
brian.bozzo@klgates.com

/s/ *Benjamin E. Weed*
Benjamin E. Weed
Gina A. Johnson
K&L GATES LLP
70 W. Madison Street, Suite 3300
Chicago, IL 60602
(312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

**COUNSEL FOR APPELLEE HONEYWELL INTERNATIONAL INC.**

Bradford F. Cangro
PV LAW LLP
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 869-4667
bradford.cangro@pvuslaw.com

/s/ *Jeremy D. Peterson*
Jeremy D. Peterson
PV LAW LLP
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 871-0140
jeremy.peterson@pvuslaw.com

**COUNSEL FOR APPELLEES TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC.**

Kyle Auteri
PEARL COHEN ZEDEK LATZER
BARATZ LLP
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0824
kauteri@pearlcohen.com

/s/ *Guy Yonay*
Guy Yonay
PEARL COHEN ZEDEK LATZER
BARATZ LLP
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0800
gyonay@pearlcohen.com

**COUNSEL FOR APPELLEE TELIT CINTERION DEUTSCHLAND GMBH, F/D/B/A THALES DIS AIS DEUTSCHLAND GMBH**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(b).  Excluding the portions exempted by rule, the brief contains 13,538 words as counted by the word-processing software used to prepare it.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Times New Roman type.

Dated:  June 15, 2023                    */s/ Kourtney Mueller Merrill*
                                          Kourtney Mueller Merrill

## CERTIFICATE OF AUTHORITY

I certify under penalty of perjury under the laws of the United States that I have the authority of Benjamin E. Weed, Jeremy D. Peterson, and Guy Yonay to file this document with their electronic signatures.

Dated:  June 15, 2023                    */s/ Kourtney Mueller Merrill*
                                          Kourtney Mueller Merrill