No. 2023-1137

# United States Court of Appeals for the Federal Circuit

3G LICENSING, S.A.,
*Appellant,*

v.

HONEYWELL INTERNATIONAL, INC, SIERRA WIRELESS, INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC., THALES DIS AIS DEUTSCHLAND GMBH,
*Appellee.*

On Appeal from the USPTO Patent Trial and Appeal Board
in *Inter Partes* Review No. IPR2021-00584

## APPELLANT 3G LICENSING, S.A.'S REPLY BRIEF

Timothy Devlin
tdevlin@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorney for Appellant*
*3G Licensing, S.A.*

July 21, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1137

**Short Case Caption** 3G Licensing, S.A. v. Honeywell International, Inc.

**Filing Party/Entity** 3G Licensing, S.A.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/21/2023

Signature: /s/ Timothy Devlin

Name: Timothy Devlin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| 3G Licensing, S.A. | | Sisvel International S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ........................................................................1

ARGUMENT ........................................................................2

I. 3G DOES NOT RELY ON AN ABANDONED CONSTRUCTION................2

II. THE BOARD'S CONSTRUCTION OF E-AGCH WAS IMPROPER .............3

A. The Board's Claim Construction Analysis Violates This Court's Precedent . ........................................................................3

B. Honeywell's Attempts to Justify the Board's Errors Fail .............................9

C. Honeywell Fails to Address 3G's Non-Waiver Argument .........................12

III. HONEYWELL IMPROPERLY IMPORTS LIMITATIONS FROM EXTRINSIC EVIDENCE IN DEFENSE OF THE BOARD'S OPINION.............14

IV. SUBSTANTIAL EVIDENCE FAILS TO SUPPORT THE BOARD'S FINDING THAT THE '625 PATENT CANNOT CLAIM PRIORITY TO THE KOREAN APPLICATION........................................................................19

A. The Board's Failure to Consider Mr. Lipoff's First, Unrebutted Declaration Demonstrates a Lack of Substantial Evidence ..................................................20

B. The Board's Analysis of Mr. Lipoff's Second Declaration Was Also Faulty ........................................................................24

V. THIS COURT NEED NOT REMAND IF IT REVERSES THE BOARD'S CLAIM CONSTRUCTION........................................................................27

VI. CONCLUSION ........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Properties Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013) .......... 7

*Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007) .......... 4, 5, 6

*Advanced Fiber Tech. (AFT) Trust v. J & L Fiber Servs., Inc.*,
674 F.3d 1365 (Fed. Cir. 2012) .......... 7

*Airbus S.A.S. v. Firepass Corp.*,
941 F.3d 1374 (Fed. Cir. 2019) .......... 23

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017) .......... 23

*Ancora Techs., Inc. v. Apple, Inc.*,
744 F.3d 732 (Fed. Cir. 2014). .......... 10, 11

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) .......... 25

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
320 F.3d 1139 (Fed. Cir. 2003) .......... 10

*Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F4th 1285 (Fed. Cir. 2021) .......... 4

*Halliburton Energy Servs. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) .......... 27

*Helmsderfer v. Bobrick Washroom Equip., Inc.*
527 F.3d, 1379 (Fed. Cir. 2008) .......... 4, 5, 11, 16

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) .......... passim

*In re Hogan*,
559 F.2d 595 (CCPA 1977) .......... 23

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) .......... 28

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) .......... 21

*In re Ziegler*,
992 F.2d 1197 (Fed. Cir. 1993) ....................20

*Intel Corp. v. VLSI Tech. LLC*,
858 F. App’x 349 (Fed. Cir. 2021) ....................21

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) ....................19

*Nystrom v. Trex Co.*,
424 F.3d 1136 (Fed. Cir. 2005) ....................4

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
448 F.3d 1309 (Fed. Cir. 2006) ....................6

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .................... passim

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
780 F. App’x 880 (Fed. Cir. 2019) ....................23

*Power Integrations, Inc. v. Fairchild Semiconductor Int’l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) ....................4, 7

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000) ....................25

*Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*,
66 F.4th 1373 (Fed. Cir. 2023) ....................28

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F4th 1285 (Fed. Cir. 2021) ....................5, 11

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ....................27

*Snow v. Lake Shore & Mich. S. Ry. Co.*,
121 U.S. 617 (1887) ....................5

*Starhome GmbH v. AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014) ....................12

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) ....................11

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ....................5, 11

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ....................4, 15

*United States v. Dunkel*,
927 F.2d 955 (7th Cir. 1991) .......... 27

*Vicor Corp. v. SynQor, Inc.*,
869 F.3d 1309 (Fed. Circ. 2017) .......... 14, 21, 22, 26

*Victronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .......... 5, 11, 15, 16

**Statutes**

35 U.S.C § 112 .......... 20

**Rules**

37 C.F.R. 42.23 .......... 13

## INTRODUCTION

The Board erred when invalidating claims 16-19, 21, 22, 39, 40, and 42. The Board improperly construed the term "E-AGCH" by *first* defining it based solely on extrinsic evidence and *then* searching the intrinsic record for redefinition. That approach to claim construction was rejected by this Court *en banc* in *Phillips*. And Honeywell can point to no contrary precedent of this Court to justify the Board's actions. Vacatur is warranted on that basis alone.

But several more errors follow this mistake. By improperly construing the key "E-AGCH" term, the Board's priority analysis was also infected with error and led the Board to improperly conclude that the '625 patent could not claim priority to its earliest filed parent application (key to the Board's invalidity finding based on prior art that post-dates the priority date of the '625 patent). Honeywell, again, advances only misplaced arguments based on misreadings of caselaw.

And the Board further erred by neglecting to consider the critical expert testimony provided by 3G on the Korean Application's disclosure of "absolute grants," which stood unrebutted in the record below by anything other than attorney argument. Indeed, as 3G explained in its principal brief (BB at 42-49), Mr. Lipoff's testimony was uncontroverted by the factual record, which supported the '625 patent's claim to its priority date. The Board's cursory and conclusory

dismissal of this critical evidence is not only procedural error under the APA, but also clear proof that the Board's findings lack substantial evidentiary support.

The Board's errors warrant reversal, or at least remand.

## ARGUMENT

### I. 3G DOES NOT RELY ON AN ABANDONED CONSTRUCTION

Honeywell incorrectly asserts that 3G is arguing a construction of E-AGCH abandoned before the Board. RB at 38-39. In its Preliminary Response to Honeywell's Petition for Institution of the IPR, 3G proposed to the Board an initial construction defining the term E-AGCH in-part as a channel "capable of assigning multiple identifiers to a single UE . . .." Appx10; Appx255-256. In its post-IPR institution Patent Owner's Response, 3G abandoned this construction because it introduced an unintended ambiguity: the implication that the channel itself could assign the multiple identifiers. *See* Appx10. In that Patent Owner's Response, 3G instead proposed *an alternative* construction that did *not* include this ambiguity: "a single common grant channel that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the channel, said channel supporting a single UE being assigned multiple identifiers." Appx483. This alternative construction is *identical* to the one 3G advances on appeal:

> E-AGCH means "a single common grant channel that transmits scheduling grants to a single user equipment, groups of user equipment, or all user equipment on the

> channel, said channel supporting a single UE being assigned multiple identifiers."

BB at 29. This also was the same construction put before the Board for its consideration. *See* Appx10. There are no shifting sands here.

## II. THE BOARD'S CONSTRUCTION OF E-AGCH WAS IMPROPER

Contrary to Honeywell's assertions, the Board's construction of the term E-AGCH is incorrect. *See, e.g.*, RB at 19. Indeed, the Board's entire claim construction analysis was not just factually inaccurate, but legally improper.

### A. The Board's Claim Construction Analysis Violates This Court's Precedent

This Court held *en banc* in *Phillips* that it is improper to construe a claim term by *first* looking to extrinsic evidence for a definition of that term generally in the field and *then* adopting that definition unless the intrinsic evidence demonstrates lexicographical intent to depart from the *extrinsic* definition. *See Phillips v. AWH Corp*., 415 F.3d 1303, 1320-21 (Fed. Cir. 2005) (rejecting this *Texas Digital* approach to claim construction).

For example, in *Trs. of Columbia Univ v. Symantec, Corp.*, this Court explained that "*Phillips* rejected" the precise approach the Board took here, "in which the specification should be consulted only *after* a determination is made, whether based on a dictionary, treatise, or other source, as to the ordinary meaning or meanings of the claim term in dispute." *Trs. of Columbia Univ. v. Symantec*

*Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (citing *Phillips*, 415 F.3d at 1320). As the Court explained, such a mistake is not a harmless one:

> As *Phillips* carefully explained, such an approach improperly restricts the role of the specification in claim construction [to determine] whether the presumption in favor of the dictionary definition of the claim term has been overcome by an explicit definition of the term different from its ordinary meaning, or whether the inventor has disavowed or disclaimed scope of coverage.

*Id.* at 1363. The Court has held the same repeatedly. *See, e.g.*, *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F4th 1285, 1287 (Fed. Cir. 2021); *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 812, n.1 (Fed. Cir. 2007) ("[O]ur *Phillips* decision . . . clarified that the *Texas Digital* approach was not appropriate."); *see also Helmsderfer v. Bobrick Washroom Equip., Inc.* 527 F.3d, 1379, 1382-83 (Fed. Cir. 2008) ("A court may look to extrinsic evidence so long as the extrinsic evidence does not contradict the meaning otherwise apparent from the intrinsic record.").

Indeed, as this Court explained shortly following *Phillips*, unless there is something in the intrinsic record to clearly show that an inventor intended something other than what is "revealed by the context of the intrinsic record," a broader or different dictionary definition cannot control. *Nystrom v. Trex Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005); *see Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1362 (Fed. Cir. 2013); *see also Snow v.*

*Lake Shore & Mich. S. Ry. Co.*, 121 U.S. 617, 629-30 (1887) (unless a patentee clearly demonstrates otherwise in the intrinsic record, a patent term cannot be read other than as used in the patent to afford a scope consistent with an extrinsic definition of a term commonly used differently in the field). This is why the Court has repeatedly held that courts need not even consult external sources if the intrinsic record alone is clear. *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from intrinsic evidence, there is no reason to resort to extrinsic evidence."); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015); *Helmsderfer v. Bobrick Washroom Equip., Inc.* 527 F.3d, 1379, 1382-83 (Fed. Cir. 2008); *see Victronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Of course, this Court's precedent does not hold that extrinsic evidence is irrelevant to claim construction. Extrinsic evidence can be consulted, but it is clearly improper when an extrinsic "definition [of a claim term] is adopted and then whittled down only if contradicted by the specification." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 809 n.2 (Fed. Cir. 2007); *see also Phillips*, 415 F.3d at 1318 (noting that "dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology" and thus "have been properly recognized as among the many tools

that can assist the court in determining the meaning of particular terminology to those of skill in the art of invention”).

And extrinsic sources can be a starting point, but the claim construction analysis must remain “centered around the intrinsic record consistent with *Phillips*.” *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316 (Fed. Cir. 2006).

But the Board did not engage in such a permissible analysis here. Rather, here, the Board began its analysis by looking at extrinsic evidence first, and only turned to the intrinsic evidence after it had determined the meaning of the term outside the context of the patent. Appx11. That does not retain the intrinsic record as the “center[]” of the inquiry—it flips the claim construction inquiry on its head, demanding the intrinsic record not reveal the meaning of a term through plain use but through clear and unmistakable disclaimer or lexicography.

Simply put, it is legal error to adopt a technical definition in the art from an extrinsic source as the starting point in a claim construction analysis as a presumptive definition and then search for lexicography in the intrinsic record. *See, e.g., Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 812, n.1 (Fed. Cir. 2007). As this Court has explained:

> Unless the inventor intended a term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, *it is improper to read the term to encompass a broader definition simply because it may be*

> *found in a dictionary, treatise, or other extrinsic source*. …[O]*ur inquiry here starts with the intrinsic record*, including the specification, and *not with a dictionary definition of the disputed term*.

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1362 (Fed. Cir. 2013) (internal citations omitted).[1] Or put another way, an extrinsic definition of a term generally in the field may be used by a court to orient itself, but the court must still analyze what definition is "ascertained by a reading of the patent documents," which controls first and above all else. *See, e.g., 3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321 (Fed. Cir. 2013) ("Courts may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents" when applying a proper claim construction methodology) (citing *Advanced Fiber Tech. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374-75 (Fed. Cir. 2012)). Thus, the meaning of the term in the context of the intrinsic record *always* controls and only it—not an extrinsic definition—is the only thing afforded a presumption of meaning that must be overcome.

The Board did not abide by this precedent in its decision here, and so its construction is erroneous. As explained in 3G's principal brief, when construing

[1] Unless otherwise noted, all emphasis in this brief is added.

the term Enhanced Absolute Grant Channel ("E-AGCH"), the Board turned *first* to the 3GPP references and determined that the term E-AGCH had a meaning generally in the field *independent of* the '625 patent at the time of its filing (i.e., *not* as of its claimed priority date). Appx11 (searching the extrinsic record for whether E-AGCH was a "term of art having an accepted meaning known to a POSITA"). Then, *after* adopting that definition as a baseline meaning of E-AGCH, the Board turned to the intrinsic record, but only in search of clear and unmistakable disclaimer or redefinition of that (prematurely and erroneously adopted) extrinsic meaning of the term. *See* Appx17-18 (reasoning that the E-AGCH of the '625 patent should be limited to pertaining to absolute grants because the extrinsic evidence suggested that is how a POSITA would understand the term according to the extrinsic evidence); *id.* ("Nowhere does the '625 patent clearly express an intent to redefine E-AGCH so as to [differ from the extrinsic evidence]."). The Board analysis thus begins with extrinsic evidence and ends with a determination that the patentees did not disclaim that definition or redefine its term. This was the very claim construction analysis proscribed as legal error by this Court *en banc* in *Phillips*. *See Phillips*, 415 F.3d at 1320-21. The Board's construction should therefore be reversed. *See* BB at 33-35.

### B. Honeywell's Attempts to Justify the Board's Errors Fail

Honeywell tries to salvage the Board's mistake by suggesting that the superseded *Texas Digital* line of cases is still somehow good law and allows reliance on extrinsic dictionary definitions in the narrow circumstances where the claim term in question is known in the field. *See* RB at 29-32. Not so. Honeywell's "known-term carveout" is not found in any of the Court's decisions. The Court left no room for such an interpretation in its *Phillips* decision, which warrants emphasis in whole on this point:

> [T]he Texas Digital approach limits the role of the specification in claim construction to serving as a check on the dictionary meaning of a claim term if the specification requires the court to conclude that fewer than all dictionary definitions apply, or if the specification contains a sufficiently specific alternative definition or withdrawal. Assigning such a limited role to the specification, and in particular requiring that any definition of claim language in the specification be express, is inconsistent with our ruling that the specification is 'the single best guide to the meaning of a disputed term,' and that the specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines them by implication.'" [. . .] Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Phillips*, 415 F.3d at 1320-21. *Phillips* makes no allowance for whether the term is already known in the field. *See id.* at 1320-21. Because the Board here turned first to how the term was understood in the field, rather than in the context of the patent, it engaged in precisely this kind of analysis, despite being proscribed in *Phillips*. *See* Appx17-18.

The cases Honeywell relies on to support its faulty assertion of a "known-term carveout" are inapposite. *See* RB at 29, 31-32 (citing *Boehringer*, *Ancora*, and *Starhome*).

For instance, *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, was decided in 2003—two years before *Phillips*—and is thus superseded by *Phillips*. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1139 (Fed. Cir. 2003).

And *Ancora* did not trample on the *en banc* Court's holding in *Phillips* and authorize ignoring the intrinsic evidence and starting with a dictionary/extrinsic definition of a term simply because the term was generally known in the field. *See Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 734-35 (Fed. Cir. 2014). The point was never challenged. Indeed, the issue in *Ancora* was whether the term "program" was limited to one specific type of program, to the exclusion of operating systems. *Id.* at 734-735. But critically, the parties in *Ancora* did *not* "meaningfully disagree[] about the ordinary meaning of the claim term[,]" which

the district court borrowed from an extrinsic source. *Id.* at 734. This Court then properly analyzed the lexicography issue by starting *with the claim language itself*, and then turning to the specification, and then to the prosecution history, as demanded by *Phillips*. *See id.* at 734-737. In contrast here, not only did 3G contest the extrinsic definition of E-AGCH relied on by the Board, but the Board's analysis was wholly tied to that extrinsic definition in the first instance with the only regard shown to the specification being whether it included a clear and unmistakable disclaimer or redefinition. *See* Appx11-18.

Honeywell's reliance on *Starhome* also falters. Were *Starhome* to stand for the proposition Honeywell asserts (i.e., start with an extrinsic dictionary definition and then search for lexicography in the intrinsic record), the case would directly (and improperly) conflict with *Phillips* and dozens of prior opinions of this Court (not to mention Supreme Court guidance). *See, e.g.*, *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-33 (2015) (noting that analysis begins first with the intrinsic record before resorting to the extrinsic record); *Phillips*, 415 F.3d at 1320-21; *Teva Pharms. USA Inc. v. Sandoz Inc.*, 789 F.3d, 1335, 1339 (Fed. Cir. 2015); *Victronics Corp.*, 90 F.3d at 1583; *see also Seabed Geosolutions*, 8 F.4th at 1287; *Helmsderfer*, 527 F.3d at 1382-83. *Starhome* should not be read to intend such conflict. Nor does it under a fair reading. As this Court explained, extrinsic definitions may be used for convenience if they do "not contradict any definition

found in or ascertained by a reading of the patent documents"—i.e., intrinsic record definition still controls, without a burden of proving lexicography. *See Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 854-55 (Fed. Cir. 2014). Here, the Board encountered such contradictions between the intrinsic and extrinsic definitions of E-AGCH, but simply ignored them to apply the extrinsic definition anyway. *See, e.g.*, Appx19 (finding that the '625 patent's E-AGCH must transmit solely absolute grants despite the lack of such a requirement in the specification because such a requirement is consistent *with the 3GPP definition*).

### C. Honeywell Fails to Address 3G's Non-Waiver Argument

In its principal brief, 3G detailed how the Board erred by improperly precluding 3G's argument below as untimely. BB at 36-39; Appx31. As 3G explained, Honeywell raised an argument that the 3GPP's version of an E-AGCH supported issuing scheduling assignments using three UE identifiers (individual, group, and universal) *for the first time* in its Reply—not in its Petition. BB at 37-38 (citing Appx600-601). Honeywell does not contest this point in its Response Brief. *See* RB at 33-37. 3G then rebutted Honeywell's belated argument in its Sur-Reply (Appx643) by demonstrating that the document contained no reference

to a UE being issued identifiers of any kind, much less three identifiers simultaneously.[2]

Contrary to the Board's conclusion, this rebuttal to Honeywell's late argument regarding whether the prior art supported multiple identifiers was proper under 37 C.F.R. 42.23(b). As 3G argued explained, 37 C.F.R. 42.23(b) states that a sur-reply may only respond to arguments raised in the corresponding reply and may not be accompanied by new evidence. BB at 38 (citing 37 C.F.R. 42.23(b)). Honeywell does not contest that 3G's rebuttal responded to an argument raised in the Reply. *See* RB at 33-37. Nor does Honeywell contest that that 3G provided any new evidence to support its assertion. *See id.* at 33-37.

Rather, Honeywell argues that the Board *did* address 3G's arguments and found them to be unsupported by the record. RB at 34. This does not support Honeywell, however, because the Board's alleged consideration of 3G's argument

---

[2] Honeywell asserts that 3G contradicted itself in its Patent Owner's Response and Sur-Reply below by stating that the 3GPP reference disclosed the use of two identifiers in the former and stating that they disclosed no identifiers whatsoever in the latter. RB at 35-36. Honeywell misrepresents the plain language of what 3G wrote in its Sur-Reply. The portion of Appx643 cited by Honeywell does not state that the 3GPP references do not disclose the use of any identifiers whatsoever—rather, that the portion of the Meeting45 reference *cited by Honeywell in its Reply* does not refer to identifiers whatsoever. Appx643 (excerpting a part of the Meeting45 reference quoted by Honeywell to demonstrate that the quoted portion contains no reference whatsoever to the use of identifiers). This attempt to read-in a contradiction where none exists echoes Honeywell's attempts to read-in limitations where none exist.

regarding multiple identifiers is tainted by the same *Texas Digital* analysis that merits reversal for the reasons laid out in section I(A) above. The Board's analysis on the subject turned on whether the patentee had expressed a clear intent to redefine the term E-AGCH to require three identifiers, instead of looking first to the definition of the term in the '625 patent and how it would be understood by a POSITA. Appx17. Because such analysis is improper under *Phillips*, the Board's analysis cannot address the substance of 3G's argument on its merits. *See Phillips*, 415 F.3d at 1320-21. 3G thus provided proper evidence rebutting Honeywell's assertion that the E-AGCH of the '625 patent functioned in the same manner as the 3GPP's E-AGCH, and the Board's failure to properly consider this evidence because of a faulty legal analysis requires at least remand. *See In re Cyclobenzaprine*, 676 F.3d at 107; *Vicor*, 869 F.3d at 1324.

## III. HONEYWELL IMPROPERLY IMPORTS LIMITATIONS FROM EXTRINSIC EVIDENCE IN DEFENSE OF THE BOARD'S OPINION

To support the Board's faulty opinion, Honeywell asserts that the '625 patent uses the term "E-AGCH" the same way as defined by 3GPP. RB at 39-52. This approach is the result of the improper *Texas Digital* analysis, but also fails because a plain reading of the intrinsic evidence reveals Honeywell's argument for what it is: an attempt to improperly impose limitations from an extrinsic source onto the '625 patent.

Honeywell asserts now, as it did in the IPR below, that the term "E-AGCH" as used in the '625 patent must pertain to a channel that solely handles absolute grants simply because the words "Absolute Grant" are in its channel name—irrespective of what the patent says. RB at 41. The Board concluded the same. Appx19. Yet, as discussed *supra*, this is not the law. The name of a term does not control; the meaning of the term in context of the specification does. *See, e.g., Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016); *Phillips*, 415 F.3d at 1315 (citing *Vitronics Corp.*, 90 F.3d at 1582).

Below, they made this same argument, asserting that the fact that the term E-AGCH contained the words "absolute grant," it must be limited solely to absolute grants: "[To assert that the name of a term is not determinative of its construction] is akin to saying that an organization called the Patent Trial and Appeal Board is not 'required' to adjudicate 'patents'; trademarks and copyrights are close enough." Appx598-599. This argument transparently seeks to ignore this Court's precedent and fails for that reason alone (*see Phillips*, 415 F.3d at 1315), but even on its face, the argument does not follow. If one were to try to determine what the Patent Trial and Appeal Board adjudicates, one would not rely on the name, but on the documents outlining its authority. Doing so, one would learn that the PTAB also reviews patent applications, not merely patents, and is not bound to pertain only to patents, despite the term "patent" appearing in its name. Similarly, the

National Ocean Service is not limited to oceanic bodies of water—it also services the Great Lakes, and defines and maintains the National Spatial Reference System which defines latitude, longitude, height, scale and orientation throughout the United States.

Here, the E-AGCH of the ’625 patent has the words “absolute grant” in its name, but, when read in context of the whole intrinsic record (as it must be) that name alone has no final bearing on whether the channel is limited to absolute grants alone in the patent. *Vitronics Corp.*, 90 F.3d at 1582 (“The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.”). This is rooted in the long-held understanding that an inventor may use terms differently than a name implies. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008); *Vitronics Corp.*, 90 F.3d at 1582. The ’625 patent simply has no requirement that its E-AGCH pertain solely to absolute grants (*see* Appx111 at claim 1; *see also id.* at 3:14-25); the Board effectively imported this nomenclature-based limitation into the claim from an extrinsic source—the 3GPP.

Honeywell also tries to buttress its arguments by pointing to how the ’625 patent contains an Enhanced *Relative* Grant Access Channel, which according to 3GPP’s definition of the term, should handle any *relative* grants, leaving none for the E-AGCH. RB at 43-44. According to Honeywell, this is somehow proof that

the E-AGCH of the ’625 patent must handle only absolute grants because its use of “relative” distinguishes from the E-AGCH’s use of “absolute” grants. *Id.* But as discussed above, the plain language of the ’625 patent does not say that the term “Enhanced Absolute Grant Channel (E-AGCH)” is limited to that portion of the name that says “absolute grant.” Rather the ’625 patent states:

> An Enhanced Absolute Grant Channel (E-AGCH) is a downlink channel used by a base station (Node B) *to send a scheduling command* to an user equipment (UE). In other words, Node B transmits a command as to how much transmission power or a level of data rate transmission an UE is permitted to transmit. This is also known as uplink *scheduling assignment or scheduling assignment*. Under EAGCH, each frame of the downlink transmission from Node B of scheduling assignment includes UE identifier (UE ID) and scheduling content. The UE ID is used to identify the receiving UE of the scheduling assignment for an uplink packet transmission.

Appx110 at 1:14-25. Whatever the functionality of the Enhanced *Relative* Grant Access Channel, its existence has no bearing on the fact that the ’625 patent’s specification contains no restrictions on the kind of grants an E-AGCH may convey.[3] Moreover, by considering the Enhanced *Relative* Grant Access Channel first from the framework of an external reference, Honeywell once more engages in the improper *Texas Digital* approach rejected by *Phillips*.

---

[3] Notably, Honeywell has made no showing that the Enhanced Relative Grant Access Channel of the ’625 patent pertains *solely* to relative grants beyond the baseless assumption that it behaves as the 3GPP’s version of the same channel does. *See* RB at 43-44.

Honeywell further argues that the Board was correct to impute the 3GPP's use of multiple channels into the '625 patent's E-AGCH despite the lack of textual support. This is hardly surprising. The importation of such a limitation means that the 3GPP's E-AGCH as it becomes co-extensive with the '625 patent's E-AGCH definition upon the adoption of the Board's construction. As discussed in 3G's principal brief (BB at 29-30), the importation of this limitation directly contradicts the singular nature of the definition set forth by the patentee, which refers to a sole channel. *See* Appx486. Where Honeywell claims to have found intrinsic evidence to support its contention that the '625 patent's E-AGCH may consist of multiple channels, the citations it provides merely suggest circumstances wherein multiple E-AGCHs may work in concert. *See* RB at 48-49 (discussing disclosures in the '625 patent regarding scheduling assignments being transmitted "via scheduling assignment channels" and the "channels used to transmit scheduling assignments."). These citations are thus wholly irrelevant. The question here, and what matters, is whether each E-ACGH has within it multiple channels. Honeywell's (and the Board's) reliance on what multiple E-ACGH channels combined can do is irrelevant to that fundamental question of whether each such E-ACGH channel itself is made from multiple channels.

Nor is Honeywell's citation to *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000), helpful to its argument that the '625 patent's

specification indicates that the E-AGCH consists of multiple channels. That case stands for the unremarkable proposition that "an indefinite article "a" or "an" in patent parlance carries the meaning of "one or more" in open-ended *claims containing the transitional phrase* "*comprising*." *Id.* at 1356. The "an" term here in the patentee's relevant definition of E-ACGH does not appear in *an "open-ended" claim using the word* "*comprising*." It appears *in the written description* (Appx110 at 3:14-25), where a plain reading of that definition under precepts of English grammar tell a POSITA all they need to know—an, i.e., *one*, E-ACGH is "*a* download link" with very particular functionality, that does not itself consist of *multiple* channels. Honeywell provides no evidence that the term at issue differs from the intended singular meaning in the written description.

## IV. SUBSTANTIAL EVIDENCE FAILS TO SUPPORT THE BOARD'S FINDING THAT THE '625 PATENT CANNOT CLAIM PRIORITY TO THE KOREAN APPLICATION

As 3G established in its principal brief (BB at 42-49), the '625 patent properly claims priority to the Korean Application. The Board concluded otherwise based on two fundamental mistakes: (1) the improper claim construction discussed above; and (2) the Board's failure to consider evidence and arguments 3G properly presented. *See* BB at 42-49.

Honeywell attempts to support the Board's Final Written Decision on this point by asserting that the Korean Application does not mention an "E-AGCH."

But whether the Korean Application uses the words "E-AGCH" is irrelevant here. When it comes to determining whether a patent can claim priority, what is determinative is whether there is sufficient written description support for a POSITA to understand the innovation is disclosed in the foreign application. *See In re Ziegler*, 992 F.2d 1197, 1200-01 (Fed. Cir. 1993) (noting that the relevant analysis for determining whether a patent is entitled to the priority date of a foreign application is whether it has sufficient written description support in the foreign application to satisfy 35 U.S.C § 112). Thus, regardless of whether the words "E-AGCH" are used or not, the fact that the Korean Application discloses the same channel that the '625 patent calls an E-AGCH establishes that the patent can claim priority to the Korean Application.

### A. The Board's Failure to Consider Mr. Lipoff's First, Unrebutted Declaration Demonstrates a Lack of Substantial Evidence

As discussed in 3G's principal brief, 3G's expert, Mr. Lipoff provided a first declaration that in-part concerned the written description support for the E-AGCH of the '625 patent found in the Korean Application, and a second declaration that pertained wholly to that subject. BB at 43-44, 46. Even though the first declaration remained effectively unrebutted, the Board ignored the declaration, preferring to limit its consideration to Mr. Lipoff's second declaration, which expanded on the analysis, but did not wholly incorporate the findings of the first declaration. BB at 43. Failure to address all of this important evidence regarding

written description support was legal error which requires at least remand. *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d at 1077 (finding that permitting a factfinder to reach a conclusion of obviousness before considering all relevant evidence is contrary to the weight of Federal Circuit caselaw); *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1324 (Fed. Circ. 2017) (all evidence and arguments must be addressed); *Intel Corp. v. VLSI Tech. LLC*, 858 F. App'x 349, 354 (Fed. Cir. 2021) (same).

Honeywell supported the Board's non-consideration of the first declaration claiming 3G's arguments were forfeited under *In re NuVasive, Inc.* Specifically, Honeywell relies on *NuVasive* to assert that 3G's arguments concerning Mr. Lipoff's first declaration were forfeited because 3G did not raise them in its Patent Owner's Response in the IPR below. RB at 56.

But *NuVasive* is inapplicable here. The Court in *NuVasive* found that a patent owner forfeited an argument when it (1) failed to raise the argument in its Response, (2) failed to heed the warning in the Scheduling Order that failure to put an argument in its Response would waive the argument, *and* (3) expressly forfeited the argument during oral argument. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1380 (Fed. Cir. 2016). The three *NuVasive* conditions were not met here. Specifically, 3G did not expressly forfeit its argument during the oral hearing. *See generally*, Appx774-827. There is nothing in the opinion of *NuVasive* to suggest that an

argument can be waived *merely* for failing to raise it in a Patent Owner's Response as Honeywell contends. *See id.* at 1380. Nor has Honeywell provided any logical rationale or support to the contrary. 3G's arguments were not waived and needed to be evaluated by the Board. *See In re Cyclobenzaprine*, 676 F.3d at 107; *Vicor*, 869 F.3d at 1324.

Honeywell next argues that, even if the Board were required to consider Mr. Lipoff's first declaration about written description support in the Korean Application, that declaration *was* (somehow) given due weight when the Board purported to have considered "3G Licensing's arguments that the '625 patent's E-AGCH requires various features." RB at 57. But the Board never said there that it actually considered the critical arguments here. Nor did it so imply. Indeed, Honeywell fails to draw any connection from consideration of arguments regarding the definition of the '625 patent's E-AGCH to the sufficiency of the Korean Application's written support for the term.

Honeywell also argues that the Board's failure to fully consider the portion of Mr. Lipoff's first declaration pertaining to the Korean Application's written description support for the concept of an "absolute grant" was appropriate because Mr. Lipoff relied on TS25.309 which post-dates the Korean Application by four months. RB at 54. Yet Honeywell ignores the reason *why* Mr. Lipoff considered TS25.309. Mr. Lipoff provided factually unrebutted testimony that a POSITA

would understand the Korean Application's term "scheduling grants" discloses the concept of "absolute grants," found in the '625 patent. *See* Appx3240; Appx3317. As Mr. Lipoff writes in his second declaration, he was merely relying on TS25.309 as a gauge of what a POSITA would have known at the time of the invention. Appx3319-3320 at ¶ 26. Use of references in this way is proper. *See Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1376 (Fed. Cir. 2017) (citing *In re Hogan*, 559 F.2d 595 (CCPA 1977)).

And notably, this is the same rationale the Board accepted for using post-filing evidence when deciding that the term E-AGCH had a known meaning at the time of invention, despite the mandate of *Phillips*. *See* Appx14. Yet the Board refused to apply that same reasoning for Mr. Lipoff's use of the reference. The Board's capricious improper use of extrinsic evidence, especially when the evidence is unrebutted, is precisely the kind of legal error which demands remand. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1077 (Fed. Cir. 2012); *see also Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1382-1383 (Fed. Cir. 2019) (error to not consider cited evidence relevant to the validity inquiry); *Polygroup Ltd. MCO v. Willis Elec. Co.*, 780 F. App'x 880, 884 (Fed. Cir. 2019) (remanding when "[t]he Board failed to explain its decision to discount [certain] evidence concerning the knowledge and skill of a POSITA"). This is particularly relevant where, as here, Mr. Lipoff's first

declaration provides unrebutted testimony that a POSITA would have found that the concept of scheduling grants in the Korean Application adequately disclosed the absolute grants of the ’625 patent—wholly undermining the main attack on the ’625 patent’s priority date. *See* Appx260-265; Appx316-317; Appx485-489; Appx3237-3241 at ¶¶ 60-66.

### B. The Board’s Analysis of Mr. Lipoff’s Second Declaration Was Also Faulty

While the Board ignored the substance of Mr. Lipoff’s first declaration in its Final Written Decision, the Board seemed to focus exclusively on Mr. Lipoff’s *second* declaration which, in its entirety as opposed to in-part, pertained to written description support for the ’625 patent’s E-AGCH in the Korean Application. *See* Appx3317-3320 at ¶¶ 21-26. But even in considering this second declaration, the Board’s analysis was faulty. The Board rejected Mr. Lipoff’s conclusions—despite being opposed only by mere attorney argument—that there existed sufficient written description support in the concept of scheduling grants that a POSITA would have understood the disclosure of absolute grants. *See* Appx24-25; Appx608. Honeywell attempts to defend the Board by suggesting that, contrary to the weight of evidence and pursuant to *Purdue* and *Ariad*, the Korean Application makes an insufficient, generic disclosure regarding scheduling assignments, not absolute grants. RB at 59.

Honeywell's reliance on *Purdue* and *Ariad* is misplaced though. For example, Honeywell points to *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (*en banc*), for its proposition that a generic disclosure of a super-set cannot also disclose a subset where the subset contains "potentially infinite possibilities." RB at 58-59. But as 3G's expert confirmed, the superset of "scheduling grants" contains a subset of only *two* options—"absolute grants" and "relative grants." *See* Appx3240; Appx3317. This is far from "infinite possibilities." *Ariad*, 598 F.3d at 1348.

And in *Purdue*, the Court found that there was no evidence in the record that a POSITA would have been able to understand "flat" to relate to a specific concentration ratio to derive sufficient written support from a graph and a series of ratios that could be calculated based on disclosed data in a foreign application. *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1324-26 (Fed. Cir. 2000). But critically, the patent owner's expert in that case effectively admitted the point by providing contradictory expert testimony. *See id.* at 1324-25. Here, no such contradictory expert testimony exists. Mr. Lipoff provided testimony that only two kinds of scheduling grants existed at the time of the invention: absolute grants and relative grants. Appx3319; *see* Appx25. Mr. Lipoff then provided factually unrebutted testimony that a POSITA would understand the term scheduling grants would be understood by a POSITA to refer to absolute grants in the context of the

Korean Application. Appx3240; App3317. There is no contradiction there.

Indeed, Honeywell's only substantial rebuttal to Mr. Lipoff's testimony on this point is a statement that there are "seven types of common transport channels." *See* RB at 59-60. But this statement is wholly irrelevant. In determining whether a POSITA would view "scheduling grant" to disclose the concept of an "absolute grant," the fact that there are additional channels is a red herring—grants are data transmissions, not channels, and Honeywell provides no reason why a POSITA would ever confuse the two entirely separate concepts. *See* Appx109 at 1:45-46 (describing that a downlink channel is used to transmit a scheduling assignment).

Finally, there is little to Honeywell remaining argument that any error made was harmless because the Board nonetheless had substantial evidence to make its determinations regarding disclosures of scheduling grants and absolute grants. RB at 60. The fact that the Board ignored factually unrebutted testimony means that the Board did not have all, or even a substantial amount of evidence to come to its decision and committed procedural error under the APA. *See In re Cyclobenzaprine*, 676 F.3d at 1077 (finding that the Board had a duty to "consider all evidence of [invalidity] and [validity] before reaching a determination"); *Vicor*, 869 F.3d at 1324.

## V. THIS COURT NEED NOT REMAND IF IT REVERSES THE BOARD'S CLAIM CONSTRUCTION

Honeywell argues that the Court must remand if it reverses the Board's claim construction decision for E-AGCH and adopts 3G's definition. RB at 61-62. Honeywell takes this position because it claims that such an E-AGCH is disclosed under another prior art reference, Chen. *Id.* at 61-62. But, in its Petition, Honeywell never contended that Chen disclosed an E-AGCH under 3G's construction for the term. Nor did Honeywell present such argument on an alternative basis in its post-institution papers either. *See* Appx611-614.[4] The argument is thus forfeited and cannot be a basis for an alternative holding by the Board on remand. Indeed, it would be improper under the APA and this Court's precedent for the Board to "raise, address, and decide unpatentability on theories never presented by the petitioner and not supported by record evidence." *Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*, 66 F.4th 1373, 1376 (Fed. Cir.

[4] At most Honeywell complained that, if the Board found support in the Korean Application for E-AGCH when that Korean Application was supposedly silent on what Honeywell thought were essential disclosures, then the "same rule" certainly would mean that Chen's silence on the same purportedly essential disclosures would be enough to invalidate. Appx168. Such glib and skeletal contentions cannot preserve an issue or warrant remand. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006); *see also Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244 at n. 2 (Fed. Cir. 2008) ("A skeletal argument, really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

2023) (quoting *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016)). If the Court were to adopt 3G's construction for E-AGCH (as it should), then the Board's invalidity decision should be reversed, not remanded.

## VI. CONCLUSION

For the foregoing reasons and those presented in 3G's principal brief, the Court should reverse or vacate and remand the Board's Final Written Decision.

July 21, 2023

Respectfully submitted,

*/s/ Timothy Devlin*
Timothy Devlin
tdevlin@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorney for Appellant*
*3G Licensing, S.A.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared in a proportionally spaced typeface in 14-point font and includes 6,630 words, excluding the parts exempted under those Rules.

*/s/ Timothy Devlin*
Timothy Devlin

*Attorney for Appellant*
*3G Licensing, S.A.*